UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

STATE OF TENNESSEE ex rel. HERBERT H.
SLATERY III, in his official capacity as the
Attorney General and Reporter of Tennessee and
ROBERT J. MARTINEAU, JR., Commissioner of
the Tennessee Department of Environment and
Conservation,

      Plaintiffs,

   and              No. _____

TENNESSEE CLEAN WATER NETWORK and
TENNESSEE SCENIC RIVERS ASSOCIATION,

      Plaintiff-Intervenors,

   v.

TENNESSEE VALLEY AUTHORITY,

      Defendant.

---

**INDEXED COMPILATION OF STATE COURT PROCESS, PLEADINGS,
AND ORDERS SUBMITTED PURSUANT TO 28 U.S.C. § 1446(a)
(ATTACHMENT 1 TO NOTICE OF REMOVAL)**

---

James S. Chase (BPR 020578)
Associate General Counsel
David D. Ayliffe (BPR 024297)
Frances Regina Koho (BPR 029261)
Lane E. McCarty (BPR 028340)
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

Exhibit 1     Verified Complaint (Jan. 7, 2015)

Exhibit 2     Signed Waiver of Service (Jan. 12, 2015)

Exhibit 3     Order of Recusal (Feb. 9, 2015)

Exhibit 4     Order of Transfer (Feb. 20, 2015)

Exhibit 5     Agreed Order Granting the Tennessee Scenic Rivers Association and the Tennessee Clean Water Network's Motion to Intervene as a Matter of Right (Feb. 25, 2015)

Exhibit 6     Complaint in Intervention (Feb. 27, 2015)

Exhibit 7     TVA's Answer to Complaint (Mar. 6, 2015)

Exhibit 8     Order Granting Motion for Pro Hac Vice Admission of Attorney Frank S. Holleman, III (Mar. 16, 2015)

Exhibit 9     TVA's Answer to Complaint in Intervention (Mar. 26, 2015)

Exhibit 10     Order setting Hearing on Intervenors Motion in Opposition to the Agreed Injunctive Order (Dec. 29, 2015)

Exhibit 11     Agreed Temporary Injunction between the State of Tennessee and Tennessee Valley Authority (Jan. 21, 2016)

Exhibit 12     Order on Intervenors' Motion in Opposition to the State of Tennessee TVA's Agreed Injunctive Order (Jan. 26, 2016)

Exhibit 13     Agreed Scheduling Order (Apr. 15, 2016)

Exhibit 14     Order Denying Intervenors' Motion for Relief (Jun. 17, 2016)

Exhibit 15     Order Designating Honorable Robert E. Lee Davies to assist Chancellor Russell T. Perkins (Jun. 29, 2016)

Exhibit 16     Order to Obtain a Trial Date (Jul. 11, 2016)

Exhibit 17     Amended Agreed Scheduling Order (Jul. 29, 2016)

Exhibit 18     Second Amended Agreed Scheduling Order (Nov. 23, 2016)

Exhibit 19     Order Setting Hearing on Plaintiff-Intervenors' Motion to Compel (Jan. 4, 2017)

Exhibit 20     Order Setting Status Conference for April 6, 2017 (Jan. 23, 2017)

Exhibit 21    Agreed Order on Plaintiffs' Motion for Expedited Hearing (Mar. 27, 2017)

Exhibit 22    Order on Plaintiffs' Motion to Reset Hearings on TVA's Motion to Bifurcate Liability and Remedy Portions of Trial and TVA's Motion to Condition Plaintiff-Intervenors' Participation in Depositions and at Trial (Apr. 4, 2017)

Exhibit 23    Agreed Order Re-setting Hearing (Apr. 17, 2017)

Exhibit 24    Third Amended Agreed Scheduling Order (Apr. 21, 2017)

Exhibit 25    Order on Status Conference (Apr. 21, 2017)

Exhibit 26    Order Denying TVA's Motions to Bifurcate (May 15, 2017)

Exhibit 27    Memorandum and Order on TVA's Motion for Summary Judgment on Plaintiffs' Verified Complaint and on TVA's Contingent Motion for Judgment on the Pleadings as to the Complaint in Intervention (Jun. 16, 2017)

Exhibit 28    Plaintiffs' Motion to Amend Verified Complaint (Jul. 13, 2017)

Exhibit 29    Plaintiffs' Memorandum in Support of Plaintiffs' Motion to Amend Verified Complaint (Jul. 13, 2017)

Exhibit 30    Order Granting Motion for Leave to Withdraw Delta Anne Davis as Counsel for Plaintiff-Intervenors (Jul. 14, 2017)

Exhibit 31    Order on Plaintiffs' Motion to Amend Complaint (Jul. 25, 2017)

Exhibit 32    Order on TVA's Motion for Leave to File Amended Answers and Plaintiffs' Motion to Supplement Pleadings or Amend Verified Complaint (Aug. 2, 2017)

Exhibit 33    Plaintiffs' Email transmitting Amended Verified Complaint (Aug. 2, 2017)

Exhibit 34    Amended Verified Complaint (Aug. 2, 2017)

Exhibit 35    TVA's Amended Answer to Complaint in Intervention (Aug. 2, 2017)

# EXHIBIT 1

COPY

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. _15-23-II_ |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant. | ) | |

---

### VERIFIED COMPLAINT

---

This is an original enforcement action under the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder, against defendant Tennessee Valley Authority (TVA) for injunctive relief and the assessment of civil penalties. The plaintiffs seek from this Court: (1) a permanent injunction establishing a schedule for the defendant's compliance with the SWDA, the TWQCA, and the rules and regulations thereunder and (2) an order and judgment from this Court assessing civil penalties against the defendant for violations of the SWDA and the TWQCA in accordance with Tenn. Code Ann. § 68-211-117 and § 69-3-115, respectively.

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 5 of 332 PageID #: 11

On November 10, 2014, the Southern Environmental Law Center (SELC), a non-profit public interest law firm, on behalf of its clients the Tennessee Clean Water Network (TCWN), a citizens' group based in Knoxville, Tennessee, and the Tennessee Scenic Rivers Association, a citizens' group based in Nashville, Tennessee, (collectively the Citizens' Groups) issued a 60-day Notice of Violation letter to TVA under the citizen suits provision of the Federal Water Pollution Control Act, also known as the Clean Water Act (CWA), 33 U.S.C. § 1365, alleging multiple violations of the statutory provisions. See 33 U.S.C. §§ 1251-1387. Under 33 U.S.C. § 1365(b), a citizen suit may not be commenced prior to 60 days after the Citizens' Groups have given notice to the U.S. Environmental Protection Agency (EPA), the State, and the alleged violator. The notice letter is intended to apprise the government of the alleged violations so that the government may take enforcement action, if appropriate. This original enforcement lawsuit serves as the State's commencement of an action in response to the Citizens' Groups' 60-day Notice of Violation letter.

## JURISIDICTION AND VENUE

1.     This Court has jurisdiction over this action in accordance with the provisions of Tenn. Code Ann. §§ 68-211-115, -117 and §§ 69-3-115, -117, respectively.

2.     In accordance with Tenn. Code Ann. §§ 68-211-115, -117(b)(5) and §§ 69-3-115(a)(2)(D), -117, venue in this action is proper in the Chancery Court of Davidson County.

## PARTIES

3.     This action is brought in the name of the State of Tennessee by plaintiff, Herbert H. Slatery III, in his official capacity as Attorney General and Reporter for the State of Tennessee. The Attorney General is the chief law enforcement officer of the State of Tennessee

2

and of all its departments, commissions, and agencies. Tenn. Code Ann. §§ 8-6-109 and 8-6-301. The Attorney General also has authority over litigation involving the public interest. The Attorney General's official residence is in Nashville, Davidson County, Tennessee.

4. This action is also brought in the name of plaintiff, Robert J. Martineau, Jr., in his official capacity as Commissioner of the Tennessee Department of Environment and Conservation (TDEC). The Commissioner is charged with implementing the provisions of the SWDA under Tenn. Code Ann. §§ 68-211-101 et seq. The TDEC Commissioner is charged by Tenn. Code Ann. §§ 68-211-107, -115, -117 with the duty and responsibility to exercise general supervision and enforcement of the SWDA and to bring suit for any violations thereunder. The Commissioner is charged with implementing the provisions of the TWQCA under Tenn. Code Ann. §§ 69-3-101 et seq. The TDEC Commissioner is charged by Tenn. Code Ann. § 69-3-107 with the duty and responsibility to exercise general supervision and enforcement of the TWQCA and to bring suit for any violations thereunder. The Affidavit and Verification of Christopher S. Moran, TDEC's Civil Enforcement Coordinator, is attached hereto and incorporated by reference herein as Exhibit 1. The Commissioner's official residence is in Nashville, Davidson County, Tennessee.

5. Upon information and belief, defendant Tennessee Valley Authority (TVA) is a corporate agency and instrumentality of the United States created by the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C. §§ 831-831ee (the TVA Act), with its headquarters in Knoxville, Tennessee. TVA operates a facility located at 1499 Steam Plant Road, Gallatin, Sumner County, Tennessee 37066, known as the TVA Gallatin Fossil Plant (GAF). The GAF is an active coal-fired power plant located on the north bank of the Cumberland River, approximately 4.5 miles south-southeast of Gallatin, Tennessee. During all

3

times subject to the provisions of applicable Tennessee statutes and regulations, TVA was a "person" as defined by Tenn. Code Ann. § 68-211-103(6) and § 69-3-103(20). Service of process may be made on TVA through William D. Johnson, Chief Operating Officer, 400 West Summit Hill Drive, Knoxville, Tennessee 37902.

## TENNESSEE SOLID WASTE DISPOSAL ACT

6. The SWDA represents a comprehensive program designed to regulate solid waste disposal in an effort to protect the public health, safety, and welfare, prevent the creation of nuisances, conserve the State's natural resources, and enhance the quality of the State's environment. A stated purpose of the SWDA is to "provide a coordinated statewide program of control of solid waste processing and disposal in cooperation with federal, state, and local agencies responsible for the prevention, control, or abatement of air, water, and land pollution." Tenn. Code Ann. § 68-211-102.

7. In accordance with Tenn. Code Ann. § 68-211-107, TDEC and TDEC's Commissioner are authorized to exercise general supervision over the operation and maintenance of solid waste processing and disposal facilities or sites.

8. The Commissioner is also empowered to undertake inspections and investigations of such facilities, operations, and sites necessary to enforce the provisions of the SWDA. Tenn. Code Ann. § 68-211-107(a).

9. It is a violation of the SWDA to place or deposit any solid waste into the waters of the state except in a manner approved by TDEC or the Tennessee Board of Water Quality, Oil and Gas. Tenn. Code Ann. § 68-211-104(1).

4

10.     It is a violation of the SWDA to construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the Commissioner. Tenn. Code Ann. § 68-211-104(3).

11.     The Commissioner may seek injunctive relief in the courts through the Office of the Attorney General to enforce compliance with the SWDA. Tenn. Code Ann. § 68-211-115. Additionally, the Commissioner may institute proceedings in court for the assessment of civil penalties of up to seven thousand dollars ($7,000.00) per day for each day of violation against persons violating the SWDA or the regulations promulgated thereunder. Tenn. Code Ann. § 68-211-117.

## TENNESSEE WATER QUALITY CONTROL ACT

12.     The CWA, as amended, 33 U.S.C. §§ 1251-1387, requires all entities who discharge into the navigable waters of the United States to obtain a National Pollutant Discharge Elimination System (NPDES) permit from EPA in accordance with standards set by the Administrator of that agency. 33 U.S.C. § 1342(a). The Administrator may, however, authorize a state to issue NPDES permits in her stead if the state permitting program is at least equal to that under the CWA. 33 U.S.C. § 1342(b).   TDEC has been authorized by EPA to issue NPDES permits in the State of Tennessee. TDEC does so under the TWQCA.

13.     The TWQCA represents a comprehensive program for the protection and preservation of the waters of the state and for the regulation of activities affecting discharges into, and/or alterations of, the waters of the state. The TWQCA defines these "waters" to encompass both surface water and groundwater "except those bodies of water confined to and

5

retained within the limits of private property, in single ownership that do not combine or effect a junction with natural surface or underground waters." Tenn. Code Ann. § 69-3-103(44). The General Assembly has declared that the waters of Tennessee are the property of the state and are held in public trust for the use of the people. Tenn. Code Ann. § 69-3-102(a). The TWQCA further provides that the State, in its exercise of the public trust, has a duty to take necessary steps to preserve and protect the public's right to enjoyment of unpolluted waters. In accordance with Tenn. Code Ann. § 69-3-107, the TDEC Commissioner is authorized to exercise general supervision and control over the quality of all state waters as well as administer and enforce all laws and regulations relating to the pollution of waters.

14.     The Commissioner is empowered to issue permits authorizing discharges that contain the most stringent effluent limitations, conditions, and water quality standards as necessary to comply with state and federal laws and regulations. Tenn. Code Ann. § 69-3-108. The Commissioner is also empowered to undertake inspections and investigations as necessary to enforce the provisions of the TWQCA. Tenn. Code Ann. § 69-3-107(5).

15.     It is a violation of the TWQCA for any person to discharge any substance into the waters of the state unless such action has been properly authorized, or to cause a substance to be placed in a location where such substance, either by itself or in combination with other substances, causes pollution as defined under the TWQCA. Tenn. Code Ann. § 69-3-114(a).

16.     It is a violation of the TWQCA for any person to alter the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state except in accordance with the conditions of a valid permit. Tenn. Code Ann. §§ 69-3-108(b)(1) and -114(b).

6

17. It is a violation of the TWQCA for any person to violate the terms or conditions of a permit issued under the TWQCA. Tenn. Code Ann. §§ 69-3-108(b)(1) and -114(b).

18. The Commissioner may seek injunctive relief in the courts through the Office of the Attorney General to enforce compliance with the TWQCA. Tenn. Code Ann. § 69-3-117. Additionally, the Commissioner may institute proceedings in court for the assessment of civil penalties of up to ten thousand dollars ($10,000.00) per day for each day of violation against persons violating the TWQCA or the regulations promulgated thereunder. Tenn. Code Ann. § 69-3-115.

## FACTS

### NON-REGISTERED SITE #83-1324

19. The GAF came online in 1959, prior to the enactment of either the SWDA, enacted in 1961, or the TWQCA, enacted in 1977. From 1959 to 1970, coal combustion byproducts generated through operation of the GAF were sluiced and treated in a series of unlined ash ponds located on the western edge of the site. These ponds reached capacity in 1970 and were closed to use. This former ash management area is now known as Non-Registered Site #83-1324 (the NRS).

20. In 1997, TVA developed a closure plan for the NRS that included provisions to carry out groundwater monitoring around the site. TDEC approved the installation of three groundwater monitoring wells in 2000. The groundwater at the NRS is classified as a waters of the state.

21.    In September of 2008, groundwater samples collected from a monitoring well contained concentrations of constituents, including beryllium, cadmium, and nickel, detected at levels above TDEC's maximum containment levels (MCLs) for groundwater protection standards.

22.    These exceedances triggered a requirement for additional groundwater monitoring at the NRS to determine if coal combustion byproducts were currently or could in the future impact all groundwater at the GAF or pose a threat to public or private water supplies near the NRS.  In February of 2009, TDEC gave TVA notice that the NRS was being placed in an assessment monitoring program pursuant to Tenn. Comp. R. & Regs. 0400-11-01-.04.

23.    As part of the assessment, TDEC required TVA to develop a Groundwater Quality Assessment Plan, which was approved by TDEC in April of 2011.

24.    In September and October of 2011, TVA installed additional groundwater monitoring wells and performed other sampling to gather data associated with the NRS, the GAF as a whole, and the Cumberland River.

25.    TVA submitted its Groundwater Monitoring Assessment Monitoring Project Summary and Risk Assessment Report (the Report) to TDEC on November 25, 2014.  The Report confirmed exceedances of various primary and secondary MCLs related to coal ash byproduct in the area's groundwater.

## NPDES PERMIT NO. TN0005428

26.    After the NRS reached capacity in 1970, TVA began treating its coal combustion byproduct using a series of unlined settling and stilling ponds.  This pond complex is located

8

north-northeast of the NRS along the Cumberland River and is comprised of Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D (the Ash Pond Complex).

27. Bottom Ash Pond A covers approximately 248 acres with earthen dikes of 20 to 25 feet. Bottom Ash Pond A discharges through buried pipes into Stilling Pond B, which discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

28. Fly Ash Pond E covers approximately 167 acres with earthen dikes of 25 to 30 feet. Fly Ash Pond E discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

29. The Cumberland River and its tributaries are waters of the state. The Cumberland River is classified for domestic water supply, industrial water supply, fish and aquatic life, recreational use, livestock watering and wildlife, and irrigation. Tenn. Comp. R. and Regs. 0400-40-04-.12. Tenn. Comp. R. & Regs. 0400-40-03-.02(5) provides that since all waters of the state are classified for more than one use, the most stringent criteria [for the respective classified use] will be applicable.

30. On June 26, 2012, TDEC's Division of Water Resources (the Division) issued NPDES Permit No. TN0005428 (the NPDES Permit) to TVA authorizing it to discharge effluent from the GAF under prescribed limitations to the Cumberland River through several outfalls. The permit authorizes TVA to discharge treated effluent including, but not limited to, discharge ash transport water, chemical and nonchemical metal cleaning wastes, water treatment plant wastes, combustion turbine oil/water separator effluent demineralizer off-spec water and filter

9

backwash, miscellaneous equipment cooling water, ash sluice water leakage, coal pile and coal barge runoff, and storm water runoff through Outfall 001 to the Cumberland River, located at mile 240.5. Outfall 001 is the only authorized discharge point for treated wastewater from the Ash Pond Complex to the Cumberland River. TVA's permit is currently scheduled to expire on May 31, 2017.

31. The NPDES Permit imposes daily maximum and monthly average limits on effluent characteristics, including, but not limited to: metals and coal ash byproduct constituents, flow, pH, oil and grease, and total suspended solids (TSS). The NPDES Permit requires TVA to submit weekly and/or monthly discharge monitoring reports (DMRs) to provide monitoring results for the effluent characteristics to the Division.

32. Any discharges from the GAF other than those specifically identified in the NPDES Permit and in the manner identified in the NPDES permit would result in a violation of the TWQCA and, in some cases, the NPDES Permit.

33. As it does for the NRS, TVA maintains groundwater monitoring wells around the Ash Pond Complex. The wells gather data on potential groundwater contamination resulting from the entrance of constituents related to the treatment of coal combustion byproduct from the Ash Pond Complex into the area's groundwater.

34. The geologic formation under and around the Ash Pond Complex is similarly, if not potentially more, porous than the geologic formation under and around the NRS, which, as detailed in ¶¶ 21-25, has had reported exceedances of MCLs for the area's groundwater.

10

35.     In addition to groundwater monitoring, TVA, as a condition of the NPDES Permit, conducts inspections of the Ash Pond Complex for structural defects. Areas in the dikes where impounded wastewater may or is escaping from the Ash Pond Complex are generally referred to as "seeps."

36.     The NPDES Permit requires TVA to conduct a daily inspection of the impoundments, maintain records of the impoundment inspections, take immediate corrective action once a potential compromise is discovered, and report within 24 hours the discovery of a change that indicates a potential compromise to the structural integrity of a dike or the impoundment.

37.     TVA has reported to TDEC at least 10 seeps it is monitoring related to the Ash Pond Complex, each constituting a potential unpermitted discharge from the impoundment ponds.

## CAUSES OF ACTION

## NRS VIOLATIONS

38.     In accordance with the provisions of Tenn. Code Ann. § 68-211-104(1), it is unlawful to "place or deposit any solid waste into the waters of the state except in a manner approved by [TDEC]."

39.     "Solid waste" is defined in the SWDA as "*spent material, byproducts, . . . ash, sludge, and all discarded material including solid, liquid, [or] semisolid . . . material resulting from industrial, commercial, and agricultural operations.*" Tenn. Code Ann § 68-211-103(8) (emphasis added).

11

40.     Based on TVA's submitted groundwater monitoring reports, and upon current information and belief, solid waste has been repeatedly discharged from the NRS into the groundwater in and around the GAF, as detailed in ¶¶ 19-25 above, in violation of the SWDA and its implementing rules and regulations.

41.     Additionally, pursuant to Tenn. Code Ann. § 68-211-104(3), it is unlawful to "construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the [C]ommissioner."

42.     "Solid waste disposal" is defined in the SWDA as "*the process of permanently or indefinitely placing, confining, compacting, or covering solid waste*." Tenn. Code Ann § 68-211-103(9) (emphasis added).

43.     The NRS meets the definition of a solid waste disposal site and based on TVA's submitted groundwater monitoring reports and upon current information and belief, solid waste has been repeatedly discharged from the NRS into the groundwater in and around the GAF, as detailed in ¶¶ 19-25 above, in violation of the provisions of the SWDA and its implementing rules and regulations.

44.     In accordance with Tenn. Code Ann. § 68-211-115, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the SWDA and the rules and regulations thereunder.

45.     In accordance with Tenn. Code Ann. § 68-211-117(a)(1), this Court may impose a civil penalty of up to $7,000 per day for each day any person violates the SWDA by failing to comply with the provisions of the SWDA and its implementing rules and regulations.

12

Additionally, pursuant to Tenn. Code Ann. § 68-211-117(2), each day such a violation continues is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $7,000.00 per day for each day of such violation.

46.     Pursuant to Tenn. Code Ann. §69-3-114(a):

> it is unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in § 69-3-103, . . . unless such action has been properly authorized.

47.     Pursuant to Tenn. Code Ann. § 69-3-114(b), it is unlawful for any person to act in a manner or degree that is violative of the TWQCA, or any rule, regulation, or standard of water quality promulgated thereunder.

48.     Based on TVA's submitted groundwater monitoring reports and upon current information and belief, as detailed in ¶¶ 19-25 above, TVA has violated the provisions of the TWQCA and its implementing rules and regulations.

49.     In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the TWQCA and the regulations thereunder.

50.     In accordance with Tenn. Code Ann. §§ 69-3-115(a)(1)(A) and (B) and § 69-3-115(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition. Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation

13

occurs is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## ASH POND COMPLEX VIOLATIONS

51.     As detailed in paragraphs ¶¶ 26-37, through reported unpermitted discharges throughout the GAF's Ash Pond Complex and based on current information and belief, TVA has violated § 69-3-114(a) and § 69-3-114(b), as set out in ¶¶ 46-47 above.

52.     Additionally, as a result of the unpermitted discharges, TVA has violated Part II.A.4.a., titled Proper Operation and Maintenance, of the NPDES Permit issued pursuant to Tenn. Code Ann. § 69-3-108, which requires that: "[t]he permittee shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit."

53.     Based upon current information and belief, TVA has also violated Part II.C.1. of the NPDES Permit, which requires that all discharges be consistent with the terms and conditions of the permit.

54.     In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the TWQCA, the regulations thereunder, and the conditions of all NPDES permits issued to TVA pursuant to Tenn. Code Ann. § 69-3-108.

55.     In accordance with Tenn. Code Ann. §§ 69-3-115(a)(1)(A) and (B) and § 69-3-115(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any

14

person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition. Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation occurs is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request the following relief:

A.     That this complaint be filed without cost bond, as provided by Tenn. Code Ann. § 20-13-101, and that process issue and be served upon the defendant requiring it to appear and answer this Complaint;

B.     That upon a trial or final hearing in this matter, the Court issue a permanent injunction against the defendant, in accordance with Tenn. Code Ann. § 68-211-115, § 69-3-117, and, as applicable, Tenn. R. Civ. P. 65, requiring TVA and its successors, assigns, officers, agents, servants, attorneys, and any other person or entity in active concert or participation with TVA, to comply with, and enjoining it from further violations of, the provisions of the SWDA, the TWQCA, and the rules promulgated thereunder, as well as the current and any future NPDES permit issued to TVA in the State of Tennessee. This request for extraordinary relief is plaintiffs' first application for such process;

C.     That upon a trial or final hearing in this matter, the Court enter judgment for the plaintiffs against the defendant and assess civil penalties in an amount not to exceed $7,000.00 per day for each violation, in accordance with Tenn. Code Ann. § 68-211-117, against the defendant for violations of the SWDA and the regulations promulgated thereunder;

15

D. That upon a trial or final hearing in this matter, the Court enter judgment for the plaintiffs against the defendant and assess civil penalties in an amount not to exceed $10,000.00 per day for each violation, in accordance with Tenn. Code Ann. § 69-3-115, against the defendant for violations of the TWQCA and the regulations promulgated thereunder;

E. That this Court assess post-judgment interest against the defendant in accordance with Tenn. Code Ann. §§ 47-14-121 and 47-14-122 until the judgment against the defendant is paid in full, for which execution may issue if necessary;

F. That all costs in this cause be taxed to the defendant; and

G. That the Court award the plaintiffs such other general and equitable relief as the Court deems appropriate.

Respectfully submitted,

HERBERT H. SLATERY III, BPR No. 009077
Attorney General and Reporter
State of Tennessee

EMILY B. MANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

16

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
                                                      )
                           Plaintiffs, )
                                                       )
v. )      No. _____
                                                       )
TENNESSEE VALLEY AUTHORITY, )
                                                       )
                       Defendant. )

## VERIFICATION OF COMPLAINT

STATE OF TENNESSEE  )
                         )
COUNTY OF DAVIDSON  )

     I, Christopher S. Moran, being duly sworn, do hereby depose and, upon personal knowledge, state as follows:

     1.     I am employed with the Tennessee Department of Environment and Conservation (TDEC) as the Department's Civil Enforcement Coordinator. I have been employed with TDEC since 1994 and have acted as the Civil Enforcement Coordinator since 2006.

     2.     As part of my job responsibilities, I provide technical support to the enforcement sections within TDEC, develop uniform policy and guidance on enforcement related matters, review draft administrative orders, including penalty calculations, and serve as the custodian of records for department enforcement matters.

1

EXHIBIT
1
tabbies

3.     I am familiar with the facts giving rise to this lawsuit.  I have read the allegations contained in the foregoing complaint and believe the allegations concerning violations of the Tennessee Solid Waste Disposal Act (SWDA), the Tennessee Water Quality Control Act of 1977 (TWQCA), and NPDES Permit No. TN0005428 to be true to the best of my knowledge, information, and belief.

4.     Based on my experience, the information obtained by TDEC in the course of its investigation of the TVA Gallatin Fossil Plant located in Sumner County, Tennessee, and the alleged current and ongoing violations of the SWDA, the TWQCA, and NPDES Permit No. TN0005428, the public interest requires that this action be commenced.

FURTHER THE AFFIANT SAITH NOT.



CHRISTOPHER S. MORAN

Sworn to and subscribed before me

this 7th day of January, 2015

Carol L. Grice

NOTARY PUBLIC

My Commission Expires: June 21, 2016

2

# EXHIBIT 2

### *Waiver of Service of Summons*

TO: Plaintiffs' Counsel – Assistant Attorney General Emily B. Vann

I acknowledge receipt of your request that I waive service of a summons in the action of *State of Tennessee et al. v. Tennessee Valley Authority*, which is civil action number 15-23-II, in the Davidson County Chancery Court. I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or motion under Rule 12 is not served upon you within 60 days after January 8, 2015.

1/12/15     Maria V. Gillen
Date         Signature

Printed/typed name: Maria V. Gillen

as Senior Attorney

of Office of General Counsel, Tennessee Valley Authority

# EXHIBIT 3

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## 20TH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBET )
H. SLATERY III, in his official capacity as the )
Attorney General and Report of Tennessee )
And ROBERT J. MARTINEAU, JR., )
Commission of the Tennessee Department of )
Environment and Conservation, )
                               )
    Plaintiffs, )
                               )
and )
                               )
TENNESSEE CLEAN WATER NETWORK )
And TENNESSE SCENIC RIVERS )
ASSOCIATION, )
                               )
    Plaintiff-Intervenors, )         *N.F*
                               )
v. )     Case No.  15-23-II
                               )
TENNESSEE VALLEY AUTHORITY, )
                               )
    Defendant. )

## ORDER OF RECUSAL

For reasons satisfactory to the court, the undersigned judge hereby recuses herself in the

above referenced case and requests the Assignment Judge to reassign this case to another

Chancellor for all further proceedings.

                               _____

                               CAROL L. MCCOY
                               CHANCELLOR

cc:     Delta Ann Davis, Attorney at Law
        Elizabeth A. Alexander, Attorney at Law
        Anne E. Passino, Attorney at Law
        Southern Environmental Law Center
        2 Victory Avenue, Suite 500
        Nashville, Tennessee 37213

        Emily B. Vann, Attorney at Law
        Assistant Attorney General
        Office of the Attorney General, Environmental Division
        P.O. Box 20207
        Nashville, TN 37202-0207

        Maria Gillen, Attorney at Law
        Senior Attorney
        Office of General Counsel
        Tennessee Valley Authority
        400 West Summit Hill Drive
        Knoxville, TN 37902-1401

        The Honorable Randy Kennedy
        Seventh Circuit
        1 Public Square, Suite 608
        Nashville, TN 37201

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 27 of 332 PageID #: 33

# EXHIBIT 4

# IN THE TRIAL COURTS FOR DAVIDSON COUNTY, TENNESSEE
## TWENTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY, III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department of )
Environment and Conservation, )
                           )
            Plaintiffs, )
                           )
and )
                           )
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )      CASE NO:___15-23-II___
                           )
        Plaintiff- Intervenors, )
                           )
v. )
                           )
TENNESSEE VALLEY AUTHORITY, )
                           )
        Defendant. )

2015 FEB 20 PM 1: 52

RICHARD R. ROOKER, CLERK

K. Farmer_____ P C

## ORDER OF TRANSFER

IT APPEARING to the Court that Chancellor Carol L. McCoy has recused herself from the hearing of this case.

IT IS HEREBY ORDERED that this case be transferred to Chancellor Russell T. Perkins for final hearing or other disposition.

Entered this ___20___ day of February, 2015.

                                     Randy Kennedy, Reassignment Judge
                                       Seventh Circuit Court

pc:   Chancellor Carol L. McCoy
       Chancery Court - Part II

       Chancellor Russell T. Perkins
       Chancery Court - Part IV

Herbert H. Slatery, III, #009077
Attorney General and Reporter
State of Tennessee
P.O. Box 20207
Nashville, TN   37202-0207

Emily B. Vann, #026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN   37202-0207

Delta Anne Davis
Elizabeth A. Alexander
Anne E. Passino
Southern Environmental Law Center
2 Victory Avenue, South, Suite 500
Nashville, TN   37213

Maria V. Gillen
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN   37902

# EXHIBIT 5

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | |
|---|---|
| **STATE OF TENNESSEE ex rel. HERBERT** | ) |
| **H. SLATERY III, in his official capacity as the** | ) |
| **Attorney General and Reporter of Tennessee** | ) |
| **and ROBERT J. MARTINEAU, JR.,** | ) |
| **Commissioner of the Tennessee Department** | ) |
| **of Environment and Conservation,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| **TENNESSEE CLEAN WATER NETWORK** | ) |
| **and TENNESSEE SCENIC RIVERS** | ) |
| **ASSOCIATION,** | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| **TENNESSEE VALLEY AUTHORITY,** | ) |
| | ) |
| Defendant. | ) |

No. 15-23-IV

2015 FEB 25 AM 8:36
CLERK & MASTER
DAVIDSON CO. CHANCERY CT
FILED

---

**AGREED ORDER GRANTING THE TENNESSEE SCENIC RIVERS ASSOCIATION
AND THE TENNESSEE CLEAN WATER NETWORK'S MOTION TO INTERVENE AS
A MATTER OF RIGHT**

---

As indicated by the signatures of Counsel below, Plaintiffs, State of Tennessee, ex. Rel.

Herbert H. Slatery, III, Attorney General and Reporter of the State of Tennessee, and Robert J.

Marteineau, Jr., Commissioner of the Tennessee Department of Environment and Conservation,

and Defendant, the Tennessee Valley Authority, hereby stipulate and agree that the Tennessee

Clean Water Network and the Tennessee Scenic Rivers Association ("the Conservation

Groups"), should be permitted to intervene in this matter as of right pursuant to Rule 24.01(3) of

the Tennessee Rules of Civil Procedure. Accordingly, the Court hereby GRANTS the

1

Conservation Groups' Motion to Intervene in this action as Plaintiff-Intervenors and deems the Complaint in Intervention filed.

IT IS SO ORDERED:

Honorable Carol McCoy, Chancellor

AGREED:

Emily Vann w/ permission (op)

Emily B. Vann, BPR No. 026642
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 532-2583
Email: Emily.Vann@ag.tn.gov

Maria Gillen w/ permission (ap)

Maria Gillen, BPR No. 030655
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Telephone: (865) 632-7741
Email: Mvgillen@tva.gov

Respectfully submitted,

Delta Anne Davis, BPR No. 010211
Elizabeth A. Alexander, BPR No. 19273
Anne E. Passino, BPR No. 027456
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470

2

Conservation Groups' Motion to Intervene in this action as Plaintiff-Intervenors and deems the

Complaint in Intervention filed.

                    IT IS SO ORDERED:

                    _____
                    Honorable Carol McCoy, Chancellor

AGREED:


_____
Emily B. Vann, BPR No. 026642
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 532-2583
Email: Emily.Vann@ag.tn.gov



_____
Maria Gillen, BPR No. 030655
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Telephone: (865) 632-7741
Email: Mvgillen@tva.gov


                    Respectfully submitted,



                    Delta Anne Davis, BPR No. 010211
                    Elizabeth A. Alexander, BPR No. 19273
                    Anne E. Passino, BPR No. 027456
                    SOUTHERN ENVIRONMENTAL LAW CENTER
                    2 Victory Avenue, Suite 500
                    Nashville, TN 37213

2

Telephone: (615) 921-9470
Facsimile: (615) 921-8011
adavis@selctn.org

*Attorneys for Proposed Plaintiff-Intervenors*
*Tennessee Scenic Rivers Association and Tennessee*
*Clean Water Network*

## CERTIFICATE OF SERVICE

I hereby certify that an Adobe PDF copy of the foregoing has been forwarded via electronic mail and that a certificate advising counsel that this document has been transmitted electronically has been sent via U.S. mail, postage prepaid, on this 5th day of February, 2015, to:

Emily B. Vann, BPR No. 026642
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 532-2583
Email: Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

Maria Gillen, BPR No. 030655
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Telephone: (865) 632-7741
Email: Mvgillen@tva.gov

*Attorney for Defendant*

Delta Anne Davis, BPR No. 010241 19273
Elizabeth A. Alexander

3

# EXHIBIT 6

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, <br><br> Plaintiffs, <br><br> and <br><br> **TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION,** <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> **TENNESSEE VALLEY AUTHORITY,** <br><br> Defendant. | No. 15-23-II |

---

## COMPLAINT IN INTERVENTION

---

Plaintiff-Intervenors, the Tennessee Clean Water Network and the Tennessee Scenic Rivers Association (the "Conservation Groups"), hereby allege as follows:

## I.    NATURE OF THE ACTION

1.    This is an original civil enforcement action brought by the State of Tennessee under the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 ("SWDA"), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 ("TWQCA"), and the rules and regulations promulgated thereunder, against defendant Tennessee Valley Authority ("TVA") for injunctive relief and the assessment of

1

civil penalties.

2.    As the State of Tennessee alleges in its verified complaint, TVA has been and continues to discharge pollutants into waters of the State of Tennessee from its Gallatin Fossil Plant ("Gallatin Plant") in violation of both the SWDA and the TWQCA. TVA's illegal discharges have resulted in the contamination of groundwater and the Cumberland River, both of which are waters of the state, at levels that exceed drinking water standards and pose a threat to human health and aquatic life.

3.    TVA's discharge of pollutants also violates the National Pollutant Discharge Elimination System ("NPDES") Permit, issued by the State of Tennessee, under which TVA is required to operate its coal ash disposal impoundment at the Gallatin Plant.

4.    The State of Tennessee commenced this action on January 7, 2015, fewer than 60 days after the Conservation Groups notified the State of Tennessee and TVA of their intent to sue TVA under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, for violations occurring at the Gallatin Plant.

5.    The State of Tennessee commenced this action in response to the Conservation Groups' Notice of Intent to Sue, and the state has informed the Conservation Groups that it is it the state's policy under these circumstances to allow citizen groups like the Conservation Groups to intervene by stipulation in the state court enforcement action.

## II.    PARTIES

6.    The Conservation Groups are non-profit organizations whose missions include protecting surface and ground waters from contamination. TVA's unlawful pollution of the Cumberland River and adjacent ground water by illegal discharges from its coal ash ponds and storage areas at the Gallatin Plant adversely affect the recreational, environmental, economic,

2

aesthetic, and quality-of-life interests of the members of the Conservation Groups.

7.    Plaintiff-Intervenor, Tennessee Scenic Rivers Association ("TSRA") is a volunteer organization dedicated to the preservation, protection, and restoration of the scenic, free-flowing rivers of the State of Tennessee.

8.    Based in Nashville, Tennessee, the organization has approximately 700 members across the state and the south.

9.    Formed in 1966, TSRA works to protect rivers, to provide training and instruction in paddling, canoeing, and kayaking, and to offer opportunities to use and enjoy Tennessee's rivers. TSRA also organizes and sponsors paddling trips on flat and whitewater rivers throughout Tennessee, including the Cumberland River, Old Hickory Reservoir, the Collins and Buffalo Rivers, and Spring Creek.

10.    TSRA is active in conservation issues, joining with other groups to combat threats to rivers like Dry Fork and threats to entire watershed areas posed by practices like mountain top removal coal mining.

11.    TSRA members "adopt" streams to monitor health, and conduct cleanups on rivers and streams. TSRA members enjoy club-sponsored trips year-round and offer instruction in sea kayak, whitewater canoe, C-1 and kayak, as well as self-rescue, swiftwater rescue, CPR, trip leader seminar and Wilderness First Aid.

12.    TSRA members use, paddle, fish in, and enjoy the Cumberland River in the vicinity of and downstream of the Gallatin Plant. The pollution from the coal ash ponds at the Gallatin Plant impairs these members' use and enjoyment of the Cumberland River and other waters in the vicinity of the Gallatin Plant. Continued contamination of the groundwater and the Cumberland River will harm the interests of TSRA's members who live, work, and recreate in the

3

vicinity of the Gallatin Plant and who use and enjoy the Cumberland River and other waters in the vicinity of the plant.

13.     Plaintiff-Intervenor, Tennessee Clean Water Network ("TCWN"), is a nonprofit corporation organized under the laws of the State of Tennessee, with its principal office in Knoxville, Tennessee. TCWN empowers Tennesseans to exercise their right to clean water and healthy communities by fostering civic engagement, building partnerships and advancing, and when necessary, enforcing water policy for a sustainable future. TCWN was organized for, among other reasons: to advocate for strong policies and programs that result in more effective protection and restoration of Tennessee waters; to educate organizations, decision-makers, and the public about important water resource issues; and to ensure the protection and restoration of Tennessee's waters.

14.     TCWN is a membership organization, and has members who are injured by the violations alleged herein, including members who live, work, and/or recreate on the Cumberland River downstream from the Gallatin Plant discharges, and have recreational, property, health, and aesthetic interests in these waters.

15.     The State of Tennessee brought this action through plaintiff, Herbert H. Slatery III, in his official capacity as Attorney General and Reporter for the State of Tennessee. The Attorney General is the chief law enforcement officer of the State of Tennessee, and of all its departments, commissions, and agencies. *See* Tenn. Code Ann. §§ 8-6-109 and 8-6-301. The Attorney General also has authority over litigation involving the public interest. The Attorney General's official residence is in Nashville, Davidson County, Tennessee.

16.     The state also brought this action in the name of plaintiff, Robert J. Martineau, Jr., in his official capacity as Commissioner of the Tennessee Department of Environment and

4

Conservation ("TDEC"). The Commissioner is charged with implementing the provisions of the SWDA under Tenn. Code Ann. §§ 68-211-101, *et seq.* The TDEC Commissioner is charged by Tenn. Code Ann. §§ 68-211-107, 115 & 117 with the duty and responsibility to exercise general supervision and enforcement of the SWDA and to bring suit for any violations thereunder. The Commissioner is also charged with implementing the provisions of the TWQCA under Tenn. Code Ann. §§ 69-3-101, *et seq.* TDEC's Commissioner is charged by Tenn. Code Ann. § 69-3-107 with the duty and responsibility to exercise general supervision and enforcement of the TWQCA and to bring suit for any violations thereunder. The Commissioner's official residence is in Nashville, Davidson County, Tennessee

17. Defendant TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933. *See* 16 U.S.C. §831 ("the TVA Act"). TVA has its headquarters in Knoxville, Tennessee, and operates a facility located at 1499 Steam Plant Road, Gallatin, Sumner County, Tennessee 37066, known as the TVA Gallatin Fossil Plant. During all times subject to the provisions of applicable Tennessee statutes and regulations, TVA was a "person" as defined by Tenn. Code Ann. § 68-211-103(6) and § 69-3-103(20). The TVA Act provides that TVA "[m]ay sue or be sued in its corporate name." 16 U.S.C. §831(c). Service of process may be made on TVA through William D. Johnson, Chief Operating Officer, 400 West Summit Hill Drive, Knoxville, Tennessee 37902.

### III.  JURISIDICTION AND VENUE

18. This Court has jurisdiction over this action in accordance with the provisions of Tenn. Code Ann. §§ 68-211-115, -117 and 69-3-115, -117, respectively.

19. In accordance with Tenn. Code Ann. §§ 68-211-115, -117(b)(5) and 69-3-115(a)(2)(D), -117, venue in this action is proper in the Chancery Court of Davidson County.

20.     TVA is subject to the jurisdiction of this Court for the allegations stated herein pursuant to 33 U.S.C. § 1323(a), which states that, "Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent, as any nongovernmental entity[.]"

## IV.     GENERAL ALLEGATIONS

21.     The Gallatin Plant is an active coal-fired power plant located approximately 4.5 miles south, south-east upstream of Gallatin, Sumner County, Tennessee, on a narrow peninsula on the north bank of a dammed reservoir of the Cumberland River known as Old Hickory Lake.

22.     The Gallatin Plant has been in operation since the late 1950s, and currently consists of four coal-fired electric generating units with a net generating capacity of 976 megawatts.

23.     The Gallatin Plant burns approximately 4,000,000 tons of coal annually.  Coal ash is a by-product of burning coal.  The Gallatin Plant produces approximately 235,000 tons of coal ash each year. TVA stores the coal ash in ponds behind the Plant.

24.     TVA's coal ash ponds are unlined and are separated from the Cumberland River and Old Hickory Lake only by a series of dams made of earth and/or coal ash.

25.     Old Hickory Lake is a popular recreation site for swimming, boating, fishing, and other water sports.

26.     The Cumberland River provides drinking water for residents of Gallatin and Nashville in Sumner and Davidson Counties, as well as for residents of Rutherford and Williamson Counties.

27.     The City of Gallatin's drinking water system withdraws water from the

6

Cumberland River approximately one and one-half miles downstream from the Gallatin Plant.

28.     The City of Gallatin's contaminant source inventory lists the Gallatin Plant as a primary threat to its drinking water supply.

29.     TVA has known for many years that its coal ash ponds and operations contaminate the groundwater, and that the groundwater contains dangerous levels of pollutants. Despite this knowledge, TVA has failed to remediate the contamination.

30.     TVA became aware in the late 1980s that contaminated groundwater had migrated offsite and impacted private wells, contaminating them with toxic substances such as iron and boron.

31.     The groundwater, hydrologically connected to the Gallatin Plant, is a water of the State of Tennessee and the United States.

32.     TVA has also been aware for many years of "seeps" or leaks from its ash ponds that allow the discharge of pollutants directly into the Cumberland River. TVA has failed to maintain the impoundments, inspect, identify, and remediate these seeps.

33.     The Cumberland River is a water of the State of Tennessee and the United States.

34.     In 2009, the United States Environmental Protection Agency ("EPA") determined that the coal ash ponds at the Gallatin Plant present a "significant hazard" in the event of dam failure or mis-operation. This designation indicates that such a failure could cause economic loss, environmental damage, or other harmful impacts.

35.     In 2013, EPA also found that the earthen dams at the Gallatin Plant were in only "fair" condition, and remained in need of improvement.  In particular, EPA concluded that the hydrologic/hydraulic safety at the Gallatin Plant was unacceptable due to the likelihood of coal

7

ash escaping from the ponds into the Cumberland River when the river floods.

36.     EPA stated that improvements to rectify these shortcomings "should be given the highest priority" because of the potential for serious impacts on human health and the environment.

37.     TVA has not cured all of the deficiencies identified by EPA, and continues to operate with dangerous structural conditions, ongoing contamination of groundwater, and seeps that leak pollutants from the coal ash ponds directly into the Cumberland River.

38.     On June 21, 2011, TVA's Office of Inspector General issued a report finding that, under its own rules and guidance documents, TDEC should require TVA to initiate corrective measures as a result of illegal discharges into the Cumberland River.

39.     TDEC declined to initiate corrective measures on its own accord, prior to bringing the instant lawsuit in response to the Conservation Groups' Notice of Intent to sue.

### A.  The Gallatin Plant Coal Ash Ponds

40.     To store the coal ash it generates at the Gallatin Plant, TVA combines the coal ash with water and sluices it away from the Plant into its vast complex of coal ash ponds.

41.     TVA then "treats" the water by allowing the ash to settle to the bottom in the ash ponds.  TVA next sends the water to a series of "stilling ponds" for additional settling, and eventually discharges the water into the Cumberland River. *See* Exhibit 1, attached.

42.     TVA is authorized to release its coal ash wastewater from one specific outfall only (Outfall 001) pursuant to its NPDES Permit. Any other discharge of wastewater from the coal ash facility constitutes a violation of the NPDES permit, the TWQCA, and the Clean Water Act.

43.     There are a series of unlined coal ash ponds at the Gallatin Plant, one of which is

closed, and all of which are constructed of ash or earthen dikes that lack cohesion and allow coal ash to leak directly into the Cumberland River through a number of seeps in the dikes.

44. These seeps may indicate that the dikes containing the ash are unstable.

45. Similar seeps were identified at TVA's Kingston Fossil Plant prior to the catastrophic failure of its similarly-constructed coal ash impoundment in 2008.

46. The Gallatin Plant site is located in an inherently unstable area with karst geology and extensive historic sinkhole activity. Attached as Exhibit 2 is a map reflecting the extent of the sinkhole problem.

47. In the 1970s, so much coal ash waste escaped from these sinkholes into the groundwater and/or the Cumberland River that TVA undertook a study to determine how to stop the release through known or suspected sinkholes below the surface of the ash ponds. As a June 13, 1977 TVA memorandum titled "Magnitude of Ash Disposal Pond Leakage Problem-Gallatin Steam Plant," reports, TVA found "that the network of solution cavities and crevices in the groundwater system under the pond is extensive; that identification of all the sinkholes which presently leak from the pond to this system would require extensive field surveys; and that plugging the presently leaking sink holes would give no assurance that other sinkholes would not begin to leak."

48. With respect to the magnitude of the problem of the sinkholes leaking coal ash into the groundwater, the 1977 report states, "The leakage rate is equal to the inflow rate of the sluiced water into the pond …"

49. In fact, other sinkholes did again appear and cause illegal discharges of coal ash waste in at least 2005 and 2010.

9

## B.  The Abandoned Ash Pond: Non-Registered Site #83-1324

50.  From 1959 until approximately 1970, TVA stored its coal ash in a series of unlined ponds beside the Cumberland River on the southwest side of the peninsula.

51.  TVA closed these ponds in approximately1970 because they reached capacity.  TVA now refers to this area as Non-Registered Site #83-1324 (the "Abandoned Ash Pond").

52.  The Abandoned Ash Pond covers nearly 73 acres, is about 25 feet deep, and contains an unknown amount of coal ash.

53.  Almost 30 years after it closed the Abandoned Ash Pond, in approximately 1997, TVA developed a closure plan for the Abandoned Ash Pond at the request of TDEC.

54.  In 2000, 30 years after closure, as part of the closure plan required by TDEC, TVA started monitoring the groundwater for coal ash contamination.

55.  By at least 2002, TVA's groundwater monitoring indicated the presence of beryllium, cadmium, and cobalt at or exceeding EPA's maximum containment levels ("MCLs") for groundwater protection.

56.  As a result of these reports of groundwater contamination, TVA should have submitted a Groundwater Quality Assessment Plan to TDEC within forty-five (45) days and should have initiated an assessment of corrective measures within ninety (90) days.  *See* Tenn. Comp. R. & Regs. 0400-11-01.04(7)(a).

57.  Additionally, as a result of the reports of groundwater contamination, TDEC should have sent TVA a Notice of Violation for violating the Groundwater Protection Standard.  *Id.*

58.  Despite clear evidence of groundwater contamination from the coal ash as early as 2002, it was not until the fall of 2011 that TVA installed additional groundwater monitoring wells at the Abandoned Ash Pond.

10

59.     A 2012 TVA study found that groundwater discharging into the Cumberland River from beneath the Abandoned Ash Pond contained beryllium, cadmium, nickel, and zinc at levels that "may pose a risk" to fish and aquatic life in the Cumberland River, and that this risk will continue into the future.

60.     On November 25, 2014, TVA submitted a Groundwater Assessment Monitoring Project Summary and Risk Assessment Report to TDEC which confirmed exceedances of various primary and secondary MCLs related to coal ash byproduct in the groundwater at the Gallatin Plant.

61.     Despite the fact that TVA should have initiated an assessment of corrective measures within 90 days of the first reports of exceedances – in 2002—the November, 2014 report did not propose any corrective measures, but instead proposed to reduce the frequency of groundwater monitoring.

62.     The unpermitted flows of untreated wastewater from the Abandoned Ash Pond constitute illegal discharges into the groundwater and the Cumberland River.

63.     Thus, in violation of its Permit, TVA has been and continues to operate what is essentially a closed, but leaking wastewater treatment facility.

64.     To date, TVA has taken no actions to clean up the groundwater it has contaminated or to stop the ongoing contamination of these waters, and it appears TVA has no plans to do so.

65.     Before filing its Verified Complaint in response to the Conservation Groups' Notice of Intent to sue, the State did not take any enforcement action against TVA for contamination of the groundwater and Cumberland River.

11

### C. The Active Ash Pond Complex: Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D

66. After it closed the Abandoned Ash Pond, TVA replaced it with the existing Ash Pond Complex, where TVA currently stores coal ash.

67. The Ash Pond Complex is located just to the north and to the northeast of the Abandoned Ash Pond along the bank of the Cumberland River.

68. According to maps prepared by the United States Geological Survey that pre-date TVA's creation of this Ash Pond Complex, this area appears to have been a part of the Cumberland River and/or Sinking Creek, both of which are waters of the State of Tennessee and the United States. *See* Exhibit 3.

69. TVA operates the Ash Pond Complex pursuant to NPDES Permit No. TN0005428, most recently re-issued by TDEC's Division of Water Resources on June 26, 2012.

70. The NPDES Permit authorizes TVA to discharge a litany of pollutants from the Ash Pond Complex to the Cumberland River from one outfall structure, located at approximately river mile 240.5 ("Outfall 001"). This discharge derives from a mix of wastewater streams, including ash transport water, demineralization wastewater, oils and laboratory chemicals, boiler blowdown, asbestos decontamination wastewater, ash sluice water leakage, coal pile and coal barge runoff, and storm water runoff.

71. The Permit does not impose any limits on the discharge of coal ash byproduct constituents from Outfall 001. Instead, it requires only that the quantity of coal ash byproduct constituents, including aluminum, arsenic, barium, beryllium, cadmium, chromium, iron, lead, mercury, manganese, nickel, selenium, and thallium, be monitored and reported to TEDC.

72. According to documents filed by TVA with TDEC, TVA has sometimes annually

12

discharged over 7,000 toxic weighted pounds of arsenic, over 8,000 toxic weighted pounds of aluminum, 3,400 toxic weighted pounds of selenium, and as hundreds of toxic weighted pounds of other metals directly to the Cumberland River through Outfall 001.

73.     Outfall 001 is the only authorized discharge point for wastewater from the Ash Pond Complex to the Cumberland River.

74.     Any discharges from the Ash Pond Complex at the Gallatin Plant other than those specifically identified in the NPDES Permit, and in the manner identified in the NPDES Permit, *i.e.,* discharges other than those through Outfall 001, would constitute a violation of the NPDES Permit, the TWQCA, and the federal Clean Water Act.

75.     In addition to its discharges through the permitted wastewater outfall, TVA illegally discharges pollutants from the Gallatin Plant coal ash ponds into the Cumberland River and the groundwater.

76.     The NPDES Permit requires TVA to conduct a daily inspection of the impoundments, maintain records of these inspections, take immediate corrective action once a potential compromise is discovered, and report within 24 hours the discovery of a change that indicates a potential compromise to the structural integrity of a dike or the impoundment.

77.     TVA fails to adequately inspect and maintain its impoundments, and has failed to report potential and actual compromises in the impoundments.

78.     The Ash Pond Complex consists of Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D, as well as a Chemical Pond.

79.     Bottom Ash Pond A covers 248 acres. TVA pours 45,000 dry tons of bottom ash and 185,000 tons of dry fly ash into Pond A each year. Its dikes, made of earth and/or coal ash, are

13

20 to 25 feet high, and contain almost 5 million cubic yards of coal ash—or approximately 2,700,000 tons of ash.

80. Bottom Ash Pond A discharges through buried pipes into Stilling Pond B, which discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

81. Ash Pond E covers 167 acres. Its dikes are constructed over fly ash and are approximately 25 to 30 feet high. Ash Pond E contains almost 5,000,000 cubic yards of coal ash, or over 2,500,000 tons of coal ash. TVA no longer sluices ash into to Fly Ash Pond E.

82. Ash Pond E discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

83. The Ash Pond Complex also provides drainage for approximately 1,059 acres of the Gallatin Plant, including ash ponds, coal pile runoff, and metal waste treatment ponds and a chemical pond totaling 931.7 acres, as well as an ash disposal area, asbestos disposal area, and other drainage areas. According to TVA's spill response documents, the chemical pond and the ash ponds serve as fuel oil emergency containment when the primary containment fails. In at least one instance in 2006, 290,000 gallons of diesel fuel/fuel oil were sent to the ponds.

84. TVA has approximately 4 groundwater monitoring wells adjacent to the Ash Pond Complex named GAF-17, 23, 24, and 25.

85. TVA's monitoring wells have shown that the groundwater under and around the Ash Pond Complex is contaminated by a number of metals and other pollutants, including aluminum, cobalt, iron, manganese, and sulfate, which are present in concentrations above state and federal standards.

86.     TVA has also identified numerous seeps from the Abandoned Ash Pond and the Ash Pond Complex, and is currently monitoring approximately 12 seeps. These unpermitted discharges, or "seeps," consist of contaminants that leak out of TVA's coal ash ponds, discharging directly into the Cumberland River.

87.     In addition to the approximately existing 12 seeps TVA identified, the Conservation Groups documented two seeps (referred to as "Seep A," and "Seep B") close to TVA's Monitoring Well 17 where wastewater is discharging into the Cumberland River, as well as two additional seeps on the east bank of the peninsula (referred to as "Seep C" and "Seep D").

88.     Because TVA fails to adequately inspect, monitor, and maintain its coal ash impoundments, TVA had not identified or repaired these seeps prior to the Conservation Groups' discovery of them.  Nor had TVA reported them to TDEC.

89.     It is not surprising that there are seeps on both the eastern and western sides of the peninsula as the groundwater flows into the Cumberland River in all directions.

90.     Contaminated water coming from these seeps was found to contain elevated levels of aluminum, arsenic, barium, boron, cadmium, dissolved solids, iron, lead, manganese, mercury, nickel, selenium, sulfate, and thallium.

91.     Seeps from the coal ash pond dike walls discharge coal ash pollutants in excess of state and federal standards. All of the seeps are illegal discharges of wastewater other than through a permitted outfall.

### D. Sampling Results

92.     TVA's own groundwater monitoring well data between February, 2008 and July, 2014 show contaminants in the groundwater at its wells.

93.     The groundwater monitoring wells are numbered with the prefix "GAF" and their

15

location is shown on Exhibit 2, attached. GAF 22, 26 and 27 are located in the vicinity of the Abandoned Ash Pond and GAF 17, 23 and 24 are located in the vicinity of the Ash Pond Complex.

94.   Table 1 below shows the maximum value TVA reported to TDEC during that time period.[1]

**TABLE 1**

| Parameter | GAF-17 | Standard Exceeded |
|---|---|---|
| Arsenic (μg/L) | 1.5 | |
| Barium (μg/L) | 38 | |
| Boron (mg/L) | 1.3 | |
| Cadmium (μg/L) | 2.1 | TDEC Fish & Aquatic Life (Continuous) |
| Chromium (μg/L) | 6.3 | |
| Cobalt (μg/L) | 7.8 | |
| Dissolved Solids (mg/L) | 630 | Secondary MCL |
| Iron (mg/L) | 3.1 | Secondary MCL |
| Manganese (μg/L) | 1,500 | Secondary MCL |
| Nickel (μg/L) | 9.7 | |
| Selenium (μg/L) | 1.3 | |
| Sulfate (mg/L) | 240 | |
| Zinc (μg/L) | 42 | |

| Parameter | GAF-19R | Standard Exceeded |
|---|---|---|
| Aluminum (mg/L) | 130 | Secondary MCL |
| Arsenic (μg/L) | 135[†] | Primary MCL/TDEC Domestic Water Supply |
| Barium (μg/L) | 100 | |
| Beryllium (μg/L) | 24.5 | |
| Boron (mg/L) | 4.5 | EPA One-day Health Advisory |

---

[1] An MCL is the legal threshold limit on the amount of a substance that is allowed in public water systems under the Safe Drinking Water Act. The limit is usually expressed as a concentration in milligrams or micrograms per liter of water. TDEC also has water standards for waters like the Cumberland River that are used for domestic water supply. Test results for substances for which there is no standard or when the results did not exceed current standards are also summarized below, because many of the results suggest the presence of coal ash contamination with the potential for health and ecosystem impacts. The independent testing results are presented below in Table 2.

16

| Parameter | GAF-19R | Standard Exceeded |
|---|---|---|
| Cadmium (µg/L) | 7.9 | TDEC Fish & Aquatic Life (Continuous) |
| Calcium (mg/L) | 456 | |
| Chloride (mg/L) | 2.66 | |
| Chromium (µg/L) | 3.57 | |
| Cobalt (µg/L) | 320 | |
| Copper (µg/L) | 10.1 | |
| Dissolved Solids (mg/L) | 6,700 | TDEC Domestic Water Supply |
| Fluoride (mg/L) | 0.397 | |
| Iron (mg/L) | 920 | Secondary MCL |
| Lead (µg/L) | 2.1 | |
| Magnesium (mg/L) | 28.2 | |
| Manganese (µg/L) | 33,000 | Secondary MCL |
| Mercury (µg/L) | 0.3 | |
| Nickel (µg/L) | 250 | TDEC Fish & Aquatic Life (Continuous) |
| Potassium (mg/L) | 14.5 | |
| Selenium (µg/L) | 38.2 | TDEC Fish & Aquatic Life (Continuous) |
| Sodium (mg/L) | 13.4 | |
| Sulfate (mg/L) | 6,300 | Secondary MCL |
| Vanadium (µg/L) | 66 | |
| Zinc (µg/L) | 730 | TDEC Fish & Aquatic Life (Continuous/Maximum) |

†Arsenic testing performed by three laboratories for same sampling date. 135 µg/L was the highest value, followed by 15.8 and "<20" µg/L.

| Parameter | GAF-20 | Standard Exceeded |
|---|---|---|
| Aluminum (mg/L) | 1.6 | Secondary MCL |
| Arsenic (µg/L) | 78 | Primary MCL/TDEC Domestic Water Supply |
| Barium (µg/L) | 27 | |
| Boron (mg/L) | 5.8 | EPA One-day Health Advisory |
| Chromium (µg/L) | 3.2 | |
| Cobalt (µg/L) | 250 | |
| Dissolved Solids (mg/L) | 2,300 | TDEC Domestic Water Supply |
| Iron (mg/L) | 78 | Secondary MCL |
| Manganese (µg/L) | 22,000 | Secondary MCL |

17

| | | |
|---|---|---|
| Nickel (μg/L) | 39 | |
| Sulfate (mg/L) | 2,000 | Secondary MCL |
| Zinc (μg/L) | 30.6 | |

| Parameter | GAF-21 | Standard Exceeded |
|---|---|---|
| Aluminum (mg/L) | 10 | Secondary MCL |
| Cadmium (μg/L) | 5.8 | Primary MCL/TDEC Domestic Water Supply |
| Cobalt (μg/L) | 330 | |
| Dissolved Solids (mg/L) | 1,900 | TDEC Domestic Water Supply |
| Manganese (μg/L) | 18,000 | Secondary MCL |
| Nickel (μg/L) | 110 | TDEC Domestic Water Supply |
| Sulfate (mg/L) | 1,800 | Secondary MCL |
| Zinc (μg/L) | 280 | TDEC Fish & Aquatic Life (Continuous/Maximum) |

| Parameter | GAF-22 | Standard Exceeded |
|---|---|---|
| Aluminum (mg/L) | 6 | Secondary MCL |
| Barium (μg/L) | 12.6 | |
| Chromium (μg/L) | 2.55 | |
| Cobalt (μg/L) | 4.6 | |
| Dissolved Solids (mg/L) | 320 | |
| Iron (mg/L) | 10 | Secondary MCL |
| Manganese (\μg/L) | 520 | Secondary MCL |
| Sulfate (mg/L) | 32 | |
| Vanadium (μg/L) | 14 | |
| Zinc (μg/L) | 39 | |

| Parameter | GAF-23 | Standard Exceeded |
|---|---|---|
| Aluminum (mg/L) | 0.96 | Secondary MCL |
| Arsenic (μg/L) | 1.1 | |
| Barium (g/L) | 61 | |
| Chromium (μg/L) | 1.6 | |
| Cobalt (μg/L) | 2.2 | |
| Iron (mg/L) | 1.1 | Secondary MCL |
| Manganese (μg/L) | 300 | Secondary MCL |
| Nickel (μg/L) | 8.2 | |
| Sulfate (mg/L) | 260 | Secondary MCL |
| Zinc (μg/L) | 11 | |

| Parameter | GAF-24 | Standard Exceeded |
|---|---|---|
| Arsenic (μg/L) | 1.3 | |

18

| Parameter | GAF-24 | Standard Exceeded |
|---|---|---|
| Barium (µg/L) | 29.1 | |
| Dissolved Solids (mg/L) | 730 | TDEC Domestic Water Supply |
| Nickel (µg/L) | 9.7 | |
| Sulfate (mg/L) | 240 | |

| Parameter | GAF-25 | Standard Exceeded |
|---|---|---|
| Antimony (µg/L) | 1.2 | |
| Arsenic (µg/L) | 1.9 | |
| Barium (µg/L) | 101.4 | |
| Cobalt (µg/L) | 2.5 | |
| Dissolved Solids (mg/L) | 440 | |
| Manganese (µg/L) | 210 | Secondary MCL |
| Nickel (µg/L) | 2.6 | |
| Selenium (µg/L) | 1.7 | |
| Sulfate (mg/L) | 46 | |

| Parameter | GAF-26 | Standard Exceeded |
|---|---|---|
| Arsenic (µg/L) | 3.82 | |
| Barium (µg/L) | 33.9 | |
| Boron (mg/L) | 5.9 | EPA One-day Healthy Advisory |
| Chromium (µg/L) | 3.08 | |
| Cobalt (µg/L) | 17 | |
| Dissolved Solids (mg/L) | 1,600 | TDEC Domestic Water Supply |
| Iron (mg/L) | 17 | Secondary MCL |
| Manganese (µg/L) | 9,400 | Secondary MCL |
| Nickel (µg/L) | 5.4 | |
| Sulfate (mg/L) | 1,000 | Secondary MCL |

| Parameter | GAF-27 | Standard Exceeded |
|---|---|---|
| Arsenic (µg/L) | 15 | Primary MCL/TDEC Domestic Water Supply |
| Barium (µg/L) | 68.3 | |
| Boron (mg/L) | 5.4 | EPA One-day Health Advisory |
| Fluoride (mg/L) | 0.214 | |
| Manganese (µg/L) | 740 | Secondary MCL |
| Sulfate (mg/L) | 970 | |
| Zinc (µg/L) | 14 | |
| | | |

19

95.     Independent testing on May 7 and August 25, 2014, revealed the following
pollutants at Seep A. The highest values found on those two dates are show below.

**TABLE 2**

**Seep A**

| Parameter | Seep A 5-7-14 and 8-25-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Aluminum | 120 | Secondary MCL |
| Arsenic | 0.13 | Primary MCL/TDEC Domestic Water Supply |
| Barium | 2.4 | EPA One-day Health Advisory |
| Boron | 12 | EPA One-day Health Advisory |
| Cadmium | 0.0093 | TDEC Fish & Aquatic Life (Continuous) |
| Calcium | 360 | |
| Chloride | 14 | |
| Chromium | 0.036 | |
| Cobalt | 2.6 | |
| Copper | 0.19 | |
| Dissolved Solids | 660 | TDEC Domestic Water Supply |
| Iron | 500 | Secondary MCL |
| Lead | 0.23 | TDEC Fish & Aquatic Life (Continuous) |
| Lithium | 0.05 | |
| Magnesium | 18 | |
| Manganese | 460 | Secondary MCL |
| Mercury | 0.000091 | TDEC Recreation ("Water and Organisms") |
| Nickel | 0.35 | TDEC Fish & Aquatic Life (Continuous) |
| Phosphorus, Total | 4.2 | |
| Selenium | 0.075 | TDEC Fish & Aquatic Life (Continuous) |
| Silicon | 80.0 | |
| Sodium | 44.0 | |
| Strontium | 1.0 | |
| Sulfate | 310 | Secondary MCL |

| Parameter | Seep A 5-7-14 and 8-25-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Sulfur | 150 | |
| Thallium | 0.019 | TDEC Recreation ("Water and Organisms") |
| Vanadium | 0.18 | |
| Zinc | 1.2 | |

96.    In addition, sediment sampled on August 25, 2014 revealed contamination, indicating that the pollutants have been seeping at that location.

| Parameter | Seep A Sediment Sample 8-25-14 (mg/kg) |
|---|---|
| Aluminum | 9800 |
| Arsenic | 18 |
| Barium | 430 |
| Beryllium | 0.71 |
| Boron | 140 |
| Calcium | 12,000 |
| Chloride | 420.00 |
| Chromium | 21 |
| Cobalt | 240.0 |
| Copper | 11.0 |
| Iron | 33,000 |
| Lead | 24.0 |
| Lithium | 8.7 |
| Magnesium | 650 |
| Manganese | 92,000 |
| Mercury | 0.054 |
| Nickel | 35 |
| Selenium | 130 |
| Silicon | 980.0 |
| Sodium | 500.0 |
| Strontium | 100.0 |
| Sulfate | 1100 |
| Sulfur | 5000 |
| Total Solids | 18.4 |
| Vanadium | 8.70 |
| Zinc | 65 |

21

97. Independent testing on May 7, 2014 revealed the following pollutants at Seep B:

**Seep B**

| Parameter | Seep B 5-7-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Boron | 11 | EPA One-day Health Advisory |
| Chloride | 14.0 | |
| Cobalt | 0.0160 | |
| Dissolved Solids | 500 | TDEC Domestic Water Supply |
| Iron | 0.33 | |
| Magnesium | 3.9 | |
| Manganese | 10 | Secondary MCL |
| Nickel | 0.0030 | |
| Strontium | 0.21 | |
| Sulfate | 260 | Secondary MCL |
| Vanadium | 0.0036 | |

98. Independent testing on August 25th, 2014 revealed the following pollutants at Seep C:

**Seep C**

| Parameter | Seep C 8-25-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Aluminum | 0.081 | Secondary MCL |
| Arsenic | 0.001 | |
| Barium | 0.0094 | |
| Boron | 0.085 | |
| Calcium | 49 | |
| Chloride | 6.1 | |
| Cobalt | 0.00028 | |
| Copper | 0.00081 | |
| Dissolved Solids | 170 | |
| Iron | 0.1 | |
| Magnesium | 4.3 | |
| Manganese | 0.087 | Secondary MCL |
| Molybdenum | 0.00080 | |
| Nickel | 0.00064 | |
| Phosphorus, Total | 0.094 | |
| Silicon | 3.7 | |

| | | |
|---|---|---|
| Sodium | 1.1 | |
| Strontium | 0.081 | |
| Sulfate | 20 | |
| Sulfur | 5 | |

99.     Sediment sampled on August 25, 2014 revealed contamination, indicating that the

pollutants have been seeping at that location.

| Parameter | Seep C Sediment Sample 8-25-14 (mg/kg) |
|---|---|
| Aluminum | 54,000 |
| Arsenic | 7.8 |
| Barium | 220 |
| Beryllium | 2.70 |
| Boron | 21 |
| Calcium | 12,000 |
| Chloride | 100 |
| Chromium | 48 |
| Cobalt | 12 |
| Copper | 15 |
| Iron | 54,000 |
| Lead | 17 |
| Lithium | 38 |
| Magnesium | 6600 |
| Manganese | 700 |
| Mercury | 0.040 |
| Nickel | 30 |
| Selenium | 4 |
| Silicon | 540 |
| Sodium | 170 |
| Strontium | 54 |
| Sulfate | 10 |
| Sulfur | 82 |
| Total Solids | 63.1 |
| Vanadium | 48 |
| Zinc | 81 |

23

100. Again, independent testing on August 25, 2014 revealed the following pollutants at Seep D:

**Seep D**

| Parameter | Seep D 8-25-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Aluminum | 1.8 | Secondary MCL |
| Arsenic | 0.0019 | |
| Barium | 0.053 | |
| Boron | 0.077 | |
| Calcium | 41 | |
| Chloride | 7.20 | |
| Chromium | 0.00098 | |
| Cobalt | 0.0021 | |
| Copper | 0.0072 | |
| Dissolved Solids | 210 | |
| Iron | 4.7 | Secondary MCL |
| Lead | 0.0031 | |
| Magnesium | 7.50 | |
| Manganese | 0.67 | Secondary MCL |
| Molybdenum | 0.00052 | |
| Nickel | 0.0046 | |
| Nitrate-Nitrite | 0.08 | |
| Phosphorus, Total | 0.92 | |
| Selenium | 0.00035 | |
| Silicon | 3.8 | |
| Sodium | 5.80 | |
| Strontium | 0.14 | |
| Sulfate | 69.00 | |
| Sulfur | 7.6 | |
| Vanadium | 0.0027 | |
| Zinc | 0.0580 | |

101.   Sediment sampled on August 18, 2014 revealed contamination, indicating that the pollutants have been seeping at Seep D.

| Parameter | Seep D Sediment Sample 8-18-14 (mg/kg) |
|---|---|
| Aluminum | 38,000 |
| Arsenic | 5.90 |
| Barium | 220.00 |
| Beryllium | 1.70 |
| Boron | 52.00 |
| Calcium | 19,000 |
| Chloride | 42.00 |
| Chromium | 26 |
| Cobalt | 11.00 |
| Copper | 19 |
| Iron | 31,000 |
| Lead | 27.0 |
| Lithium | 24.00 |
| Magnesium | 4900 |
| Manganese | 290 |
| Mercury | 0.080 |
| Nickel | 23 |
| Silicon | 380.0 |
| Sodium | 380.00 |
| Strontium | 120.00 |
| Sulfate | 42.00 |
| Sulfur | 4200.00 |
| Total Solids | 28.8 |
| Vanadium | 38.00 |
| Zinc | 190 |

25

102.    Finally, on August 25, 2014, a white cloudy area of discharge was observed near Seeps A and B.

### White Cloudy Area

| Parameter | White Cloudy Area Observed Near Seeps A and B 8-25-14 (mg/L) | Standard Exceeded |
|---|---|---|
| Aluminum | 0.16 | Secondary MCL |
| Arsenic | 0.0013 | |
| Barium | 0.066 | |
| Boron | 2.9 | |
| Calcium | 71 | |
| Chloride | 7.10 | |
| Cobalt | 0.0011 | |
| Copper | 0.0022 | |
| Dissolved Solids | 350 | |
| Iron | 0.57 | Secondary MCL |
| Lead | 0.00039 | |
| Magnesium | 7.2 | |
| Manganese | 4.9 | EPA Lifetime Health Advisory |
| Molybdenum | 0.00041 | |
| Nickel | 0.0012 | |
| Phosphorus, Total | 0.24 | |
| Silicon | 2.5 | |
| Sodium | 18.0 | |
| Strontium | 0.21 | |
| Sulfate | 64 | |
| Sulfur | 23 | |
| Zinc | 0.0029 | |

103.    According to the Agency for Toxic Substances and Disease Registry ("ATSDR"), exposure to high levels of aluminum has been connected to bone and brain diseases, including Alzheimer's disease in humans.  Animals exposed to high levels of aluminum can also have damage to their nervous system.  Exposure to aluminum has also been shown to be harmful to unborn and developing animals because it can cause delays in skeletal and neurological

26

development.

104. Arsenic is a known carcinogen that causes multiple forms of cancer in humans. It is also a toxic pollutant, 40 C.F.R. § 401.15, and a priority pollutant, 40 C.F.R. Part 423 App'x. A. Arsenic is also associated with non-cancer health effects of the skin and the nervous system. The ATSDR reports that there is some evidence that in childhood, long-term exposure to arsenic may result in lower IQ scores and exposure to arsenic in the womb and early childhood may increase mortality in young adults.

105. Ingesting small amounts of barium for a short period may cause vomiting, abdominal cramps, diarrhea, difficulties in breathing, increased or decreased blood pressure, numbness around the face, and muscle weakness. Animals exposed to barium can suffer swelling and irritation of the intestines, changes in organ weights, decreased body weight, kidney damage, and death.

106. Oral exposure to boron has led to developmental and reproductive toxicity in multiple species. Specific effects include testicular degeneration, reduced sperm count, reduced birth weight, and birth defects.

107. Cadmium exposure has been strongly correlated with renal damage, even with low level exposure. There is also a correlation between exposure to cadmium and birth defects and fetal deaths in animals.

108. Iron can render water unusable by imparting a rusty color and a metallic taste and causing sedimentation and staining. To prevent these effects the EPA has set a secondary drinking water standard of 300 µg/L.

109. Lead is a very potent neurotoxant that is highly damaging to the nervous system. Health effects associated with exposure to lead include, but are not limited to, neurotoxicity,

27

developmental delays, hypertension, impaired hearing acuity, impaired hemoglobin synthesis, and male reproductive impairment. Importantly, many adverse health effects may occur without overt signs of toxicity. Lead is also classified by the EPA as a "probable human carcinogen."

110.     Manganese is known to be toxic to the nervous system.  Manganese concentrations greater than 50 µg/L render water unusable by discoloring the water, giving it a metallic taste, and causing black staining. Exposure to high levels can affect the nervous system and exposure to very high levels may impair brain development in children.

111.     Exposure to nickel can cause dermatitis in humans, as well as an increase in risk of lung and nasal cancers.  EPA has classified nickel refinery dust and nickel subsulfide as Group A, human carcinogens, and nickel carbonyl as a Group B2, probable human carcinogen.

112.     High concentrations of sulfates in drinking water can cause diarrhea. The U.S. EPA has established a secondary MCL of 250 mg/L and a health-based advisory of 500 mg/L.

113.     Selenium is an essential element, but it is also listed as a toxic pollutant, 40 C.F.R. § 401.15, and excess exposure can cause a chemical-specific condition known as selenosis, with symptoms that include hair and nail loss, as well as neuropathy or nerve damage.  Selenium causes severe reproductive impacts on fish resulting in skeletal deformities and missing body parts.  Such reproductive failures can eventually cause fish populations to collapse.

114.     Thallium is a toxic pollutant, 40 C.F.R. § 401.15, and exposure to high levels of thallium can result in harmful health effects. Studies in rats have shown adverse developmental effects from exposure to high levels of thallium, and some adverse effects on the reproductive system after ingesting thallium for several weeks.

115.     Concurrent exposure to multiple contaminants may intensify existing effects of individual contaminants, or may give rise to interactions and synergies that create new effects.

28

Where several coal ash contaminants share a common mechanism of toxicity or affect the same body organ or system, exposure to several contaminants concurrently produces a greater chance of increased risk to health.

116.    In addition to the unpermitted discharges, the locations of which are described above, TVA has violated the terms of its NPDES Permit, and thus violated the TWQCA and the federal Clean Water Act, by allowing pollutants and coal ash constituents including aluminum, arsenic, barium, beryllium, boron, cadmium, cobalt, iron, lead, manganese, selenium, nickel, thallium, and zinc to escape from its unlined ponds into the groundwater at the Gallatin Plant and into Tennessee waters and navigable waters of the United States. TVA's unauthorized discharges are prohibited by the Permit and the CWA and the TWQCA.

## V.    APPLICABLE LAW AND REGULATIONS

117.    Section 301 of the CWA prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except pursuant to and in compliance with permits issued under the Act.  33 U.S.C. § 1311 (a).

118.    Each discharge of a pollutant not authorized by such a permit is a violation of the CWA.  *See* 33 U.S.C. § 1311(a).  Each discharge that violates the terms of the permit is also a violation of the CWA.  *See* 33 U.S.C. §§ 1342(a), 1365(f).

119.    TDEC administers Tennessee's NPDES permitting and compliance program, pursuant to authority delegated to the State of Tennessee from EPA, under § 402(b) of the CWA, 33 U.S.C. § 1342(b).

120.    TDEC issues NPDES permits in accordance with Tenn. Code Ann. § 108, implementing regulations, and the federal Clean Water Act.

121.    A Memorandum of Agreement between the EPA and TDEC (dated August 23, 2007

29

and October 12, 2007) also sets forth procedures for the administration of Tennessee's NPDES permitting program.

122. The Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities rule ("the Coal Ash Rule"), signed by EPA Administrator on December 19, 2014, and submitted by EPA for publication in the *Federal Register*, (Docket Number EPA-HQ-2009-0640), provides that remedies for closure of coal ash impoundments must be selected "so that releases to groundwater are addressed without unnecessary delay." EPA-HQ-2009-0640, at 383.

123. The Coal Ash Rule also provides that coal ash impoundments must be closed in a manner that "will control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the . . . ground or surface waters." *Id.* at 408.

124. The Coal Ash Rule further states that remedies "must control the source of the contamination to reduce or eliminate further releases by identifying and locating the cause of the release." *Id.* at 379.

125. The Cumberland River and its tributaries are waters of the United States and the State of Tennessee, which classifies the Cumberland River for domestic water supply, industrial water supply, fish and aquatic life, recreational use, livestock watering and wildlife, and irrigation. Tenn. Comp. R. and Regs. 0400-40-04-.12. Tenn. Comp. R. & Regs. 0400-40-03-.02(5) provides that since all waters of the state are classified for more than one use, the most stringent criterion for the respective classified use applies.

126. The allegations contained in paragraphs 6 through 18 of the Complaint of the State of Tennessee in this matter, setting forth state statutory background, are incorporated herein by reference and realleged in full as if those allegations were fully set forth in this paragraph.

30

127. None of the continuing discharges described herein, other than those through Outfall 001, is authorized by the NPDES Permit or by any other permit.

128. On November 9, 2014, pursuant to 33 U.S.C. § 1365(b)(l)(A), the Conservation Groups sent Defendant TVA a Notice of Intent to commence a citizen suit for violations of the CWA occurring at the Gallatin Plant.

## VI. CAUSES OF ACTION

### A. ABANDONED ASH POND VIOLATIONS

129. In accordance with the provisions of Tenn. Code Ann. § 68-211-104(1), it is unlawful to "place or deposit any solid waste into the waters of the state except in a manner approved by [TDEC]."

130. "Solid waste" is defined in the SWDA as "spent material, byproducts, . . .ash, sludge, and all discarded material including solid, liquid, [or] semisolid . . . material resulting from industrial, commercial, and agricultural operations." Tenn. Code Ann § 68-211-103(8).

131. Based on TVA's groundwater monitoring reports, and upon current information and belief, solid waste has been repeatedly discharged from the Abandoned Ash Pond into the groundwater in and around the Gallatin Plant, as detailed above, in violation of the SWDA and its implementing rules and regulations.

132. Additionally, pursuant to Tenn. Code Ann. § 68-211-104(3), it is unlawful to "construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the [C]ommissioner."

133. "Solid waste disposal" is defined in the SWDA as "the process of permanently or indefinitely placing, confining, compacting, or covering solid waste." Tenn. Code Ann § 68-11-103(9) (emphasis added).

31

134. The Abandoned Ash Pond meets the definition of a solid waste disposal site and based on TVA's groundwater monitoring reports and upon current information and belief, solid waste has been repeatedly discharged from the Abandoned Ash Pond into the groundwater in and around the Gallatin Plant, as detailed above, in violation of the provisions of the SWDA and its implementing rules and regulations.

135. In accordance with Tenn. Code Ann. § 68-211-115, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the SWDA and the rules and regulations thereunder.

136. In accordance with Tenn. Code Ann. § 68-21 1-117(a)(1 ), this Court may impose a civil penalty of up to $7,000 per day for each day any person violates the SWDA by failing to comply with the provisions of the SWDA and its implementing rules and regulations.

137. Additionally, pursuant to Tenn. Code Ann. § 68-211-117(2), each day such a violation continues is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $7,000.00 per day for each day of such violation.

138. Pursuant to Tenn. Code Ann. §69-3-1 14(a), "it is unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in § 69-3-103, . . . unless such action has been properly authorized."

139. Pursuant to Tenn. Code Ann. § 69-3-114(b), "it is unlawful for any person to act in a manner or degree that is violative of the TWQCA, or any rule, regulation, or standard of water quality promulgated thereunder."

140. Based on TVA's submitted groundwater monitoring reports and upon current information and belief, as detailed above, TVA has violated the provisions of the TWQCA and its

32

implementing rules and regulations.

141.    In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the TWQCA and the regulations thereunder.

142.    In accordance with Tenn. Code Ann. §§ 69-3-115(a)(l )(A) and (B) and § 69-3-115(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition.   Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation occurs is considered a separate violation.   TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## B. ASH POND COMPLEX VIOLATIONS

143.    As detailed above, through reported unpermitted discharges throughout the Gallatin Plant's Ash Pond Complex and based on current information and belief, TVA has violated Tenn. Code Ann. §§ 69-3-l 14(a) and 69-3-l 14(b).

144.    Additionally, as a result of the unpermitted discharges, TVA has violated Part II.A.4.a., titled Proper Operation and Maintenance, of the NPDES Permit issued pursuant to Tenn. Code Ann. § 69-3-108, which requires that: "[t]he permittee shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit."

145.    Based upon current information and belief, TVA has also violated Part II.C.l. of the NPDES Permit, which requires that all discharges be consistent with the terms and conditions of the permit.

146.    In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a

33

permanent injunction against TVA requiring it to comply with the provisions of the TWQCA, the regulations thereunder, and the conditions of all NPDES permits issued to TVA pursuant to Tenn. Code Ann. § 69-3-108.

147. In accordance with Tenn. Code Ann. §§ 69-3-1 15(a)(l)(A) and (B) and § 69-3-1 15(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition. Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation occurs is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations contained in the foregoing paragraphs, the Conservation Groups join in the state's request for relief and request such further relief as stated in paragraphs A through D below:

A. That the Court, upon final judgment, enter a mandatory permanent injunction to ensure that TVA:

    i. Prevents its coal ash ponds from leaking, seeping, and flowing into the groundwater and Cumberland River;

    ii. Complies with the provisions of the SWDA, the TWQCA, the regulations thereunder, and the conditions of all NPDES permits issued to TVA pursuant to Tenn. Code Ann. § 69-3-108;

    iii. Takes all necessary action to immediately abate the violations of the groundwater standards;

    iv. Takes immediate action to eliminate, terminate, and control the source or

34

sources of contamination into the groundwater and Cumberland River, and implement corrective action for groundwater contamination pursuant and restoration of groundwater quality pursuant to Tenn. Comp. R. & Regs. 0400-11-01.04(7)(a);

    v.    Removes all existing coal combustion byproducts and contaminated soil from the Gallatin coal ash ponds within a reasonable amount of time and stores them in an appropriately lined industrial solid waste landfill facility away from the Cumberland River, with appropriate monitoring;

    vi.    Implements a door-to-door survey of potentially contaminated drinking and domestic use wells within one mile of any groundwater monitoring well at the Gallatin Plant demonstrating exceedances;

B.    That the Court impose the maximum penalties available under the SWDA and the TWQCA against TVA considering the magnitude and severity of the contamination and TVA's ongoing knowledge of its violations of the laws;

C.    That the Court tax TVA with the costs of this action; and

D.    That the Court grant any other and further relief that the Court deems to be just and proper.

Respectfully submitted,

Delta Anne Davis, BPR No. 010211
Elizabeth A. Alexander, BPR No. 19273
Anne E. Passino, BPR No. 027456
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
adavis@selctn.org

35

*Attorneys for Proposed Plaintiff-Intervenors*
*Tennessee Scenic Rivers Association and Tennessee*
*Clean Water Network*

# CERTIFICATE OF SERVICE

I hereby certify that an Adobe PDF copy of the foregoing has been forwarded via electronic mail and that a certificate advising counsel that this document has been transmitted electronically has been sent via U.S. mail, postage prepaid, on this 27th day of February, 2015, to:

Emily B. Vann, BPR No. 026642
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 532-2583
Email: Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

Maria Gillen, BPR No. 030655
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Telephone: (865) 632-7741
Email: Mvgillen@tva.gov

*Attorney for Defendant*

Delta Anne Davis, BPR No. 010211

Exhibit 1

# Gallatin Power Station
## Seeps, Monitoring Wells, and Coal Ash Impoundment Extents



RM 246

GAF-25

Stilling Pond B

RM 240

Stilling Pond D

GAF-24

Stilling Pond C

Seep 2'

Seep D

NPDES Outfall 001

GAF-23

Seep 6'

Seep 1'

Bottom Ash Pond A

Old Hickory Lake/
Cumberland River

Old Hickory Lake/
Cumberland River

Fly Ash Pond E

RM 241

RM 245

Seep B

White Cloud Observed

Seep 3'

Seep 5'

Seep C

Seep 4'

GAF-17

Seep 9'

Seep 10'

Seep 7'

Sluice Ditch
Begins Here

Seep 12'

Pipes Carrying Sluiced Ash
to the Ash Pond Facility

Chemical
Pond

GAF-20
GAF-27

Abandoned Ash
Disposal Area

GAF-21

GAF-19R
GAF-26

RM 242

RM 244

RM 243

## Legend

Seep (Independently Identified)   ● Other Site

Seep (TVA Identified)   River Mile

⚓ Monitoring Well

0    0.25    0.5                    1 Miles

**DISCLAIMER:** Map intended for illustrative purposes only. Ash pond and landfill boundaries are best estimates based on documents from EPA and the utilities themselves. Locations of existing and retired ash ponds and landfills were created by heads-up digitizing of aerial imagery and USGS 7.5 min. topographic maps. Outlined areas appearing to be void of a pond or landfill are thought to be retired units that are now covered in place. Locations of seeps and wells are accurate, but not exact because precise coordinates were not available for all of them.

Data Sources: ESRI World Imagery Basemap; USGS
*Map created by Jovian Sackett ( jsackett@selcnc.org)*
*Date: October 27, 2016*

Southern
Environmental
Law Center

Exhibit 2

# Gallatin Power Station
## Seep, Monitoring Wells, and Coal Ash Impoundments
## With Sinkhole Data Overlaid



**Legend**

Seep (Independently Identified)

Seep (TVA Identified)

Monitoring Well

Other Site

River Mile

Sinkholes (1950 Topography)

Sinkholes (1951 Photogeology)

Service Layer Credits: NAIP Imagery (USDA, 2014)
Map created by Jovian Sackett ( jsackett@selcnc.org)
Last Updated: 2/3/2015

Southern
Environmental
Law Center

0  500  1,000  2,000  3,000 Feet

Exhibit 3



# EXHIBIT 7

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) | No. 15-23-IV |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) | |
| Plaintiff-Intervenors, | ) ) | |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## DEFENDANT TENNESSEE VALLEY AUTHORITY'S ANSWER

### JURISDICTION AND VENUE

1.      Answering the allegations of paragraph 1, TVA admits that jurisdiction is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-117, but denies that jurisdiction over the Tennessee Valley Authority is proper under Tenn. Code Ann. § 69-3-115.

2.      Answering the allegations of paragraph 2, TVA admits that venue is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-117, but denies that venue over the Tennessee Valley Authority is proper under Tenn. Code Ann. § 69-3-115.

### PARTIES

3.      Admitted.

4.  Admitted.

5.  TVA admits the allegations of the first, second, and third sentences of paragraph 5. Answering the allegations of the fourth sentence of paragraph 5, TVA admits that the current definitions of "person" in the Tennessee Solid Waste Disposal Act and the Tennessee Water Quality Control Act include TVA, but denies that TVA fell within the definition of "person" under these statutes at "all times." TVA further states that the proper provision in the Tennessee Water Quality Control Act for the definition of "person" is Tenn. Code Ann. § 69-3-103(26). TVA admits the allegations of the fifth sentence but states that William D. Johnson is TVA's Chief Executive Officer.

## TENNESSEE SOLID WASTE DISPOSAL ACT

6.  Admitted.

7.  Admitted.

8.  Answering the allegations of paragraph 8, TVA admits that Tenn. Code Ann. § 68-211-107(a) empowers the Commission, in the exercise of general supervision over the operation and maintenance of solid waste processing facilities and disposal facilities or sites, to "investigate such facilities, operations and sites as often as the commissioner deems necessary." Except as expressly admitted, TVA denies the allegations of paragraph 8.

9.  Admitted.

10. Admitted.

11. TVA admits the allegations of paragraph 11 but states that civil penalties of up to $7,000 are permitted only if the violation involves the disposal of solid waste into a sinkhole.

## TENNESSEE WATER QUALITY CONTROL ACT

12. Admitted.

13. Admitted.

2

14.     Admitted.

15.     TVA admits the allegations of paragraph 15 but states that the cited statute also states that discharges "due to an unavoidable accident" or actions "properly authorized" are not unlawful under the provisions of the TWQCA.

16.     Admitted.

17.     Admitted.

18.     Admitted.

## FACTS

### NON-REGISTERED SITE #83-1324

19.     TVA admits the allegations of paragraph 19, but states that TVA ceased disposal activities at the Non-Registered Site before enactment of Section 313 of the federal Clean Water Act, 33 U.S.C. § 1323, and before enactment of Section 6001 of the federal Solid Waste Disposal Act, 42 U.S.C. § 6961. Except as expressly admitted, the allegations of paragraph 19 are denied.

20.     TVA admits the allegations of the first and second sentences of paragraph 20, but states that TVA developed a closure plan for the Non-Registered Site voluntarily. Answering the allegation of the third sentence of paragraph 20, TVA is without information to admit or deny whether the groundwater at the Non-Registered Site is classified as a "waters of the state." Except as expressly admitted, the allegations of paragraph 20 are denied.

21.     TVA admits the allegations of paragraph 21 but states that nothing other than beryllium, cadmium, and nickel were detected at levels above TDEC's maximum contaminant levels in 2008.

22.     Answering the allegations of paragraph 22, TVA admits that TDEC gave TVA notice in February 2009 that the Non-Registered Site was being placed in an assessment

3

monitoring program, but TVA denies that state law authorized or required TDEC to place the Non-Registered Site in this program. Except as expressly admitted, TVA denies the allegations of paragraph 22.

23.     Answering the allegations of paragraph 23, TVA admits that TDEC directed TVA to prepare a Groundwater Quality Assessment Plan and that TDEC approved TVA's plan in April 2011, but TVA denies that state law authorized or required TDEC to direct TVA to submit such plan. Except as expressly admitted, TVA denies the allegations of paragraph 23.

24.     Admitted.

25.     TVA admits the allegations of the first sentence of paragraph 25. TVA denies the allegations of the second sentence of paragraph 25. Except as expressly admitted, TVA denies the allegations of paragraph 25.

## NPDES PERMIT NO. TN0005428

26.     Admitted.

27.     Admitted.

28.     TVA admits the allegations of the first sentence of paragraph 28. TVA denies the allegations of the second sentence of paragraph 28 and states that Fly Ash Pond E discharges to Bottom Ash Pond A, then Stilling Pond B, then Stilling Pond C, then to Stilling Pond D before discharging to the Cumberland River through Outfall 001.

29.     TVA admits the allegations of paragraph 29 and states that, in addition to the use classifications listed, the Cumberland River is also classified for navigation.

30.     TVA admits the allegations of the first, second, and fourth sentences of paragraph 30. TVA denies the allegations of the third sentence of paragraph 30. Except as expressly admitted, TVA denies the allegations of paragraph 30.

4

31.     Answering the allegations of the first sentence of paragraph 31, TVA admits that the NPDES permit imposes daily maximum and monthly average limits on oil & grease and total suspended solids and weekly limits on pH at Outfall 001, but TVA denies that the permit contains limits on discharges of metals, coal ash byproduct constituents, or flow at Outfall 001, and states that the permit requires monitoring of metals and flow at Outfall 001. Answering the allegations of the second sentence of paragraph 31, TVA admits that the NPDES permit requires TVA to submit monthly discharge monitoring reports to report on its compliance with its limits at Outfall 001 and to provide the results of its monitoring of metals and flow at Outfall 001. Except as expressly admitted, TVA denies the allegations of paragraph 31.

32.     Denied.

33.     Answering the allegations of paragraph 33, TVA admits that it voluntarily installed groundwater monitoring wells around the Ash Pond Complex and that those wells gathered data on potential groundwater contamination, but states that TVA discontinued its voluntary monitoring of those wells in September 2014.

34.     TVA is without information to admit or deny the allegations of paragraph 34 and therefore denies them, but states that TVA's groundwater monitoring results from its wells around the Ash Pond Complex have not shown exceedances of maximum contaminant levels for the area's groundwater since monitoring wells were voluntarily installed in 2011.

35.     TVA admits the allegations of the first sentence of paragraph 35. Answering the allegations of the second sentence of paragraph 35, TVA admits that the escape of impounded wastewater from the Ash Pond Complex dikes could qualify as a "seep" but denies that all "seeps" are caused by the escape of wastewater; "seeps" and potential seeps or areas of interest can result from other causes unrelated to the escape of impounded wastewater. Except as expressly admitted, TVA denies the allegations of paragraph 35.

36.     Answering the allegations of paragraph 36, TVA admits that the Gallatin NPDES permit requires daily visual inspections of dams, dikes, and toe areas, and requires TVA to report to TDEC and begin remediation procedures within 24 hours of discovering changes that indicate a potential compromise to the structural integrity of the impoundment. Except as expressly admitted, TVA denies the allegations of paragraph 36.

37.     Answering the allegations of paragraph 37, TVA states that it has reported to TDEC seeps related to the Ash Pond Complex but denies that such seeps are unpermitted discharges because they are not hydrologically connected to "waters of the state," because they are not flowing, because they have been remediated, or because they are routed and treated before discharging through permitted Outfall 001. Except as expressly admitted, TVA denies the allegations of paragraph 37.

## CAUSES OF ACTION

## NRS VIOLATIONS

38.     Admitted.

39.     Admitted that this is a partial description of solid waste from the Tennessee Solid Waste Disposal Act.

40.     Denied.

41.     Admitted.

42.     Admitted.

43.     Denied.

44.     Denied.

45.     Answering the allegations of the first sentence of paragraph 45, TVA admits that the Court may impose civil penalties generally, but states that penalties of up to $7,000 per day are permitted only when a violation involves the disposal of waste into a sinkhole and further

6

states that there are no allegations of disposal of waste into a sinkhole in the Complaint. TVA admits the allegations of the second sentence of paragraph 45. TVA denies the allegations of the third sentence of paragraph 45. Except as expressly admitted, TVA denies the allegations of paragraph 45.

46.     TVA admits the allegations of paragraph 46 but states that the cited statute also states that discharges "due to an unavoidable accident" are not unlawful under the provisions of the TWQCA.

47.     Admitted.

48.     Denied.

49.     Denied.

50.     TVA admits the allegations of the first and second sentences of paragraph 50, but denies the allegations of the third sentence of paragraph 50. Except as expressly admitted, TVA denies the allegations of paragraph 50.

## ASH POND COMPLEX VIOLATIONS

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     TVA admits the allegations of the first and second sentences of paragraph 55, but denies the allegations of the third sentence of paragraph 55. Except as expressly admitted, TVA denies the allegations of paragraph 55.

7

## ANSWER TO PRAYER FOR RELIEF

TVA denies that Plaintiff is entitled to the relief requested, or to any relief.

## AFFIRMATIVE DEFENSES

### First Defense

TVA is immune from civil penalties under the Tennessee Water Quality Control Act of 1977, *as amended*, Tenn. Code Ann. §§ 69-3-101 to 69-3-148.

### Second Defense

To the extent there were any violations of the Tennessee Water Quality Control Act, they have been remediated.

### Third Defense

TVA is shielded from liability by virtue of its compliance with the National Pollutant Discharge Elimination System Permit issued to it by TDEC.

### Fourth Defense

There is no jurisdiction over the Non-Registered Site under the Tennessee Solid Waste Disposal Act.

8

## Fifth Defense

TVA has sovereign immunity and may not be sued except to the extent that its immunity has been waived by Congress.

Respectfully submitted,

Edwin W. Small, Deputy General Counsel,
    BPR No. 012347
Maria V. Gillen, Senior Attorney,
    BPR No. 030655
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

2804232

9

# CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2015, I forwarded a true and exact copy of the foregoing

document by first class U.S. mail and electronic mail to:

Emily B. Vann
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
(615) 532-2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*


Delta Ann Davis
Elizabeth A. Alexander
Anne E. Passino
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, TN 37213
(615) 921-9470
adavis@selctn.org

*Attorneys for Plaintiff-Intervenors*



Attorney for Tennessee Valley Authority

10

# EXHIBIT 8

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

RECEIVED

MAR 1 0 2015

Dav. Co. Chancery Court

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT | ) | |
| H. SLATERY, III, in his official capacity as | ) | |
| the Attorney General and Reporter of Tennessee | ) | |
| and ROBERT J. MARTINEAU, JR., | ) | No. 15-23-II |
| Commissioner of the Tennessee Department of | ) | |
| Environment and Conservation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER GRANTING MOTION FOR PRO HAC VICE ADMISSION OF
ATTORNEY FRANK S. HOLLEMAN III**

Good cause appearing, the motion of Plaintiff-Intervenors for pro hac vice admission of

Attorney Frank S. Holleman III is GRANTED.

Date: _____

_____

Chancellor Russell T. Perkins

# EXHIBIT 9

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT H.      )
SLATERY III, in his official capacity as the   )
Attorney General and Reporter of Tennessee and )
ROBERT J. MARTINEAU, JR., Commissioner of )
the Tennessee Department of Environment and   )
Conservation,                                  )
                                               )
                   Plaintiffs,                 )
                                               )
         and                                   )        No. 15-23-IV
                                               )
TENNESSEE CLEAN WATER NETWORK and             )
TENNESSEE SCENIC RIVERS ASSOCIATION,          )
                                               )
                   Plaintiffs-Intervenors,     )
                                               )
         v.                                    )
                                               )
TENNESSEE VALLEY AUTHORITY,                    )
                                               )
                   Defendant.                  )

## DEFENDANT TENNESSEE VALLEY AUTHORITY'S ANSWER
## TO COMPLAINT IN INTERVENTION

### I.      NATURE OF THE ACTION

1.      Answering the allegations of paragraph 1, TVA admits that the State brought a

civil enforcement action under the cited state statutes, but states that TVA is immune from civil

penalties under the TWCQA and that the TWQCA spans Tenn. Code Ann. §§ 69-3-101 to

69-3-148.  Except as expressly admitted, TVA denies the allegations of paragraph 1.

2.      Denied.

3.      Denied.

4.      Admitted.

5.       Answering the allegations of paragraph 5, TVA admits that the State's Complaint in this action states that the State's enforcement action is "in response to the Citizens' Groups' 60-day Notice of Violation letter."  TVA is without information to admit or deny the allegations of paragraph 5 regarding communications between the State and the Plaintiff-Intervenors. Except as expressly admitted, TVA denies the allegations of paragraph 5.

## II.       PARTIES

6.       Upon information and belief, TVA admits the allegations of the first sentence of paragraph 6.  TVA denies the allegations of the second sentence of paragraph 6.  Except as expressly admitted, TVA denies the allegations of paragraph 6.

7.       Upon information and belief, TVA admits the allegations of paragraph 7.

8.       Upon information and belief, TVA admits the allegations of paragraph 8.

9.       Upon information and belief, TVA admits the allegations of paragraph 9.

10.       Upon information and belief, TVA admits the allegations of paragraph 10.

11.       Upon information and belief, TVA admits the allegations of paragraph 11.

12.       Upon information and belief, TVA admits the allegations of the first sentence of paragraph 12.  TVA denies the allegations of the second and third sentences of paragraph 12. Except as expressly admitted, TVA denies the allegations of paragraph 12.

13.       Upon information and belief, TVA admits the allegations of paragraph 13.

14.       Denied.

15.       Admitted.

16.       Admitted.

17.       TVA admits the allegations of the first sentence of paragraph 17, but states that the appropriate citation for the TVA Act, as amended, is 16 U.S.C. §§ 831-831ee.  TVA admits the allegations of the second sentence of paragraph 17.  TVA denies the allegations of the third

sentence of paragraph 17.  Answering the allegations of the fourth sentence of paragraph 17, TVA admits that the TVA Act at 16 U.S.C. § 831c(b) provides that TVA "[m]ay sue and be sued in its corporate name."  TVA admits the allegations of the fifth sentence of paragraph 17 but states that William D. Johnson is TVA's Chief Executive Officer.  Except as expressly admitted, TVA denies the allegations of paragraph 17.

### III.  JURISDICTION AND VENUE

18.  Answering the allegations of paragraph 18, TVA admits that jurisdiction over the State's action against TVA is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-117, but denies that jurisdiction over the Tennessee Valley Authority is proper under Tenn. Code Ann. § 69-3-115.  Except as expressly admitted, TVA denies the allegations of paragraph 18.

19.  Answering the allegations of paragraph 19, TVA admits that venue in the State's action against TVA is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-117, but denies that venue over the Tennessee Valley Authority is proper under Tenn. Code Ann. § 69-3-115.  Except as expressly admitted, TVA denies the allegations of paragraph 19.

20.  Answering the allegations of paragraph 20, TVA admits that, pursuant to 33 U.S.C. § 1323(a), TVA is subject to the jurisdiction of this Court for claims of injunctive relief by the State stemming from allegations of violations of state law respecting the control and abatement of water pollution.  Except as expressly admitted, TVA denies the allegations of paragraph 20.

### IV.  GENERAL ALLEGATIONS

21.  Admitted.

22.  Admitted.

23.  TVA admits the allegations of the first and second sentences of paragraph 23. Answering the allegations of the third sentence of paragraph 23, TVA states that 235,000 tons of

3

coal ash are not consistently produced each year and that this figure represents the maximum annual value of historical coal ash production since 2006. Answering the allegations of the fourth sentence of paragraph 23, TVA states that coal ash is sluiced to a settling pond on the plant property. Except as expressly admitted, TVA denies the allegations of paragraph 23.

24.     Answering the allegations of paragraph 24, TVA admits that the ash ponds are bounded adjacent to the Cumberland River by earthen dikes and states that Gallatin's ponds may have a naturally occurring clay liner. Except as expressly admitted, TVA denies the allegations of paragraph 24.

25.     Upon information and belief, TVA admits the allegations of paragraph 25.

26.     Upon information and belief, TVA admits the allegations of paragraph 26.

27.     Admitted.

28.     TVA is without information to admit or deny the allegations of paragraph 28.

29.     Denied.

30.     Denied.

31.     Answering the allegations of paragraph 31, TVA admits that the groundwater at the Gallatin Plant is a water of the State of Tennessee. Except as expressly admitted, TVA denies the allegations of paragraph 31.

32.     Denied.

33.     Admitted.

34.     Answering the allegations of paragraph 34, TVA admits that the coal ash ponds at Gallatin were rated in 2009 by TVA staff as having "significant" hazard potential, which does not reflect their actual stability but rather the probable impacts that would result should they fail; specifically, a "significant" hazard indicates that "failure or misoperation results in no probable loss of human life but can cause economic loss, environmental damage, disruption of lifeline

4

facilities, or can impact other concerns." TVA denies that EPA made this determination in 2009. Except as expressly admitted, TVA denies the allegations of paragraph 34.

35. TVA denies the allegations of the first sentence of paragraph 35, and states that EPA found "the Gallatin Fly Ash Pond E is rated **SATISFACTORY** for continued safe and reliable operation" and that "the Bottom Ash Pond A and the system of Stilling Ponds B, C, and D are rated **FAIR**." Answering the allegations of the second sentence of paragraph 35, TVA states the EPA concluded that because TVA "has taken the necessary action to replace an existing deficient spillway at Bottom Ash Pond A and to make improvements in the stilling ponds (Pond B, C, and D), for improving the design flood routing through the CCR Complex to prevent overtopping of the dikes, the inadequacy is considered temporary. Upon completion of the new spillway and stilling pond improvements, the CCR Complex will be considered adequate with respect to hydrologic/hydraulic safety." Except as expressly admitted, TVA denies the allegations of paragraph 35.

36. Answering the allegations of paragraph 36, TVA states that in a June 13, 2013, letter, EPA stated, "Since these recommendations relate to actions which could affect the structural stability of the CCR management unit(s) and, therefore, protection of human health and the environment, EPA believes their implementation should receive the highest priority." Except as expressly admitted, TVA denies the allegations of paragraph 36.

37. Denied.

38. Denied.

39. Denied.

## A.    The Gallatin Plant Coal Ash Ponds

40.    Answering the allegations of paragraph 40, TVA states that it adds water to the coal ash from the Gallatin Plant and sluices it to a settling pond.  Except as expressly admitted, TVA denies the allegations of paragraph 40.

41.    TVA admits the allegations of the first and second sentences of paragraph 41 but states that ash is sluiced only to one settling pond.  TVA denies the accuracy of Exhibit 1 attached to Intervenors' Complaint.   Except as expressly admitted, TVA denies the allegations of paragraph 41.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Answering the allegations of paragraph 46, TVA admits that the Gallatin plant is located in an area with karst geology, which has had sinkhole activity, and denies the accuracy of Exhibit 2 attached to Intervenors' Complaint.  Except as expressly admitted, TVA denies the allegations of paragraph 46.

47.    Answering the allegations of paragraph 47, TVA admits that it undertook a study and produced a report based on that study dated April 1977, entitled "Magnitude of Ash Disposal Pond Leakage Problem: Gallatin Steam Plant," that such report was attached to a memorandum with the same subject dated June 13, 1977, and that the language quoted in paragraph 47 is a partial quotation from the report.  Except as expressly admitted, TVA denies the allegations of paragraph 47.

6

48.     Answering the allegations of paragraph 48, TVA states that the referenced report states, "The leakage rate is equal to the inflow rate of the ash sluice water into the pond . . . ." Except as expressly admitted, TVA denies the allegations of paragraph 48.

49.     Denied.

### B.     The Abandoned Ash Pond:  Non-Registered Site #83-1324

50.     Answering the allegations of paragraph 50, TVA admits that, until around 1970, TVA placed ash in a facility comprised of a series of ponds beside the Cumberland River which is now closed, and states that these ponds may have a naturally occurring clay liner.  Except as expressly admitted, TVA denies the allegations of paragraph 50.

51.      TVA admits that it ceased disposal at Non-Registered Site # 83-1324 around 1970 when the area reached capacity and that the area is closed, and states that the area no longer contains or impounds water and is vegetated, and further states that TVA and TDEC refer to the area as "Non-Registered Site # 83-1324," which is an identifier assigned by TDEC.  Except as expressly admitted, TVA denies the allegations of paragraph 51.

52.     Answering the allegations of paragraph 52, TVA admits that the surface area of the Non-Registered Site is estimated to be 73 acres inside the dikes, the height of the Non-Registered Site is estimated to be 25 feet from toe to top of dike, and the Non-Registered Site's estimated coal ash storage is unknown because the area is closed.  Except as expressly admitted, TVA denies the allegations of paragraph 52.

53.     Answering the allegations of paragraph 53, TVA admits that it ceased disposal at Non-Registered Site # 83-1324 in approximately 1970 when the area reached capacity, that the area is closed and no longer contains or impounds water, and that TVA developed a closure plan for the Non-Registered Site in 1997 at the request of TDEC.  Except as expressly admitted, TVA denies the allegations of paragraph 53.

54. Answering the allegations of paragraph 54, TVA admits that it ceased disposal at Non-Registered Site # 83-1324 in approximately 1970 when the area reached capacity, that the area is closed and no longer contains or impounds water, and that TVA installed monitoring wells and began collecting groundwater data in 2000, but TVA denies that state law authorized or required TDEC to direct TVA to develop a closure plan. Except as expressly admitted, TVA denies the allegations of paragraph 54.

55. Answering the allegations of paragraph 55, TVA admits that TVA's groundwater monitoring in 2002 indicated the presence of beryllium and cadmium at or exceeding MCLs, and states that although cobalt was present in amounts exceeding MCLs, TDEC concurred with TVA's assessment that those exceedances were due to naturally occurring background levels of cobalt. Except as expressly admitted, TVA denies the allegations of paragraph 55.

56. Denied.

57. Denied.

58. Answering the allegations of paragraph 58, TVA admits that it installed new groundwater monitoring wells in 2011. Except as expressly admitted, TVA denies the allegations of paragraph 58.

59. Answering the allegations of paragraph 59, TVA admits that a Preliminary Ecological Screening Evaluation of Groundwater Discharges at the Abandoned Ash Disposal Area (Non-Registered Site # 83-1324) at Gallatin yielded measured and modeled concentrations of beryllium, cadmium, nickel, and zinc that "may pose a risk to aquatic biota in the groundwater discharge zone of the Cumberland River [but that] the conservative assumptions required for [the study's] screening evaluation are likely to overestimate potential risks." Except as expressly admitted, TVA denies the allegations of paragraph 59.

60. Denied.

8

61.     Denied.

62.     Denied.

63.     Denied.

64.     Answering the allegations of paragraph 64, TVA states that it has begun a root cause analysis in response to the groundwater monitoring results.  Except as expressly admitted, TVA denies the allegations of paragraph 64.

65.     Denied.

**C.      The Active Ash Pond Complex:  Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D**

66.     Answering the allegations of paragraph 66, TVA admits that it ceased disposing ash at the Non-Registered Site in approximately 1970, that the Non-Registered Site is closed, and that TVA now sluices ash to a settling pond.  Except as expressly admitted, TVA denies the allegations of paragraph 66.

67.     Admitted.

68.     Answering the allegations of paragraph 68, TVA states that the United States Geological Survey map attached as Exhibit 3 to Intervenors' Complaint speaks for itself.  Except as expressly admitted, TVA denies the allegations of paragraph 68.

69.     Admitted.

70.     Answering the allegations of the first sentence of paragraph 70, TVA admits that its NPDES Permit No. TN0005428 includes limits on TVA's discharge of Oil & Grease, Total Suspended Solids, and pH from Outfall 001 located at Cumberland River mile 240.5.  TVA admits the allegations of the second sentence of paragraph 70.  Except as expressly admitted, TVA denies the allegations of paragraph 70.

9

71.     Answering the allegations of paragraph 71, TVA admits that the NPDES permit for the Gallatin plant does not impose numeric limits on the discharge of the constituents listed in paragraph 71 but does contain narrative limits requiring TVA to implement best management practices to address controls on those constituents in ash pond discharges and requires TVA to monitor those constituents and report its monitoring results to TDEC.  Except as expressly admitted, TVA denies the allegations of paragraph 71.

72.     Answering the allegations of paragraph 72, TVA states that in the past five years, the reported toxic weighted pounds equivalent of aluminum has ranged from 3,044 to 8,951 TWPE; the reported toxic weighted pounds equivalent of arsenic has ranged from 932 to 7,057 TWPE; and the reported toxic weighted pounds equivalent of selenium has ranged from 847 to 4,713 TWPE.  TVA further states that on the "Discharge Monitoring Report Pollutant Loading Tool" website where EPA provides the toxic weighting factors, EPA states that a Toxic-Weighted Pound Equivalent is a number calculated from Discharge Monitoring Report data and pollutant specific toxic weighting factors and is used to compare the relative toxicities of different pollutant discharges but that "**[i]t is important to note that this value is not a measure of risk or potential for human health impacts**."  (Emphasis in original.)  Except as expressly admitted, TVA denies the allegations of paragraph 72.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Answering the allegations of paragraph 76, TVA admits that the Gallatin NPDES permit requires daily visual inspections of dams, dikes, and toe areas, and requires TVA to report to TDEC and begin remediation procedures within 24 hours of discovering changes that indicate

10

a potential compromise to the structural integrity of the impoundment. Except as expressly admitted, TVA denies the allegations of paragraph 76.

77. Denied.

78. Denied.

79. TVA admits the allegations in the first sentence of paragraph 79. Answering the allegations of the second sentence of paragraph 79, TVA states that the amount of ash produced each year varies, but admits that approximately 185,000 tons of fly ash and 45,000 tons of bottom ash annually are sluiced to Bottom Ash Pond A. Answering the allegations of the third sentence of paragraph 79, TVA states that the earthen dikes at Bottom Ash Pond A are estimated to be between 20-25 feet high and estimated to contain just under 5 million cubic yards of coal ash. Except as expressly admitted, TVA denies the allegations of paragraph 79.

80. Answering the allegations of paragraph 80, TVA states that water from Bottom Ash Pond A flows through buried pipes to Stilling Pond B, then to Stilling Pond C, and then to Stilling Pond D, before discharging to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001. Except as expressly admitted, TVA denies the allegations of paragraph 80.

81. TVA admits the allegations of the first and fourth sentences of paragraph 81. Answering the allegations of the second and third sentences of paragraph 81, TVA states that the dikes at Fly Ash Pond E are partially constructed over fly ash, estimated to be between 25-30 feet high, and estimated to contain just under 5 million cubic yards of coal ash. Except as expressly admitted, TVA denies the allegations of paragraph 81.

82. Denied.

83. Denied.

84. Admitted.

11

85.     Answering the allegations of paragraph 85, TVA admits that its monitoring wells in the vicinity of the Ash Pond Complex have shown the presence of some amount of metals and other pollutants, but states that the only pertinent regulatory standards are Maximum Contaminant Levels (MCLs) and/or groundwater protection standards (GWPS) and there have been no exceedances of MCLs or GWPS at those monitoring wells.  Except as expressly admitted, TVA denies the allegations of paragraph 85.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     TVA is without information to admit or deny the purported sampling results, and states that it is not aware of an EPA-approved protocol for sampling seeps.  Except as expressly admitted, TVA denies the allegations of paragraph 90.

91.     Denied.

### D.      Sampling Results

92.     Admitted.

93.     Answering the allegations of the first sentence of paragraph 93, TVA admits that the groundwater monitoring wells in the vicinity of the Gallatin plant are identified by number, with each well having the prefix "GAF," but TVA denies the accuracy of Exhibit 2 attached to Intervenors' Complaint.  TVA admits the allegations of the second sentence of paragraph 93 but states that the listed monitoring wells are not the only wells that exist in the vicinity of the Gallatin plant.  Except as expressly admitted, TVA denies the allegations of paragraph 93.

94.     Denied.

95. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 95.

96. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 96.

97. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 97.

98. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 98.

99. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 99.

100. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 100.

101. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 101.

102. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 102.

103. Answering the allegations of paragraph 103, TVA states that these are summaries of statements that appear in the current Agency for Toxic Substances and Disease Registry (ATSDR) toxicological profile of aluminum, but that the profile also states, among other things, that "[p]eople generally consume little aluminum from drinking water," that "[o]ral exposure to aluminum is usually not harmful," and that "[o]bvious signs of damage were not seen in animals after high oral doses of aluminum." The ATSDR report further states that, if a person is exposed to aluminum, many factors will determine whether that person will be harmed, including the

dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 103.

104. Answering the allegations of the first, third, and fourth sentences of paragraph 104, TVA states that these are summaries of statements that appear in the current ATSDR toxicological profile of arsenic. The ATSDR report further states that, if a person is exposed to arsenic, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits the allegations of the second sentence of paragraph 104. Except as expressly admitted, TVA denies the allegations of paragraph 104.

105. Answering the allegations of paragraph 105, TVA states that the current ATSDR toxicological profile of barium and barium compounds states that some studies have shown these effects, but that the profile also states, among other things, that "[t]he amount of barium found in food and water usually is not high enough to be a health concern." The ATSDR report further states that, if a person is exposed to barium and barium compounds, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 105.

106. Answering the allegations of paragraph 106, TVA states that the current ATSDR toxicological profile of boron states that "[s]tudies of dogs, rats, and mice indicate that the male reproductive organs, especially the testes, are affected if large amounts of boron are ingested for short or long period of time [but that the] doses that produced these effects in animals are more than 1,800 times higher than the average intake of boron in food by adults in the U.S. population," that "concentrations [of boron] up to 0.4 mg/L have been found in most drinking water samples," and that "[b]oron is part of the natural environment and [one will] have some

14

exposure from foods and drinking water." The ATSDR report further states that, if a person is exposed to boron, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 106.

107.    Answering the allegations of paragraph 107, TVA states that the current ATSDR toxicological profile of cadmium summarizes several studies with equivocal results from long-term exposure to cadmium or exposure to acute levels of cadmium and states "[f]or the U.S. population, cadmium exposure through the drinking water supply is of minor concern." The ATSDR report further states that, if a person is exposed to cadmium, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 107.

108.    Answering the allegations of paragraph 108, TVA admits that iron levels above the secondary MCL can produce a rusty color, reddish or orange staining, a metallic taste, or sedimentation, but denies that water containing iron becomes "unusable" as a result of certain cosmetic or aesthetic effects. Except as expressly admitted, TVA denies the allegations of paragraph 108.

109.    Answering the allegations of paragraph 109, TVA states that exposure to high lead levels can affect the nervous system and that, although EPA has determined that lead is a probable human carcinogen, the current ATSDR toxicological profile of lead states that there is "no conclusive proof that lead causes cancer (is carcinogenic) in humans" and that "very little lead is found in lakes, rivers, or groundwater used to supply the public with drinking water" and that more "than 99% of all publicly supplied drinking water contains less than 0.005 parts of lead per million parts of water (ppm)." The ATSDR report further states that, if a person is exposed

15

to lead, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 109.

110. Answering the allegations of the first and third sentences of paragraph 110, TVA states that the current ATSDR toxicological profile of manganese states that inhalation of very high levels of manganese by workers in mines and factories has been shown to affect the nervous system and that nervous system disturbances have been observed in animals after being given very high oral doses of manganese. The ATSDR report further states that, if a person is exposed to manganese, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Answering the allegations of the second sentence of paragraph 110, TVA admits that such manganese concentrations can discolor water, give water a metallic taste, and cause black staining, but denies that water containing manganese becomes "unusable." Except as expressly admitted, TVA denies the allegations of paragraph 110.

111. Answering the allegations of the first sentence of paragraph 111, TVA states that the current ATSDR toxicological profile of nickel states that "exposure to nickel may cause dermatitis in some sensitized people" and that "cancer of the lung and nasal sinus has occurred in people who have breathed dust containing certain nickel compounds while working in nickel refineries or nickel-processing plants [but that the] levels of nickel in these workplaces were much higher than usual (background) levels in the environment." The ATSDR report further states that, if a person is exposed to nickel, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits the allegations of the second sentence of paragraph 111, but states that EPA has reported that "[t]here is no evidence that nickel has the potential to cause

cancer from lifetime exposures in drinking water." Except as expressly admitted, TVA denies the allegations of paragraph 111.

112. Answering the allegations of the first sentence of paragraph 112, TVA states that EPA conducted studies "to examine the association between consumption of tap water continuing high levels of sulfates and reports of osmotic diarrhea in susceptible populations (infants and transients, i.e., those acutely exposed) [but was] unable to conduct a study of infants [and] did not find a significant dose-response association between acute exposure to sodium sulfate in water (up to 1200 mg/L) and reports of diarrhea [but] did find a weak (not statistically significant) increase in reports of diarrhea at the highest does level when it was compared to the combined lower doses." Answering the allegations of the second sentence of paragraph 112, TVA admits that EPA has established a secondary MCL of 250 mg/L for sulfates in drinking water "based on aesthetic effects (i.e., taste and odor)" and has recommended a health-based advisory for acute effects of 500 mg/L. Except as expressly admitted, TVA denies the allegations of paragraph 112.

113. Answering the allegations in the first sentence of paragraph 113, TVA admits that 40 C.F.R. § 401.15 lists selenium as a toxic pollutant, and states that the current ATSDR toxicological profile of selenium states that "[a]s shown by affected populations in China, chronic dietary exposure to . . . excess levels of selenium [10-20 times more than normal] has caused [selenosis, but that] studies of people living in areas of naturally occurring high selenium concentrations in the United States have not revealed adverse health effects in those populations." The ATSDR report further states that, if a person is exposed to selenium, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits that the allegations in the second and third sentences of paragraph 113 appear in a 2009 report entitled,

17

"Coal Combustion Waste Is a <u>Deadly</u> Poison to Fish," but is without information to admit or deny the substance of those allegations. Except as expressly admitted, TVA denies the allegations of paragraph 113.

114. Answering the allegations in the first sentence of paragraph 114, TVA admits that 40 C.F.R. § 401.15 lists thallium as a toxic pollutant and states that the current ATSDR toxicological profile of thallium states that adverse health effects can result if large amounts of thallium are eaten or drunk for short periods of time but that "[n]o information was found on health effects in humans after exposure to smaller amounts of thallium for longer periods." Answering the allegations in the second sentence of paragraph 114, TVA admits that the 1992 ATSDR profile reports such findings, but states that the profile also reports "[n]o studies were located regarding reproductive effects in humans after inhalation, oral, or dermal exposure to thallium." The ATSDR report further states that, if a person is exposed to thallium, several factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 114.

115. TVA admits that the allegations of paragraph 115 appear in a 2010 report entitled "Coal Ash: The toxic threat to our health and environment," but is without information to admit or deny the substance of those allegations. Except as expressly admitted, TVA denies the allegations of paragraph 115.

116. Denied.

# V.  APPLICABLE LAW AND REGULATIONS

117.    Answering the allegations of paragraph 117, TVA states that 33 U.S.C. § 1311(a) states:  "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."  Except as expressly admitted, TVA denies the allegations of paragraph 117.

118.    TVA admits the allegations of paragraph 118 and states that 33 U.S.C. § 1342(k) provides that compliance with a permit issued pursuant to 33 U.S.C. § 1342 shall be deemed compliance with 33 U.S.C. § 1311 for purposes of 33 U.S.C. §§ 1319 and 1365.

119.    Answering the allegations of paragraph 119, TVA admits that, pursuant to 33 U.S.C. § 1342(b), EPA approved the State of Tennessee's request to administer its own permit program under state law for discharges into navigable waters within its jurisdiction and that TDEC administers Tennessee's approved NPDES permitting and compliance program. Except as expressly admitted, TVA denies the allegations of paragraph 119.

120.    Answering the allegations of paragraph 120, TVA admits that TDEC issues NPDES permits in accordance with Tenn. Code Ann. § 69-3-108, other provisions of the Tennessee Water Quality Control Act, TDEC's implementing regulations, and the CWA.  Except as expressly admitted, TVA denies the allegations of paragraph 120.

121.    TVA admits the allegations of paragraph 121, but states the agreement is clear that it becomes effective upon last signature, which was dated October 12, 2007.

122.    Answering the allegations of paragraph 122, TVA states that EPA's pending Coal Ash Rule speaks for itself, and TVA denies any allegations that are inconsistent with that pending Rule or the ultimate version of the Rule that will be published in the Federal Register. Except as expressly admitted, TVA denies the allegations of paragraph 122.

123.     Answering the allegations of paragraph 123, TVA states that the Preamble to the Coal Ash Rule provides that "the CCR unit must be closed in a manner that will control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters."  Except as expressly admitted, TVA denies the allegations of paragraph 123.

124.     Admitted.

125.     TVA admits the allegations of paragraph 125 and states that, in addition to the use classifications listed, the Cumberland River is also classified for navigation.

126.     Answering the allegations of paragraph 126, TVA incorporates herein by reference its responses to the allegations in paragraphs 6 through 18 in TVA's Answer to the State of Tennessee's Complaint in this matter as if such responses were set forth fully in this paragraph.

127.     Denied.

128.     Answering the allegations of paragraph 128, TVA admits that Plaintiff-Intervenors sent a Notice of Intent dated November 10, 2014, but denies the allegations contained in that Notice of Intent.  Except as expressly admitted, TVA denies the allegations of paragraph 128.

### VI.     CAUSES OF ACTION

#### A.     Abandoned Ash Pond Violations

129.     Admitted.

130.     Admitted that this is a partial description of solid waste from the Tennessee Solid Waste Disposal Act.

131.     Denied.

132.     Admitted.

133. TVA admits the allegations of paragraph 133, but states that the proper citation for the quoted language is Tenn. Code Ann. § 68-211-103(9).

134. Denied.

135. Denied.

136. Answering the allegations of paragraph 136, TVA admits that the Court may impose civil penalties generally, but states that penalties of up to $7,000 per day are permitted only when a violation involves the disposal of waste into a sinkhole. Except as expressly admitted, TVA denies the allegations of paragraph 136.

137. TVA admits the allegations of the first sentence of paragraph 137. TVA denies the allegations of the second sentence of paragraph 137.

138. TVA admits the allegations of paragraph 138, but states that the cited statute states that discharges "due to an unavoidable accident" are not unlawful under the provisions of the TWQCA.

139. Answering the allegations of paragraph 139, TVA states that Tenn. Code Ann. § 69-3-114(b) states: "In addition, it is unlawful for any person to act in a manner or degree that is violative of any provision of this part or of any rule, regulation, or standard of water quality promulgated by the board or of any permits or orders issued pursuant to this part . . . ." Except as expressly admitted, TVA denies the allegations of paragraph 139.

140. Denied.

141. Denied.

142. TVA admits the allegations of the first and second sentences of paragraph 142, but denies the allegations of the third sentence of paragraph 142. Except as expressly admitted, TVA denies the allegations of paragraph 142.

## B.     Ash Pond Complex Violations

143.    Denied.

144.    Denied.

145.    Denied.

146.    Denied.

147.    TVA admits the allegations of the first and second sentences of paragraph 147, but denies the allegations of the third sentence of paragraph 147.  Except as expressly admitted, TVA denies the allegations of paragraph 147.


## ANSWER TO PRAYER FOR RELIEF

TVA denies that Plaintiff-Intervenors are entitled to the relief requested, or to any relief.


## AFFIRMATIVE DEFENSES

### First Defense

TVA is immune from civil penalties under the Tennessee Water Quality Control Act of 1977, *as amended*, Tenn. Code Ann. §§ 69-3-101 to 69-3-148.


### Second Defense

To the extent there were any violations of the Tennessee Water Quality Control Act, they have been remediated.


### Third Defense

TVA is shielded from liability by virtue of its compliance with the National Pollutant Discharge Elimination System Permit issued to it by TDEC.

## Fourth Defense

There is no jurisdiction over the Non-Registered Site under the Solid Waste Disposal Act.

## Fifth Defense

TVA has sovereign immunity and may not be sued except to the extent that its immunity has been waived by Congress.

## Sixth Defense

Plaintiff-Intervenors have no standing to pursue the claims stated in this Complaint in Intervention independent from the State's enforcement action.

## Seventh Defense

There is no private right of action under the Tennessee Water Quality Control Act or the Tennessee Solid Waste Disposal Act.

Respectfully submitted,

*s/Maria V. Gillen*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney, BPR 030655
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

29156812

# CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2015, I forwarded a true and exact copy of the

foregoing document by first class U.S. mail and electronic mail to:

Emily B. Vann, Esq.
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
615.532.2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*


Delta Ann Davis, Esq.
Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
615.921.9470
adavis@selctn.org

Frank S. Holleman III, Esq.
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, North Carolina 27516-2356
919.967.1450
fholleman@selcnc.org

*Attorneys for Plaintiff-Intervenors*


*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority

# EXHIBIT 10

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
)
     Plaintiffs, )
)
and )
) CASE NO. 15-0023
)
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCEBUC RUVERS )
ASSOCIATION, )
)
     Plaintiff-Intervenors, )
)
vs. )
)
TENNESSEE VALLEY AUTHORITY, )
)
     Defendant. )

## ORDER

The Court hereby sets Intervenors Motion in Opposition to the State of Tennessee

and TVA's Agreed Injunctive Order for a non-evidentiary hearing on January 15, 2016,

at 10:30 a.m. The Court will conduct a telephonic status conference about this matter on

January 4, 2016 at 1:30 p.m. The Court requests that the lawyers involved in this case

arrange for the conference call. If there is a scheduling conflict, the Court requests that

the lawyers contact Keturah Barnett, Deputy Clerk & Master, at (615) 862-5713.

    **IT IS SO ORDERED.**

RUSSELL T. PERKINS, CHANCELLOR

cc:    Elizabeth A. Alexander, Esq. (via facsimile)
       Delta Anne Davis, Esq. (via facsimile)
       Anne E. Passino, Esq. (via facsimile)
       Emily B. Vann, Esq. (via facsimile)
       Maria V. Gillen, Esq. (via facsimile)
       Edwin W. Small, Esq. (via facsimile)

FILED
2015 DEC 29 PM 12: 17
DAVIDSON CO. CHANCERY CT
CLERK & MASTER
DC&M

# EXHIBIT 11

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
      )
      **Plaintiffs,** )
      )
**and** )    **No. 15-23-IV**
      )
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
      )
      **Plaintiff-Intervenors,**)
**v.** )
      )
TENNESSEE VALLEY AUTHORITY, )
      )
      **Defendant.** )

RECEIVED

JAN 19 2016

Dav. Co. Chancery Court

FILED 2016 JAN 21 AM 11: 06 CLERK & MASTER DAVIDSON CO. CHANCERY CT. DC&M

---

## AGREED TEMPORARY INJUNCTION BETWEEN THE STATE OF TENNESSEE AND TENNESSEE VALLEY AUTHORITY

---

This Agreed Order is made and entered into by and between Plaintiffs Herbert H. Slatery III, the Tennessee Attorney General, and Robert J. Martineau, Jr., the Commissioner of the Tennessee Department of Environment and Conservation (collectively the State), and Defendant Tennessee Valley Authority (TVA).

For purposes of this Agreed Order only, the parties stipulate as follows:

1.    Robert J. Martineau, Jr. is the duly appointed Commissioner of the Tennessee Department of Environment and Conservation (TDEC) and as such is responsible for the

1

administration of the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder.

2.      TVA operates a facility located at 1499 Steam Plant Road, Gallatin, Sumner County, Tennessee 37066, known as the TVA Gallatin Fossil Plant (the GAF). During all times subject to the provisions of applicable Tennessee statutes and regulations, TVA was a "person" as defined by Tenn. Code Ann. § 68-211-103(6) and § 69-3-103(26).

3.      The GAF manages its coal combustion residual (CCR) material in two areas on site: a historical series of unlined ash ponds located on the western edge of the site, now known collectively as Non-Registered Site #83-1324 (the NRS), and a currently active series of unlined settling and stilling ponds located north-northeast of the NRS along the Cumberland River, comprised of Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D (the Ash Pond Complex).

4.      On December 19, 2014, the Administrator of the Environmental Protection Agency (EPA) signed a final rule that establishes a comprehensive set of requirements for the disposal of CCR material from electric utilities. This rule was published in the *Federal Register* on April 17, 2015, 80 Fed. Reg. 21302-21501, and became effective on October 19, 2015.

5.      EPA's regulations specifically do not preempt state law requirements and EPA recognized in its rulemaking the significant role that states play in implementing requirements for managing CCR material.

6.      The SWDA represents the State's comprehensive program designed to regulate solid waste disposal in an effort to protect the public health, safety, and welfare, prevent the

2

creation of nuisances, conserve the State's natural resources, and enhance the quality of the State's environment.

7.     The TWQCA represents the State's comprehensive program for the protection and preservation of the waters of the State and for the regulation of activities affecting discharges into, and/or alterations of, the waters of the State. The TWQCA defines these "waters" to encompass both surface water and groundwater. Tenn. Code Ann. § 69-3-103(44).

8.     The SWDA and TWQCA authorize TDEC's Commissioner to bring an action for injunctive and other equitable relief whenever any person has violated either Act. Tenn. Code Ann. § 68-211-115 and Tenn. Code Ann. § 69-3-117.

9.     On January 7, 2015, the State filed an action against TVA for alleged violations of the SWDA and the TWQCA at the GAF.

10.    Plaintiff-Intervenors Tennessee Clean Water Network and Tennessee Scenic Rivers Association (collectively the Citizens Groups), through their attorneys the Southern Environmental Law Center (SELC), filed a Motion to Intervene in the State's lawsuit on February 5, 2015. In accordance with Tenn. R. Civ. P. 24.01(3), the State and TVA stipulated to intervention by the Citizens Groups, which was granted on February 25, 2015.

11.    To date, the parties have engaged in significant informal discovery, with TVA providing over 100,000 pages of documents containing historical information concerning the GAF's construction and operation and on-site groundwater monitoring data.

12.    TVA has also provided information relating to its future plans for the GAF related to closure of the NRS and Ash Pond Complex and the parties have engaged in limited additional groundwater sampling at the GAF.

13.    However, TDEC is concerned that there is insufficient information concerning the

3

current hydrology and geology at the GAF, including potential for releases of CCR material to surface and/or groundwater, and has determined that additional evaluations and monitoring need to be conducted for the parties to have an accurate understanding of the current conditions at and around the site before proceeding.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. TVA will develop an Environmental Investigation Plan (EIP) for the GAF and submit it to TDEC within 60 days of the entry of this Order. The EIP shall include a schedule of the work to be performed to fully characterize the hydrology and geology of the GAF and identify the extent of soil, surface water, and groundwater contamination by CCR material.

2. The EIP will include the following, unless otherwise approved by the State, and TVA shall implement the EIP in accordance with a schedule approved by TDEC:

A. A complete hydrogeologic characterization of the GAF. The plan should be based on a 2,000 foot grid and include:

    i. bedrock borings into the Lebanon limestone logged by a professional geologist. Each boring shall be completed with borehole geophysics and include packer tests based on drilling logs and geophysical logs;

    ii. monitoring wells in the Lebanon limestone, if hydraulically viable;

    iii. monitoring wells at shallower depths at each grid location, if significant hydraulic differences are identified; and

    iv. geologic cross sections.

B. A current groundwater elevation map showing direction and rate of groundwater flow, both laterally and vertically, for the GAF and, if possible given available data, including the area within the private water well survey,

4

as provided for in D. below. Based on the groundwater elevation map, TVA will conduct surface geophysical investigations to evaluate the presence of preferred contaminant migration pathways.

C. A groundwater elevation map for anticipated future conditions after pond closure based on modeling.

D. A private water well survey for Odom's Bend Road within one mile of the GAF northern property line and bounded on the east and west by the Cumberland River-Old Hickory Lake. To the extent feasible, TVA will sample all private water wells identified in the survey for CCR constituents as specified by TDEC. If impacts related to TVA activities are found at a private well and TDEC deems those impacts to be material, TVA will develop, with the State's assistance, a plan for TVA to provide an alternate water supply to those citizens, including, where necessary, short term and long term alternate water supplies as determined for public health protection.

E. Establish a permanent network of ground water monitoring wells based on the (1) hydrogeologic investigation; (2) private water well survey; (3) surface geophysics; (4) the groundwater elevation map; and (5) groundwater flow modeling for closure conditions.

F. Identification of proposed background wells for the GAF to establish background groundwater quality at the GAF.

G. Conduct soil (overburden) borings at grid locations where overburden is present and at areas identified as seeps in previous TVA reports. The plan should include: (1) a log of each boring by a professional geologist and (2)

5

sampling for metals and other CCR constituents at 5 foot intervals, beginning with a surface sample.

H. An assessment of the quantity of CCR material in each pond or disposal area, including the quantity of CCR material below the zone of saturation and below the groundwater table. This assessment must include appropriate cross section drawings showing the CCR material profile in relation to the zone of saturation and the groundwater table. TVA shall provide an estimate of CCR material in each surface impoundment at the site, including the NRS and the complete Ash Pond Complex.

I. An analysis of the chemical and physical properties of CCR material in each of the ponds or disposal areas included in the NRS and Ash Pond Complex, including the characteristics of CCR material both above and below the zone of saturation. The analysis should include total CCR material constituent values, pH, leachability values, and engineering properties of the CCR material and use EPA's SW-846 Leaching Environmental Assessment Framework (LEAF) methods, attached hereto as Exhibits 1-4.

J. An analysis of the riverbed of the Cumberland River adjacent to the GAF to determine if there are layers of CCR material deposited into the river. TVA will collect core samples of the riverbed a minimum of 500 feet upgradient of the NRS and extending to a point a minimum of 500 feet below the primary NPDES discharge point below Pond E of the Ash Pond Complex. TVA shall include a proposed number of sampling points and distance between sampling points in the EIP. Core samples will begin at the top of the riverbed until

6

refusal or 25 feet below riverbed, whichever occurs first and the analysis shall include identifying layers of sediment and CCR material in the core samples, depth of each stratified layer and for layers with CCR material, and analysis of the CCR material using the SW-846 LEAF methods.

K. Additional surface water sampling necessary to characterize CCR contamination at the GAF where not already covered under other surface water monitoring.

3.   Within 60 days of completion of the EIP, TVA will submit an Environmental Assessment Report (EAR) to TDEC. The EAR will provide an analysis of the extent of soil, surface water, and groundwater contamination by CCR material at the site using the information obtained through the EIP.

4.   After review of the EAR, TDEC will contact the parties to discuss its conclusions and development of a corrective action plan for the GAF.

5.   In signing this Agreed Temporary Injunction, the Court does not intend for this agreed order to have an effect on the progression of the pending federal lawsuit between the Citizens Groups and TVA, styled <u>Tennessee Clean Water Network and Tennessee Scenic Rivers Association v. Tennessee Valley Authority</u>, Docket No. 3:15-cv-00424, filed in the United States District Court for the Middle District of Tennessee.


HONORABLE RUSSELL T. PERKINS
CHANCELLOR

7

APPROVED FOR ENTRY:

HERBERT H. SLATERY III
Attorney General and Reporter
State of Tennessee


EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs


EDWIN W. SMALL, BPR No. 012347
Deputy General Counsel
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-7741

Counsel for Defendant

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 19th day of January, 2016, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

Edwin W. Small
Kelly A. Love
David D. Ayliffe
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant*

EMILY B. VANN
Assistant Attorney General

9

# EXHIBIT 12

FAX RECEIVED ORDER

DATE___JAN 2 5 2016 TIME_____
DAVIDSON COUNTY CHANCERY COURT

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
                                       )
                  Plaintiffs, )
                                         )
and )
                                         )
TENNESSEE CLEAN WATER NETWORK )     No. 15-23-IV
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
                                         )
        Plaintiff-Intervenors,)
v. )
                                         )
TENNESSEE VALLEY AUTHORITY, )
                                         )
                Defendant. )

FILED 2016 JAN 26 PM 3: 16 DAVIDSON CO. MASTER CHANCERY CT DC&H

## ORDER ON INTERNENORS' MOTION IN OPPOSITION TO THE STATE OF TENNESSEE AND TVA'S AGREED INJUNCTIVE ORDER

This matter came to be heard on January 15, 2016, upon Plaintiff-Intervenors' Motion in Opposition to State of Tennessee and TVA's Proposed Agreed Injunctive Order. After consideration of the briefs, oral argument of the parties, and the record as a whole, the Court finds that Plaintiff-Intervenors' motion should be denied.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiff-Intervenors' Motion in Opposition is DENIED and that the Revised Agreed Temporary Injunction Between the State of Tennessee and Tennessee Valley Authority shall issue with the

1

alterations below as provided by the Court, in addition to the revisions made in the Agreed

Temporary Injunction filed January 19, 2016.

Additionally, the Court orders the following:

1. This matter shall be set for trial in October or November of 2017. The parties shall work together to determine an agreeable trial date and provide the Court with the proposed trial date and the estimated length of trial;

2. The parties shall provide a scheduling order, including discovery deadlines, by agreement to the Court;

3. The Court shall receive periodic status updates with regard to the work outlined in the agreed temporary injunction order, with copies of the reports also going to the parties. These reports shall be provided to the Court every 75 days, beginning from the entry date of this Order; and

*The Parties are directed to confer about the extent to which*

4. Plaintiff-Intervenors shall be permitted to participate in and propose alterations to the

nature of the work outlined in the Agreed Temporary Injunction and, if necessary, *Plaintiff-Intervenors* may seek the Court's guidance if the parties are unable to agree.

IT IS SO ORDERED.

Entered this the _____ day of _____, 2016.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

2

SUBMITTED FOR ENTRY:

*Elizabeth Alexander* ✓ permission by A. Perrino

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

*Counsel for Plaintiff-Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 25th day of January 2016 to:

Emily B. Vann
Barry Turner
Sohnia Hong
Environmental Division
Office of the Attorney General & Reporter
P.O. Box 20207
Nashville, Tennessee 37202
Phone: (615) 532-2583
Fax: (615) 741-8724

*Attorneys for Plaintiff State of Tennessee*

Edwin W. Small
David D. Ayliffe
Maria V. Gillen
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

*Elizabeth Alexander* ✓ permission by A. Perrino.

ELIZABETH A. ALEXANDER, BPR No. 019273

3

# EXHIBIT 13

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
)
           Plaintiffs, )
)
and )
)
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
)
         Plaintiff-Intervenors,)
v. )
)
TENNESSEE VALLEY AUTHORITY, )
)
         Defendant. )

RECEIVED

APR 1 1 2016

Dav. Co. Chancery Court

No. 15-23-IV

## AGREED SCHEDULING ORDER

By agreement of the parties, as evidenced by the signature of counsel below, the Court finds that a scheduling order should be entered in this matter under the terms set forth below:

1. **Written Discovery:** All written discovery, including interrogatories and responses, production of documents, and/or requests for admission and responses, shall be completed by September 30, 2016. The parties note that substantial document production already has occurred in this case.

2. **Depositions of Fact Witnesses:** All depositions of fact witnesses shall be completed by May 31, 2017.

1

3.     **Expert Discovery:**     All expert discovery shall be completed according to the following schedule:

        (A)   Plaintiffs and Plaintiff-Intervenors shall identify experts by November 30, 2016;

        (B)   Defendant shall identify experts by December 31, 2016;

        (C)   All depositions of experts identified pursuant to sections (A) and (B) shall be completed on or before April 30, 2017;

        (D)   Plaintiffs and Plaintiff-Intervenors shall identify rebuttal experts by January 31, 2017;

        (E)   All depositions of experts identified pursuant to sections (D) shall be completed on or before May 31, 2017.

4.     **Discovery Motions:**     All discovery motions shall be filed on or before June 30, 2017. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

5.     **Dispositive Motions:**     Any dispositive motions shall be filed with the Court and served upon the opposing party on or before August 31, 2017. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

6.     **Joint Status Report:** The parties shall file a Joint Status Report with the Court after completion of all depositions or after a ruling on any dispositive motions, whichever is later. Alternatively, the parties may request a Status Conference after completion of all depositions or after a ruling on any dispositive motions, whichever is later, by obtaining a date from the Docket Clerk.

7.     **Pretrial Conference:** The Court may order at its discretion, or the parties may request, a pretrial conference once all depositions have been completed and/or any dispositive motions have been ruled upon. A pretrial conference shall be held no earlier than 45 days prior to the Trial Date.

2

8. **Trial Date:** By previous order of the Court, this case shall be set for trial in October or November of 2017 by agreement of the parties once the Court's calendar becomes available.

9. **Other Matters:** All other matters not specifically addressed above are to be accomplished within the time periods provided by the Tennessee Rules of Civil Procedure and the local rules of court for Davidson County.

The above schedule may not be changed without the Court's permission.

IT IS SO ORDERED.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

3

APPROVED FOR ENTRY:

EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors

DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 11<u>th</u> day of April, 2016, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

Edwin W. Small
David D. Ayliffe
Maria V. Gillen
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

5

# EXHIBIT 14

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as The Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| and | ) NF ) CASE NO. 15-23-IV ) |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) ) ) |
| Plaintiffs-Intervenors, | ) ) |
| vs. | ) ) |
| TENNESSEE VALLEY AUTHORITY | ) ) |
| Defendant. | ) |

## ORDER

This Court hereby DENIES Plaintiff-Intervenors' Motion for relief from Tennessee Valley Authority's ("TVA") use of the Agreed Temporary Injunction to impact the progression of the federal action.

## Facts

On January 21, 2016, this Court entered an Order for an Agreed Temporary Injunction (hereafter, "Injunction") between the State of Tennessee and the TVA requiring TVA to develop and submit an Environmental Investigation Plan ("EIP") for the TVA Gallatin Fossil Plant ("GAF") and include a schedule of the work to be performed to determine the amount of

contamination at the site. This Court directed in the Injunction: "In signing this Agreed Temporary Injunction, the Court does not intend for this agreed order to have an effect on the progression of the pending federal lawsuit between the Citizens Groups and TVA, styled Tennessee Clean Water Network and Tennessee Scenic Rivers Association v. TVA, Docket No. 3:15-cv-00424, filed in the United States District Court for the Middle District of Tennessee." After the Court's Order was sent to the parties, TVA filed (in the federal lawsuit) a Motion for Leave to File Supplemental Authority, a Supplemental Brief in Further Support of TVA's Motion to Dismiss the Federal Action, and a Notice of Recent Enforcement Activity in the Environmental Enforcement Action Currently being Prosecuted in the Chancery Court of Davidson County, Tennessee. Plaintiff-Intervenors, the Conservation Groups (who are the Plaintiffs in the federal lawsuit), then filed this Motion to request that this Court order TVA to withdraw the Motion for Leave and the Supplemental Brief and take other actions as the Court finds appropriate.

The Conservation Groups ask the Court to find that TVA violated the Injunction. They explain that TVA wants the federal action dismissed on grounds that there is diligent prosecution in the state action, despite the statement in the Injunction that this Court does not intend for the Injunction to have an effect on the progression of the pending federal lawsuit. The Conservation Groups reason further that the federal lawsuit should not be precluded under 33 U.S.C. § 1365(b)(1)(B) because the Tennessee Department of Environment and Conservation ("TDEC") is not engaged in the enforcement of the same standard, order, or limitation because the enforcement provisions of the Tennessee Water Quality Control Act ("TWQCA") are different from those of the Clean Water Act ("CWA") and because TDEC is not engaged in diligent prosecution. TVA counters that the relief the Conservation Groups are seeking would violate a

2

basic principle of federalism, as a state court cannot prevent a party from pursuing a federal court remedy. It also alleges that the Motion filed by the Conservation Groups here is a "transparent attempt to harass TVA and needlessly increase the cost of litigation" in both lawsuits.

## Discussion

TVA cites a number of cases in support of its argument that state courts may not interfere with a federal court's proceedings. In *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964), the Supreme Court held that a state court could not enjoin plaintiffs, who had been unsuccessful in a comparable state court action, from prosecuting federal court actions attacking a city airport's issuance and selling of municipal bonds to build an additional runway. Similarly, the Supreme Court found in *Geneneral Atomic Co. v. Felter*, 436 U.S. 493, 495-96 (1978), that a state court could not interfere with a corporation's attempts to assert its entitlement to arbitration in federal forums. TVA also cited two Tennessee cases, *Roy v. Brittain*, 297 S.W.2d 72, 75 (Tenn. 1956) (affirming that a Tennessee state court could not enjoin enforcement of a mandate of a Federal District Court calling for integration of schools) and *JPMorgan Chase Bank v. Franklin National Bank*, No. M2005-02088-COA-R3CV, 2007 WL 2316450, at *5 (Tenn. Ct. App. Aug 13, 2007) (illustrating that Tennessee courts are not authorized to enjoin proceedings in federal court filed there after a voluntary dismissal in state court), in support of its assertion that this Court lacks the power to prevent TVA from requesting a federal court solution. Similarly here, the Conservation Groups ask the Court to find that TVA violated the Injunction, which would have the effect of preventing TVA from pursuing its motion to dismiss in the federal lawsuit.

In ordering the Injunction, this Court considered several factors, one of which was that another similar case was ongoing in federal court. This Court did not intend that the Injunction affect the federal suit, but it also never intended to preclude any party from going to federal court

3

to seek remedy. TVA has the better argument here because, despite whether the Conservation

Groups are correct in claiming that there has not been diligent prosecution in the state action, it is

truly the place of the federal court to determine that for the purposes of TVA's motion in the

federal suit.

**IT IS SO ORDERED.**

RUSSELL T. PERKINS, CHANCELLOR

cc:    Emily B. Vann, Esq.
        Edwin W. Small, Esq.
        Delta Anne Davis, Esq.
        Elizabeth A. Alexander, Esq.
        Anne E. Passino, Esq.
        Frank S. Holleman, III, Esq.



**MAILED**
10-17-16

4

# EXHIBIT 15

## IN THE SUPREME COURT OF TENNESSEE

IN RE:      <u>Regularly Scheduled Dockets July 1 – August 31, 2016</u>
Davidson County Chancery Court, Part IV
20th Judicial District

## ORDER

In the interest of the efficient and orderly administration of justice, the Chief Justice, exercising her statutory and inherent powers pursuant to Title 17, Chapter 2, Part 1 of the provisions of Tennessee Code Annotated, and Rule 11 of the Rules of the Supreme Court, hereby designates and assigns the Honorable Robert E. Lee Davies to hear any and all cases on the above-styled dockets in order to assist Chancellor Russell T. Perkins in Part IV of Davidson County Chancery Court with his caseload effective July 1, 2016.

ENTERED this 29th day of June, 2016.

_Sharon D. Lee_
Sharon G. Lee
Chief Justice

cc:      Hon. Joseph P. Binkley, Jr.
Hon. Russell T. Perkins
Hon. Robert E. Lee Davies
Davidson County Chancery Court Clerk
Administrative Office of the Courts

# EXHIBIT 16

## IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

**STATE OF TENNESSEE ex rel. HERBERT
H. SLATERY III, in his official capacity as
the Attorney General and Reporter of
Tennessee and ROBERT J. MARTINEAU,
JR., Commissioner of the Tennessee
Department of Environment and
Conservation,**

      **Plaintiffs,**

v.

**DOCKET NO.    15-23-IV**

**TENNESSEE CLEAN WATER NETWORK
and TENNESSEE SCENIC RIVERS
ASSOCIATION,**

      **Plaintiff-Intervenors,**

v.

**TENNESSEE VALLEY AUTHORITY,**

      **Defendant.**

### ORDER

Pursuant to the Order entered by the Chief Justice of the Tennessee Supreme Court on June 29, 2016, (A copy of which is attached), the Court has conducted a review of the file of this case.

The Court has reviewed the Agreed Scheduling Order entered April 15, 2016. Paragraph 8 of said Order is amended as follows:

On or before July 29, 2016, the parties will contact the Court and obtain a trial date for October 2017.

It is so **ORDERED.**

**ENTER** this _____ day of _____, 2016.

1

ROBERT E. LEE DAVIES, SENIOR JUDGE

Cc:    Chancellor Russell Perkins
          Emily B. Vann, Esq.
          Elizabeth A. Alexander, Esq.
          David D. Ayliffe, Esq.

2

# IN THE SUPREME COURT OF TENNESSEE

**IN RE:**    Regularly Scheduled Dockets July 1 – August 31, 2016
Davidson County Chancery Court, Part IV
20th Judicial District

## ORDER

In the interest of the efficient and orderly administration of justice, the Chief Justice, exercising her statutory and inherent powers pursuant to Title 17, Chapter 2, Part 1 of the provisions of Tennessee Code Annotated, and Rule 11 of the Rules of the Supreme Court, hereby designates and assigns the Honorable Robert E. Lee Davies to hear any and all cases on the above-styled dockets in order to assist Chancellor Russell T. Perkins in Part IV of Davidson County Chancery Court with his caseload effective July 1, 2016.

ENTERED this 29th day of June, 2016.

_Sharon D. Lee_
Sharon G. Lee
Chief Justice

cc:    Hon. Joseph P. Binkley, Jr.
Hon. Russell T. Perkins
Hon. Robert E. Lee Davies
Davidson County Chancery Court Clerk
Administrative Office of the Courts

# EXHIBIT 17

RECEIVED

JUL 2 6 2016

Davidson Co. Chancery Court

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
                       )
                Plaintiffs, )
                       )
and )
                       )
TENNESSEE CLEAN WATER NETWORK )       No. 15-23-IV
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
                       )
          Plaintiff-Intervenors,)
v. )
                       )
TENNESSEE VALLEY AUTHORITY, )
                       )
                Defendant. )

---

## AMENDED AGREED SCHEDULING ORDER

---

To comply with the July 13, 2016, Order of Senior Judge Robert E. Lee Davies, the parties now submit this Amended Agreed Scheduling Order. Upon receipt of the Court's Order, Plaintiffs contacted Part IV and were provided with potential trial dates of October 23-24, 2017, and October 30-November 1, 2017. Plaintiffs were also advised that these dates were the only available non-jury trial dates on the Court's October 2017 calendar. The parties were able to reach an agreement and set this matter for trial, as evidenced by the attached correspondence.

Upon review, the Court now finds that this Amended Agreed Scheduling Order, setting trial in this matter for October 30 – November 1, 2017, is well taken and should be entered under

1

the terms set forth below:

1. **Written Discovery:** All written discovery, including interrogatories and responses, production of documents, and/or requests for admission and responses, shall be completed by September 30, 2016. The parties note that substantial document production already has occurred in this case.

2. **Depositions of Fact Witnesses:** All depositions of fact witnesses shall be completed by May 31, 2017.

3. **Expert Discovery:** All expert discovery shall be completed according to the following schedule:

>    (A)    Plaintiffs and Plaintiff-Intervenors shall identify experts by November 30, 2016;
>    (B)    Defendant shall identify experts by December 31, 2016;
>    (C)    All depositions of experts identified pursuant to sections (A) and (B) shall be completed on or before April 30, 2017;
>    (D)    Plaintiffs and Plaintiff-Intervenors shall identify rebuttal experts by January 31, 2017;
>    (E)    All depositions of experts identified pursuant to sections (D) shall be completed on or before May 31, 2017.

4. **Discovery Motions:** All discovery motions shall be filed on or before June 30, 2017. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

5. **Dispositive Motions:** Any dispositive motions shall be filed with the Court and served upon the opposing party on or before August 31, 2017. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

6. **Joint Status Report:** The parties shall file a Joint Status Report with the Court after completion of all depositions or after a ruling on any dispositive motions, whichever is

2

later. Alternatively, the parties may request a Status Conference after completion of all depositions or after a ruling on any dispositive motions, whichever is later, by obtaining a date from the Docket Clerk.

7.   **Pretrial Conference**: The Court may order at its discretion, or the parties may request, a pretrial conference once all depositions have been completed and/or any dispositive motions have been ruled upon. A pretrial conference shall be held no earlier than 45 days prior to the Trial Date.

8.   **Trial Date**:   This matter is set for a non-jury trial to be held on October 30 – November 1, 2017.

9.   **Other Matters**: All other matters not specifically addressed above are to be accomplished within the time periods provided by the Tennessee Rules of Civil Procedure and the local rules of court for Davidson County.

The above schedule may not be changed without the Court's permission.

IT IS SO ORDERED.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

3

Respectfully submitted,

EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 26th day of July, 2016, to:

> Delta Anne Davis
> Elizabeth A. Alexander
> Annie E. Passino
> Frank S. Holleman III
> Southern Environmental Law Center
> 2 Victory Avenue South, Suite 500
> Nashville, Tennessee 37213
>
> *Attorneys for Plaintiff-Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*
>
> Edwin W. Small
> David D. Ayliffe
> Maria V. Gillen
> Kelly A. Love
> Office of the General Counsel
> Tennessee Valley Authority
> 400 West Summit Hill Drive
> Knoxville, Tennessee 37902
>
> *Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 156 of 332 PageID #: 162

# EXHIBIT 18

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
 )
    **Plaintiffs,** )
 )
and )
 )
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
 )
   **Plaintiff-Intervenors,**)
v. )
 )
TENNESSEE VALLEY AUTHORITY, )
 )
    **Defendant.** )

*NF*
No. 15-23-IV

RECEIVED

NOV 17 2016

Dav. Co. Chancery Court

2016 NOV 23 AM 8: 41
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
FILED

## SECOND AMENDED AGREED SCHEDULING ORDER

On July 29, 2016, this Court entered the parties' Amended Agreed Scheduling Order pursuant the terms of the July 13, 2016, Order of Senior Judge Robert E. Lee Davies. Subsequent to the entry of the Amended Agreed Scheduling Order, the parties have discussed the expert discovery schedule, the time until trial, and the ongoing environmental investigation associated with this action and reached an agreement with regard to amending the interim expert discovery dates. These revisions do not affect the trial date or any dispositive date previously established by the Amended Agreed Scheduling Order and are not opposed by Plaintiff-Intervenors.

1

Upon review, the Court now finds that this Second Amended Agreed Scheduling Order is well taken and should be entered under the terms set forth below:

1.  **Written Discovery:**   All written discovery, including interrogatories and responses, production of documents, and/or requests for admission and responses, shall be completed by September 30, 2016.   The parties note that substantial document production already has occurred in this case.

2.  **Depositions of Fact Witnesses:**   All depositions of fact witnesses shall be completed by May 31, 2017.

3.  **Expert Discovery:**   All expert discovery shall be completed according to the following schedule:

    (A)   Plaintiffs and Plaintiff-Intervenors shall identify experts by January 23, 2017;
    (B)   Defendant shall identify experts by February 27, 2017;
    (C)   Plaintiffs and Plaintiff-Intervenors shall identify rebuttal experts by March 31, 2017;
    (D)   All depositions of experts shall be completed on or before May 31, 2017.

4.  **Discovery Motions:**   All discovery motions shall be filed on or before June 30, 2017.   Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

5.  **Dispositive Motions:**   Any dispositive motions shall be filed with the Court and served upon the opposing party on or before August 31, 2017.   Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

6.  **Joint Status Report:**   The parties shall file a Joint Status Report with the Court after completion of all depositions or after a ruling on any dispositive motions, whichever is

later. Alternatively, the parties may request a Status Conference after completion of all depositions or after a ruling on any dispositive motions, whichever is later, by obtaining a date from the Docket Clerk.

7. **Pretrial Conference:** The Court may order at its discretion, or the parties may request, a pretrial conference once all depositions have been completed and/or any dispositive motions have been ruled upon. A pretrial conference shall be held no earlier than 45 days prior to the Trial Date.

8. **Trial Date:** This matter is set for a non-jury trial to be held on October 30 – November 1, 2017.

9. **Other Matters:** All other matters not specifically addressed above are to be accomplished within the time periods provided by the Tennessee Rules of Civil Procedure and the local rules of court for Davidson County.

The above schedule may not be changed without the Court's permission.

IT IS SO ORDERED.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

3

Respectfully submitted,

_[signature]_

EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

_[signature]_ BPRN 026642

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors

_[signature]_ BPRN 026642

DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

4

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the ___ day of _____ 2016, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

Edwin W. Small
David D. Ayliffe
Maria V. Gillen
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

5

# EXHIBIT 19

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
                                    )
        Plaintiffs, )
                                      )
and ) CASE NO. 15-0023-IV
                                      )
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
                                      )
        Plaintiff-Intervenors, )
                                      )
vs. )
                                      )
TENNESSEE VALLEY AUTHORITY, )
                                      )
        Defendant. )

## ORDER

The Court convened a telephonic hearing on January 4, 2017, on the request of Plaintiff–Intervenors for an expedited hearing on Plaintiff–Intervenors' Motion to Compel ("Motion"). After reviewing the relevant portions of the record and hearing the arguments of counsel for the parties, the Court, for good cause shown, based in part on the fact that counsel for the Commissioner of TDEC is leaving the country on January 12, 2017 and given that questions of whether TVA has reasonably supplemented discovery responses related to newly discovered alleged violations of the relevant statutes have been raised, the Court hereby GRANTS Plaintiff-Intervenors' request for an expedited hearing.[1]

---

[1] The Court respectfully declines to give weight to Plaintiff-Intervenors' argument that an expedited hearing is warranted here because a similar federal court case involving these parties is set for trial later this month.

The Court, therefore, sets Plaintiff-Intervenors' Motion to Compel for oral argument on January 11, 2017 at 1:30 p.m., Central Time. This will be an in-person hearing. TVA and TDEC may file written responses to the Motion on or before January 9, 2017. The Court requests that the parties convey courtesy copies of all filings related to this Motion to all other parties by expedited, same day means (fax, E-mail, hand-delivery, etc.).

IT IS SO ORDERED.

RUSSELL T. PERKINS, CHANCELLOR

cc:  Delta Anne Davis, Esq. (via facsimile)
     Elizabeth A. Alexander, Esq. (via facsimile)
     Anne E. Passino, Esq. (via facsimile)
     Frank S. Holleman, III, Esq. (via facsimile)
     Edwin W. Small, Esq. (via facsimile)
     David D. Ayliffe, Esq. (via facsimile)
     James S. Chase, Esq. (via facsimile)
     Lane E. McCarty, Esq. (via facsimile)
     Emily B. Vann, Esq. (via facsimile)


**MAILED**

2

# EXHIBIT 20

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT H.      )
SLATERY III, in his official capacity as the      )
Attorney General and Reporter of Tennessee and      )
ROBERT J. MARTINEAU, JR., Commissioner of      )
the Tennessee Department of Environment and      )
Conservation,      )
                                                        )
                    Plaintiffs,      )
                                                        )
and      )     *NF*
                                                        )     No. 15-23-1V
TENNESSEE CLEAN WATER NETWORK and      )
TENNESSEE SCENIC RIVERS ASSOCIATION,      )
                                                        )
                    Plaintiff-Intervenors,      )
                                                        )
     v.      )
                                                        )
TENNESSEE VALLEY AUTHORITY,      )
                                                        )
                    Defendant.      )

## ORDER

This matter came to be heard on January 11, 2017, upon Plaintiff-Intervenors' Motion to

Compel in which the Intervenors seek to compel Defendant Tennessee Valley Authority

("TVA") to supplement responses to Intervenors' written discovery with respect to information

and data that is being developed pursuant to the ongoing Environmental Investigation Plan

("EIP"). After consideration of the briefs, oral argument of the parties, and the record as a

whole, the Court finds that TVA has agreed to provide EIP records requested by the Plaintiffs

State of Tennessee ex rel. Attorney General and Reporter and Commissioner of the Tennessee

Department of Environment and Conservation ("State"), under a sequential production beginning

January 13, 2017, and that the pace of TVA's production of records at this stage of the litigation

is seasonable as contemplated by Tennessee Rule of Civil Procedure 26.05.

1

Accordingly, for the reasons more fully explained at the conclusion of oral argument, as set forth in the excerpts of the hearing transcript attached hereto (Hr'g Tr., Jan. 11, 2017, 20:6-22:17, Attach. 1), it is ORDERED that:

1.      TVA shall contemporaneously serve Intervenors with documents being provided to the State as part of TVA's sequential production scheduled to commence January 13, 2017, to the extent such documents are responsive to Intervenors' discovery requests.  To the extent that these documents are responsive to interrogatories, TVA shall also supplement its responses consistent with the requirements of the Tennessee Rules of Civil Procedure.

2.      This matter is set for status conference on April 6, 2017, at 1:30 p.m., at which the parties shall inform the Court of the status of work being performed under the Environmental Investigation Plan, the status of the Environmental Assessment Report, the likelihood that work required under the Agreed Temporary Injunction will be complete before trial, and any proposed amendments to the scheduling order and trial date.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

2

APPROVED FOR ENTRY:

HERBERT H. SLATERY III
Attorney General and Reporter
State of Tennessee

*Sohnia W. Hong (by permission)* *James S. Chase*

EMILY B. VANN, BPR 026642
SOHNIA W. HONG, BPR 017415
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

*Elizabeth A. Alexander (by permission)* *James S. Chase*

ELIZABETH A. ALEXANDER, BPR 019273
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors

JAMES S. CHASE, BPR 020578
TVA General Counsel's Office
400 West Summit Hill Drive
Knoxville, Tennessee 37213
(615) 921-9470

Counsel for Tennessee Valley Authority

40256013

3

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2017, the foregoing document, was served on counsel

for Plaintiffs and Plaintiff-Intervenors by sending a copy via electronic mail to the e-mail

addresses listed below and also by sending a copy via U.S. Mail:

Emily B. Vann, Esq.
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

Delta Ann Davis, Esq.
Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
(615) 921-9470
adavis@selctn.org

Frank S. Holleman III, Esq.
Southern Environmental Law Center
601 West Rosemary Street
Suite 220
Chapel Hill, North Carolina 27516-2356
(919) 967-1450
fholleman@selcnc.org

*Attorneys for Plaintiff-Intervenors*

s/

Attorney for Tennessee Valley Authority

4

Attachment 1

STATE OF TENNESSEE EX REL,, ET AL. vs.TENNESSEE VALLEY AUTHORITY
Transcript of Proceedings on 01/11/2017

FAX FILED
ON_____ JAN 1 7 2017
BY_____ D C & M
MARIA M. SALAS _____ , C & M
DAVIDSON CO. CHANCERY CT.

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official )
capacity as the Attorney General )
and Report of Tennessee and ROBERT )
J. MARTINEAU, JR., Commissioner )
of the Tennessee Department of )
Environment and Conservation, )
                                  )
          Plaintiffs, )
                                  )
and                               ) CASE NO.
                                  ) 15-23-IV
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
                                  )
          Plaintiff-Intervenors, )
                                  )
v.                                )
                                  )
TENNESSEE VALLEY AUTHORITY, )
                                  )
          Defendant. )

TRANSCRIPT OF PROCEEDINGS BEFORE
THE HONORABLE RUSSEL T. PERKINS
January 11, 2017

HUSEBY
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

STATE OF TENNESSEE EX REL., ET AL. vs.TENNESSEE VALLEY AUTHORITY
Transcript of Proceedings on 01/11/2017                    Page 20

```
 1   information, we'd appreciate it.  Thank you.
 2                 THE COURT:  Okay.  The Court's read
 3   the rule on this.
 4                 MS. ALEXANDER:  Apparently the state
 5   is already in the process of doing that, so...
 6                 THE COURT:  Okay.  Well, I'm not
 7   going to do anything that modifies the processes
 8   under the agreed temporary injunction.  Number
 9   one, it's not before me.  And, secondly, it seems
10   that I just need to focus on this discovery
11   dispute.  So I don't have a problem with the
12   parties continuing -- with TVA continuing to
13   provide information to the state on the basis that
14   it is providing it under the temporary injunction.
15   But I am going to require that TVA in producing
16   that information or in its review of its duty to
17   seasonably supplement, that to the extent that
18   that information is covered by a discovery
19   request, that it also contemporaneously serve that
20   on the requesting party, whether it be the
21   state -- well, primarily since the state is
22   getting it anyway, simultaneously serve it under
23   your duty to seasonably supplement to the
24   intervenors with an indication that you are
25   supplementing request number 9 or -- et cetera.
```

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 173 of 332 PageID #: 179

STATE OF TENNESSEE EX REL., ET AL. vs.TENNESSEE VALLEY AUTHORITY
Transcript of Proceedings on 01/11/2017          Page 21

```
 1   If it is an interrogatory request and you are
 2   providing answers rather than documents, then you
 3   probably need to have that response sworn if it is
 4   supplemental.  I suspect that most of those
 5   answers are coming by way of documents that do not
 6   necessarily have to be separately sworn.
 7             So that's -- it looks to me like that
 8   under the -- putting aside your question of the
 9   federal case and what somebody would like to be
10   prepared in the -- that we're proceeding at a --
11   at a pace that satisfies the overall obligation to
12   be seasonable.  So apart from requiring TVA to
13   simultaneously send information to the intervenors
14   if it is covered by a discovery request -- I'm not
15   altering the agreed temporary injunction
16   requirements, but if it is something that is
17   covered by the discovery request, then that should
18   be offered up at the same time it's offered to
19   TDEC.
20             Now, maybe this motion will push
21   things along, maybe it will help things move a
22   little faster, I don't know.  But it seems to me
23   in looking at all the papers on this that there's
24   been a good-faith effort to respond.  And that's
25   what the Court looks for, particularly when you're
```

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 174 of 332 PageID #: 180

1   several months out from trial.  If we were closer
2   to trial, maybe I would be a little bit more
3   stringent on this.  It makes sense to have a
4   status conference this spring, end of March,
5   maybe, first half of April, maybe.  And so we can
6   do that right now while we have the parties here.
7              But I'm going to -- on the motion to
8   compel, I'm going to rule that it appears that TVA
9   is responding with the one caveat with respect to
10  matters being produced to TDEC under the -- under
11  the injunction that TVA do a separate analysis to
12  determine whether it needs to produce that to the
13  intervenors and, if so, to produce it at the same
14  time.  Whether it falls under a category of raw
15  data or whatever the category is, if it's covered
16  by the discovery request, go ahead and produce
17  that simultaneously.
18             So when are we going to have a status
19  conference?  And after we get a status conference
20  date, I'll entertain any requests for
21  clarifications if there's something unclear about
22  how we're going to proceed.  All right?  This can
23  be done by telephone to accommodate the lawyers
24  from Knoxville or it can be in person.  I don't
25  have a preference.  The 27th or 29th of March are

# EXHIBIT 21

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT<br>H. SLATERY III, in his official capacity as the<br>Attorney General and Reporter of Tennessee<br>and ROBERT J. MARTINEAU, JR.,<br>Commissioner of the Tennessee Department<br>of Environment and Conservation,<br><br>           Plaintiffs,<br><br>and<br><br>TENNESSEE CLEAN WATER NETWORK<br>and TENNESSEE SCENIC RIVERS<br>ASSOCIATION,<br><br>           Plaintiff-Intervenors,<br>v.<br><br>TENNESSEE VALLEY AUTHORITY,<br><br>           Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>No. 15-23-IV |

RECEIVED

MAR 23 2017

Dav. Co. Chancery Court

FILED 2017 MAR 27 AM 11: 17
CLERK & MASTER
DAVIDSON CO. CHANCERY CT
DC&M

---

## AGREED ORDER ON PLAINTIFFS' MOTION FOR EXPEDITED HEARING

---

By agreement of the parties, as evidenced by the signatures of counsel below, and in accordance with Local Rule 26.07, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that Plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion to Reset Hearings on TVA's Motion to Bifurcate Liability and Remedy Portions of Trial and TVA's Motion to Condition Plaintiff-Intervenors' Participation in Depositions and at Trial, currently set for telephonic hearing on Monday, March 27, 2017, is **GRANTED**.

Although Plaintiffs also noticed the accompanying Motion to Reset for a telephonic hearing, Defendant requested that the motion be heard in-person. Plaintiffs and Plaintiff-

1

Intervenors had no objection to Defendant's request and Plaintiffs suggested beginning the hearing at 11:00 a.m. CST to provide Defendant's counsel additional time to reach Nashville. Plaintiffs contacted the Court to determine availability for an in-person hearing and received confirmation from the calendar clerk of the Court's availability to hear the Motion to Reset on the requested date and time.

Accordingly, it is hereby further **ORDERED, ADJUDGED,** and **DECREED** that Plaintiffs' Motion to Reset Hearings on TVA's Motion to Bifurcate Liability and Remedy Portions of Trial and TVA's Motion to Condition Plaintiff-Intervenors' Participation in Depositions and at Trial is set for hearing at **11:00 a.m. CST** on **Wednesday, March 29, 2017,** in Part IV of Davidson County Chancery Court. Defendant must serve its response on all parties by no later than 5:00 p.m. CST on Monday, March 27, 2017. For the purposes of this motion, the parties have consented to service via electronic mail.

IT IS SO ORDERED.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

2

Respectfully submitted,

_[signature]_

EMILY B. MANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

_[signature]_

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors

_[signature]_

DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

3

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 23rd day of March, 2017, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers
Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Edwin W. Small
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*


EMILY B. VANN
Assistant Attorney General

4

# EXHIBIT 22

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT    )
H. SLATERY III, in his official capacity as the    )
Attorney General and Reporter of Tennessee    )
and ROBERT J. MARTINEAU, JR.,    )
Commissioner of the Tennessee Department    )
of Environment and Conservation,    )
    )
                    Plaintiffs,    )
    )
and    )
    )
TENNESSEE CLEAN WATER NETWORK    )
and TENNESSEE SCENIC RIVERS    )
ASSOCIATION,    )
    )
                    Plaintiff-Intervenors,)
v.    )
    )
TENNESSEE VALLEY AUTHORITY,    )
    )
                    Defendant.    )

*NF*
No. 15-23-IV

FILED
2017 APR -4 PM 1:11
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
DC&M

---

**ORDER ON PLAINTIFFS' MOTION TO RESET HEARINGS ON TVA'S MOTION TO
BIFURCATE LIABILITY AND REMEDY PORTIONS OF TRIAL AND TVA'S
MOTION TO CONDITION PLAINTIFF-INTERVENORS' PARTICIPATION IN
DEPOSITIONS AND AT TRIAL**

---

This matter came to be heard on March 29, 2017, upon Plaintiffs' Motion to Reset

Hearings on TVA's Motion to Bifurcate Liability and Remedy Portions of Trial and TVA's

Motion to Condition Plaintiff-Intervenors' Participation in Depositions and at Trial.    After

consideration of the briefs and oral argument of the parties, the Court finds that Plaintiffs'

motion should be granted.

1

Accordingly, it is hereby **ORDERED, ADJUDGED** and **DECREED** that Plaintiffs'

Motion to Reset is **GRANTED**. Pursuant to the parties' agreement, TVA's Motion to Bifurcate

Liability and Remedy Portions of Trial and TVA's Motion to Condition Plaintiff-Intervenors'

Participation in Depositions and at Trial are now set for hearing at **1:30 p.m. on Friday, May**

**12, 2017,** in the Davidson County Chancery Court Part IV, Metro Courthouse, 4th Floor, 1

Public Square, Nashville, Tennessee. Responses and replies shall be filed and served in

accordance with Local Rule § 26.04.

IT IS SO ORDERED.


Entered this the _____ day of _____, 2017.



_____
HONORABLE RUSSELL T. PERKINS
CHANCELLOR


Respectfully submitted,



_____
EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

2

_Elizabeth A. Alexander_ _by EBr_
_BPRN 026642_

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors




_David D. Ayliffe_ _by EBr_
_BPRN 026642_

DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 30th day of March, 2017, to:

> Delta Anne Davis
> Elizabeth A. Alexander
> Annie E. Passino
> Frank S. Holleman III
> Southern Environmental Law Center
> 2 Victory Avenue South, Suite 500
> Nashville, Tennessee 37213
>
> *Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers*
> *Association and Tennessee Clean Water Network*
>
> David D. Ayliffe
> James S. Chase
> Frances Regina Koho
> Lane E. McCarty
> Edwin W. Small
> Kelly A. Love
> Office of the General Counsel
> Tennessee Valley Authority
> 400 West Summit Hill Drive
> Knoxville, Tennessee 37902
>
> *Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

4

# EXHIBIT 23



## TENNESSEE COURTS
### UNIFORM FACSIMILE FILING COVER SHEET

TO: Davidson County Chancery Court Clerk

CLERK'S FAX NUMBER: 615-862-5722

CASE NAME: _____ State of Tennessee v. Tennessee Valley Authority

DOCKET NUMBER: ____ 15-23-IV

TITLE OF DOCUMENT: _____

FROM (SENDER): David D. Ayliffe, Esq., TVA General Counsel's Office

SENDER'S ADDRESS: 400 West Summit Hill Drive, WT6A

SENDER'S VOICE TELEPHONE NUMBER: 865-632-8964

SENDER'S FAX TELEPHONE NUMBER: 865-632-2422

DATE: April 17, 2017

TOTAL PAGES, INCLUDING COVER PAGE: _5_

******************************************************************************

CONFIRMATION (For Clerk's office use only)

              **FAXED**

☒ This confirms your facsimile filing listed above was processed by __C&M__ with
the filing date of _____ APR 17 2017 _____.

Your service charge pursuant to T.R.C.P. 5A.04 is $ _10.00_

Please send your payment along with this cover sheet within 10 days to:

Clerk & Master's Office
1 Public Square, Suite 308
Nashville, TN 37201

**DENIED FOR FILING**

Your facsimile listed above WAS NOT FILED OR PROCESSED due to the following
deficiency:

☐ The facsimile filing was longer than 10 pages and not pre-approved by the
Court.

☐ The document you attempted to file by facsimile transmission is prohibited from
filing in this manner by T.R.C.P. 5A.02 (4)

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| and | ) ) | No. 15-23-IV |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) | |
| Plaintiff-Intervenors, | ) ) | |
| v. | ) ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## AGREED ORDER RESETTING HEARING ON TVA'S DISPOSITIVE MOTIONS AND ESTABLISHMENT OF BRIEFING SCHEDULE

On March 14, 2017, Defendant Tennessee Valley Authority ("TVA") filed a Motion for Summary Judgment on Plaintiffs' Verified Complaint, and on March 15, 2017, TVA filed a Contingent Motion for Judgment on the Pleadings As To The Complaint In Intervention (collectively the "Motions"). In accordance with Davidson County Local Rule 26.03, TVA noticed the hearings on the Motions for April 21, 2017.

In order to allow additional time for settlement discussions and after having ascertained the Court's availability, the parties have agreed to reset the hearing on the Motions from April

1

21, 2017, to 1:30 p.m. on June 6, 2017.[1]  Subject to the Court's approval, the parties also have

agreed to the following briefing schedule for the filing of Plaintiffs' and Plaintiff-Intervenors'

respective responses to the Motions and for the filing of TVA's reply to the responses, if any:[2]

Responses:    May 26, 2017, at 5:00 p.m. CDT

Reply to Response(s):    June 2, 2017, at 5:00 p.m. CDT

As evidenced by the signatures below, the parties respectfully request the entry of the

this Agreed Order resetting the hearing on TVA's Motions to June 6, 2017, and confirming the

briefing schedule set forth above.

---

[1]    The Court previously had scheduled a status conference for 1:30 p.m. on June 6, 2017;
therefore, the parties will defer to the Court's preference regarding the order in which the
motions should be argued and the status matters that should be discussed.

[2]    The parties have agreed to service via electronic mail for the response and reply briefs.

Respectfully submitted,

_David D. Ayliffe_

David D. Ayliffe (BPR 024297)
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov

*Attorney for Defendant Tennessee Valley Authority*

_Emily B. Vann      by permission DDA_

Emily B. Vann
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Telephone 615.532.2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

_Elizabeth H. Alexander      by permission DDA_

Elizabeth A. Alexander
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
Telephone 615.921.9470
ealexander@selctn.org

*Attorney for Plaintiff-Intervenors*

3

# CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2016, I forwarded a true and exact copy of the

foregoing document by first class U.S. mail and electronic mail to:

Emily B. Vann, Esq.
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Telephone 615.532-2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

Delta Ann Davis, Esq.
Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
Telephone 615.921-9470
adavis@selctn.org

Frank S. Holleman III, Esq.
Southern Environmental Law Center
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516-2356
Telephone 919.967-1450
fholleman@selcnc.org

*Attorneys for Plaintiff-Intervenors*

Attorney for Tennessee Valley Authority

37018052

4

# EXHIBIT 24

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

RECEIVED

APR 17 2017

Dav. Co. Chancery Court

STATE OF TENNESSEE ex rel. HERBERT ) 
H. SLATERY III, in his official capacity as the ) 
Attorney General and Reporter of Tennessee ) 
and ROBERT J. MARTINEAU, JR., ) 
Commissioner of the Tennessee Department ) 
of Environment and Conservation, ) 
                       ) 
             **Plaintiffs,** ) 
                       ) 
and ) 
                       ) 
TENNESSEE CLEAN WATER NETWORK )    *NF* 
and TENNESSEE SCENIC RIVERS )    No. 15-23-IV 
ASSOCIATION, ) 
                       ) 
          **Plaintiff-Intervenors,**) 
v. ) 
                       ) 
TENNESSEE VALLEY AUTHORITY, ) 
                       ) 
              **Defendant.** )

---

## THIRD AMENDED AGREED SCHEDULING ORDER

---

On July 29, 2016, this Court entered the parties' Amended Agreed Scheduling Order

pursuant the terms of the July 13, 2016, Order of Senior Judge Robert E. Lee Davies. On April

6, 2017, the parties appeared before the Court for a status conference in this matter. Pursuant to

the Court's Order on Status Conference, the Court now finds that this Third Amended Agreed

Scheduling Order is well taken and should be entered under the terms set forth below:

     1.    **Written Discovery:**    All written discovery, including interrogatories and

responses, production of documents, and/or requests for admission and responses, shall be

completed by September 30, 2016. The parties note that substantial document production has

1

already occurred in this case.

2. **Depositions of Fact Witnesses:** All depositions of fact witnesses shall be completed by September 30, 2017.

3. **Expert Discovery:** All expert discovery shall be completed according to the following schedule:

(A) Plaintiffs and Plaintiff-Intervenors shall identify experts by January 23, 2017;
(B) Defendant shall identify experts by February 27, 2017;
(C) Plaintiffs and Plaintiff-Intervenors shall identify rebuttal experts by March 31, 2017;
(D) All depositions of experts shall be completed by September 30, 2017.

4. **Discovery Motions:** All discovery motions shall be filed no later than 120 days before trial and in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

5. **Dispositive Motions:** Any dispositive motions shall be filed with the Court and served upon the opposing party no later than 60 days before trial and in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court. Responses shall be filed in accordance with the applicable provisions of the Tennessee Rules of Civil Procedure and the Davidson County Local Rules of Court.

6. **Joint Status Report:** The parties shall file a Joint Status Report with the Court after completion of all depositions or after a ruling on any dispositive motions, whichever is later. Alternatively, the parties may request a Status Conference after completion of all

2

depositions or after a ruling on any dispositive motions, whichever is later, by obtaining a date from the Docket Clerk.

7.   **Pretrial Conference:** The Court may order at its discretion, or the parties may request, a pretrial conference once all depositions have been completed and/or any dispositive motions have been ruled upon. A pretrial conference shall be held no earlier than 45 days prior to the Trial Date.

8.   **Trial Date:**   This matter is set for a non-jury trial to be held on December 11-22, 2017

9.   **Other Matters:** All other matters not specifically addressed above are to be accomplished within the time periods provided by the Tennessee Rules of Civil Procedure and the local rules of court for Davidson County.

The above schedule may not be changed without the Court's permission.

IT IS SO ORDERED.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

3

SUBMITTED FOR ENTRY:

HERBERT H. SLATERY III
Attorney General and Reporter


EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs


ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors


DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

4

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 17th day of April, 2017, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Edwin W. Small
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

5

# EXHIBIT 25

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

RECEIVED

APR 17 2017

Dav. Co. Chancery Court

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) ) |
| Plaintiff-Intervenors, | ) |
| v. | ) ) |
| TENNESSEE VALLEY AUTHORITY, | ) ) |
| Defendant. | ) |

No. 15-23-IV

## ORDER ON STATUS CONFERENCE

A status conference in the above-referenced matter was held before the Court on April 6, 2017, at 1:30 p.m. Participating in the status conference were Assistant Attorney General Emily B. Vann on behalf of the plaintiffs, Elizabeth A. Alexander on behalf of the plaintiff-intervenors, and David D. Ayliffe on behalf of the defendant. During the conference, the Court heard from all parties on a variety of matters, including scheduling concerns and the participation of the plaintiff-intervenors in the on-site environmental investigation. Based on the matters discussed, the Court hereby orders the following:

1. The briefing schedule on TVA's Contingent Motion for Judgment on the Pleadings as

1

to the Complaint in Intervention is unchanged.

2. For good cause shown, trial in this matter is reset to December 11, 2017 - December 22, 2017. The parties will submit an amended scheduling order reflecting this reset.

3. For good cause shown, the deadline for deposition in this matter is extended to September 30, 2017. The parties will submit an amended scheduling order reflecting this extension.

4. Plaintiff-Intervenors' request for an order allowing them to observe the ongoing dye trace study is denied.

5. Another status conference in this matter is set for June 6, 2017, at 1:30 p.m. Central Standard Time.

IT IS SO ORDERED.


Entered this the _____ day of _____, 2017.


HONORABLE RUSSELL T. PERKINS
CHANCELLOR

2

APPROVED FOR ENTRY:

HERBERT H. SLATERY III
Attorney General and Reporter


EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs


ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors


DAVID D. AYLIFFE, BPR No. 024297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 17th day of April, 2017, to:

Delta Anne Davis
Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Kelly A. Love
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

4

# EXHIBIT 26



MARIA M. SALAS
CLERK & MASTER
CHANCERY COURT

**Davidson County**

VICKI BAILEY, OFFICE MANAGER

CHRISTY DANIEL, SUPERVISOR
JULIE SPENCER, SUPERVISOR

1 PUBLIC SQUARE, SUITE 308
NASHVILLE, TENNESSEE 37201
(615) 862-5710
www.chanceryclerkandmaster.nashville.gov

# FACSIMILE

## Maria M. Salas, Clerk and Master

PHONE: 615-862-5710          FAX: 615-862-5722

TO: _Counsel of Record_

FROM: _Part IV Chancery_     FAX: _____

DATE: _5/15/17_          PAGES: _5_, including cover

COMMENTS: _Order ( Case # 15-0023-IV_
_State of Tennessee et al,_
_v. TVA_ )

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department of )
Environment and Conservation, )
            )
        Plaintiffs, )
            )
and )
            )    CASE NO. 15-0023-IV
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
            )
        Plaintiff-Intervenors, )
            )
vs. )
            )
TENNESSEE VALLEY AUTHORITY, )
            )
        Defendant. )

## ORDER ADDRESSING TVA'S MOTIONS TO BIFURCATE AND TO LIMIT PARTICIPATION OF PLAINTIFF-INTERVENORS

Defendant, Tennessee Valley Authority ("Defendant" or "TVA"), filed TVA's Motion to Bifurcate Liability and Remedy Portion of Trial ("Motion to Bifurcate") and TVA's Motion to Condition Plaintiff-Intervenors' Participation in Depositions and at Trial ("Motion to Limit Participation") on March 16, 2017 and March 17, 2017, respectively. Plaintiff-Intervenors, Tennessee Clean Water Network and Tennessee Scenic Rivers Association ("Plaintiff-Intervenors" or "Citizens Groups"), and Plaintiffs, the State of Tennessee, ex rel. the Attorney General and Reporter and the Commissioner of the Tennessee Department of Environment and Conservation ("TEDC") (collectively, "the State"), separately filed responses opposing both motions on May 8, 2017. These motions were heard on May 12, 2017.

## Motion to Bifurcate

This case is set for a two-week bench trial in December 2017. TVA's motion to bifurcate asserts that the proof relevant to relief differs significantly from the proof relevant to liability and, accordingly, the Court should order two bifurcated trials in the interest of judicial efficiency. *See* Tenn. R. Civ. P. 42.02; *Ennix v. Clay*, 703 S.W.2d 137, 139 (Tenn. 1986). The Tennessee Supreme Court has held that litigants do not have a right to bifurcation and that "the interest of justice will warrant a bifurcation of the issues in only the most exceptional cases and upon a strong showing of necessity." *Ennix*, 703 S.W.2d at 139.

Here, TVA asserts that the question of liability will turn on the extent to which the proof demonstrates that any discharges or seeps from that Gallatin Fossil Plant violate state law. TVA asserts that the proof on relief (injunctive relief and/or civil penalties) will differ from the proof on liability. On the question of injunctive relief, for example, proof related to proposed remedial approaches and economic proof on the question of whether any potential benefits of proposed remedial approaches will be outweighed by the cost of TVA's ratepayer. Additionally, proof on the question of civil penalties also has an economic thrust requiring the Court to determine whether the penalties will, at least in part, be a deterrent to illegal activity. TVA asserts that the proof related to relief (injunctive relief and civil penalties) substantially differs from proof to be offered on the question of liability. These substantial differences, TVA claims, militate in favor of bifurcation in the interest of judicial efficiency.

Citizens Groups and the State counter, urging that this case does not present an exceptional situation warranting bifurcation. They urge, variously, that: 1) bifurcation here would cause unwarranted delay; 2) there is no reason to have two trials, particularly when several of the same witnesses would testify on liability and relief issues; 3) there is

2

overlap between liability and relief issues; 4) TVA never sought bifurcation in the similar federal case pending in the United States District Court of the Middle District of Tennessee; and 5) discovery has already been initiated in this case without limitation, with no demonstrated prejudice or judicial inefficiency.

The Court is persuaded by the non-movants' arguments, and, accordingly, concludes that TVA has not made a strong showing of necessity or demonstrated that this case presents an exceptional situation warranting bifurcation. On the question of overlap between liability and relief questions, for example, the geology of the site will be central to the proof at trial, and the geology of the site necessarily bears on liability and remediation. The Court, further, is not inclined to bifurcate simply because it appears that bifurcation would not result in greater efficiency. Along these lines, bifurcation could result in arguably collateral disputes about perceived improper overlap between the two phases. Also, in weighing complex expert proof in a bench trial, it is often helpful for the Court to hear the totality of the expert proof (on liability and relief) in one sitting. This is particularly true if one or more of the parties asserts at trial that another party's expert proof is, in whole or in part, unreliable, flawed, or insubstantial. The Court, therefore, respectfully DENIES TVA's Motion to Bifurcate.

### Motion to Limit Participation

Contrary to TVA's arguments about the underlying nature of the intervention by the Citizens Groups, Plaintiff-Intervenors intervened in this case as of right, by stipulation, under Tenn. R. Civ. P. 24.01(3). Consequently, Plaintiff-Intervenors have been participating in this case for over a year without objection from TVA. TVA has not made a showing that Plaintiff-Intervenors' participation in this litigation and at trial in December 2017 should now be restricted. The Court, further, is convinced that the State and the Citizens Groups will cooperate in seeking to have this matter proceed in a

3

reasonably coordinated fashion. The Court, therefore, respectfully DENIES TVA's Motion to Limit Participation.

## Conclusion

For the foregoing reasons, the Court hereby DENIES TVA's Motion to Bifurcate and TVA's Motion to Limit Participation.

**IT IS SO ORDERED.**

RUSSELL T. PERKINS, CHANCELLOR

cc:    Emily B. Vann, Esq. (via facsimile)
Sohnia W. Hong, Esq. (via facsimile)
J. Peter Murrey, Esq. (via facsimile)
Elizabeth A. Alexander, Esq. (via facsimile)
Delta Anne Davis, Esq. (via facsimile)
Annie E. Passino, Esq. (via facsimile)
David D. Ayliffee, Esq. (via facsimile)
James S. Chase, Esq. (via facsimile)
Frances Regina Koho, Esq. (via facsimile)
Lane E. McCarty, Esq. (via facsimile)



**MAILED**

4

# EXHIBIT 27

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY, III, et al., )
)
    Plaintiffs, )
)
and )
)
TENNESSEE CLEAN WATER NETWORK )
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
)
    Plaintiff-Intervenors, )
)
v. )
)    *NF*
)    No. 15-23-IV
TENNESSEE VALLEY AUTHORITY, )
)
    Defendant. )

## MEMORANDUM AND ORDER ON TVA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' VERIFIED COMPLAINT AND ON TVA'S CONTINGENT MOTION FOR JUDGMENT ON THE PLEADINGS AS TO THE COMPLAINT IN INTERVENTION

    This is an original enforcement action under the Tennessee Solid Waste Disposal Act ("SWDA"), Tenn. Code Ann. §§ 68-211-101 to -124, the Tennessee Water Quality Control Act of 1977 ("TWQCA"), Tenn. Code Ann. §§ 69-3-101 to -137, and the rules and regulations promulgated thereunder. Plaintiffs seek injunctive relief establishing a schedule for Defendant's compliance with the SWDA, TWQCA and the rules and regulations thereunder and assessment of civil penalties for alleged violations.

    On November 10, 2014, the Southern Environmental Law Center ("SELC"), a non-profit public interest law firm, on behalf of the Tennessee Clean Water Network ("TCWN"), a citizens' group based in Knoxville, and the Tennessee Scenic Rivers

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 211 of 332 PageID #: 217

Association, a citizens' group based in Nashville (collectively "the Citizens' Groups"), issued a 60-day Notice of Violation letter to the Tennessee Valley Authority ("TVA") under the citizen suits provision of the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. § 1365, alleging multiple violations of the statutory provisions. Under 33 U.S.C. § 1365(b), a citizen suit may not be commenced prior to 60 days after the Citizens' Groups have given notice to the U.S. Environmental Protection Agency ("EPA"), the State, and the alleged violator. The Notice letter is intended to apprise the government of the alleged violations so that the government may take enforcement action, if appropriate. This original enforcement lawsuit serves as the State's commencement of an action in response to the Citizens' Groups' 60-day Notice of Violation letter.

This enforcement action is for alleged violations of the TWQCA, the SWDA, and the National Pollutant Discharge Elimination System ("NPDES") Permit No. TN0005428 ("the Permit"), reissued to Gallatin Fossil Plant in 2012 by the Tennessee Department of Environment and Conservation ("TDEC") pursuant to the CWA and the TWQCA. Plaintiff's Verified Complaint is based on the theory that seepage of coal combustion residual ("CCR") leachate from Gallatin's unlined coal ash treatment and storage facilities to surface and subsurface waters of Tennessee is in violation of the TWQCA, SWDA, and the Permit.

The TVA has moved the Court for summary judgment on Plaintiff's Verified Complaint on the grounds that the seepage of CCR leachate from Gallatin's unlined coal ash treatment and storage facilities was authorized by TDEC as a matter of law. Specifically, TVA asserts that, during the administrative process leading up to TDEC's

2

reissuance of the Permit in 2012, TDEC was aware of ongoing seepage from the Gallatin facilities and took into account potential impacts of seepage on surface and groundwater quality. TVA argues that it is entitled to summary judgment under the permit shield doctrine and under fundamental principles of permit interpretation, due process, and fair notice. TVA asserts that past and current seepage from TVA's unlined coal ash facilities at Gallatin cannot retroactively be declared unlawful.

TVA's motion for summary judgment was heard before the Court on Tuesday, June 6, 2017 at 1:30 p.m.

## I. Facts on Summary Judgment

### A. Non-Registered Site #83-1324

TVA operates a facility located at 1499 Steam Plant Road, Gallatin Tennessee, known as the TVA Gallatin Fossil Plant ("GAF"). GAF is a coal-fired electric power generating plant located on the North bank of the Cumberland River, approximately 4.5 miles South-Southeast of Gallatin, Tennessee. GAF came online in 1959, prior to the enactment of either the SWDA in 1961 or the TWQCA in 1977. GAF's generation of electricity through the burning of coal produces waste material in the form of coal ash particles, generally referred to as coal combustion residuals or CCRs. The site has not been in operation since 1970.

From 1959 to 1970, CCRs generated through the operation of GAF were sluiced to a series of unlined ash ponds located on the Western edge of the plant site. Those ponds reached capacity in 1970 and were closed. The former ash management area is now known as Non-Registered Site #83-1324 ("NRS"). In 1997, TDEC approved TVA's closure plan for the NRS, which included groundwater monitoring, and TDEC approved

3

the installation of three groundwater monitoring wells in 2000. The groundwater at the NRS is classified as waters of the state.

In September of 2008, groundwater samples collected from a monitoring well contained concentrations of constituents, including beryllium, cadmium, and nickel, detected at levels above TDEC's maximum containment levels ("MCLs") for groundwater protection standards. These exceedances triggered a requirement for additional groundwater monitoring at the NRS to determine if CCRs were currently impacting all groundwater at the GAF or posing a threat to public or private water supplies near the NRS or whether they could in the future. In February of 2009, TDEC gave TVA notice that the NRS was being placed in an assessment monitoring program pursuant to Tenn. Comp. R. & Regs. 0400-11-01-.04.

As part of the assessment, TDEC required TVA to develop a Groundwater Quality Assessment Plan, which was approved by the TDEC in April of 2011. In September and October of 2011, TVA installed additional groundwater monitoring wells and performed other sampling to gather data associated with the NRS, the GAF as a whole, and the Cumberland River. TVA submitted its Groundwater Monitoring Assessment Monitoring Project Summary and Risk Assessment Report ("the Report") to TDEC on November 25, 2014. The Report confirmed exceedances of various primary and secondary MCLs related to coal ash byproduct in the area's groundwater.

## B. NPDES Permit No. TN0005428

After the NRS reached capacity in 1970, TVA began sluicing its CCRs to a different series of unlined settling and stilling ponds. That pond complex is active and is located North-Northwest of the NRS along the Cumberland River and is comprised of

4

Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C and D ("the Ash Pond Complex"). The ponds are referred to as treatment ponds because they treat the slurry transport wastewater by allowing the coal ash particulate matter to drop out of the wastewater and to settle and accumulate in the ponds before the wastewater is released through Outfall 001 to the Cumberland River.

Bottom Ash Pond A covers approximately 248 acres with earthen dikes of 20 to 25 feet. Bottom Ash Pond A discharges through buried pipes into Stilling Pond B, which discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 ("the Permit") Outfall 001.

Fly Ash Pond E covers approximately 167 acres with earthen dikes of 25 to 30 feet. Fly Ash Pond E discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through the Permit Outfall 001.

The Cumberland River and its tributaries are waters of the state. The Cumberland River is classified for domestic water supply, industrial water supply, fish and aquatic life, recreational use, livestock watering and wildlife, and irrigation. *See* Tenn. Comp. R. & Regs. 0400-40-04-.12.

On June 26, 2012, TDEC's Division of Water Resources ("the Division") issued the Permit to TVA authorizing it to discharge effluent from the GAF under prescribed limitations to the Cumberland River through several outfalls. The Permit is for a five-year period beginning July 1, 2012 and ending May 31, 2017.[1] The Permit authorizes TVA to discharge treated effluent including, but not limited to, discharge ash transport water, chemical and nonchemical metal cleaning wastes, water treatment plant wastes,

---

[1] The Permit expired on May 31, 2017, but currently has been administratively continued.

combustion turbine oil/water separator effluent demineralizer off-spec water and filter backwash, miscellaneous equipment cooling water, ash sluice water leakage, coal pile and coal barge runoff, and storm water runoff through Outfall 001 to the Cumberland River located at mile 240.5. Outfall 001 is the only authorized discharge point for treated wastewater from the Ash Pond Complex to the Cumberland River. The Permit imposes daily maximum and monthly average limits on effluent characteristics, including, but not limited to, metals and coal ash byproduct constituents, flow, pH, oil and grease, and total suspended solids ("TSS"). The Permit requires TVA to submit weekly and/or monthly discharge monitoring reports ("DMRs") to provide monitoring results for the effluent characteristics to the Division.

TVA maintains groundwater monitoring wells around the Ash Pond Complex. The wells gather data on potential groundwater contamination resulting from the entrance of constituents related to the treatment of coal combustion byproduct from the Ash Pond Complex. The wells gather data on potential groundwater contamination resulting from the entrance of constituents related to the treatment of coal combustion byproduct from the Ash Pond Complex into the area's groundwater.

In addition to groundwater monitoring, TVA, as a condition of the Permit, conducts inspections of the Ash Pond Complex for structural defects. The Permit requires TVA to conduct a daily inspection of the impoundments, maintain records of the impoundment inspections, take immediate corrective action once a potential compromise is discovered, and report within 24-hours the discovery of a change that indicates a potential compromise to the structural integrity of a dike or the impoundment.

6

Areas in the dikes where impoundment wastewater may or is escaping from the Ash Pond Complex are generally referred to as "seeps." TVA has reported to TDEC at least ten seeps it is monitoring related to the Ash Pond Complex. For purposes of TVA's motion for summary judgment, TVA admits that seepage of CCR leachate has occurred and is occurring from GAF's unlined CCR treatment and storage facilities to waters on and beneath the surface of the ground and that some amount of CCR leachate seepage reaches the Cumberland River.

On April 25, 2016, TDEC conducted a Permit compliance inspection. The NPDES Inspection Report found no violation. TDEC's May 23, 2016 letter reporting the inspection results to TVA states: "No obvious problems with the berms or dike structure were observed during the inspection. Several past seep repairs were observed, and no noticeable seeps were occurring at these sites. . . . No permit violations were observed, and as such there are at this time no corrective actions that need to be taken." Letter from TDEC Jordan Fey to TVA's Michael Gray at 2, 3 (May 23, 2016) (Descamps, Ex. 7).

### C. Permit Rationale

A NPDES permit contains the enforceable requirements, limitations, and conditions deemed necessary for a facility to discharge into a receiving stream or body of water. A NPDES permit is only made up of the permit documentation itself. However, as a standard part of the NPDES permitting process, TDEC explains the basis for its regulatory judgments in a permit rationale. TDEC issued a forty-seven page Rationale for the Permit when it released the draft permit for public comment in May 2011. During the public comment period, TDEC received review comments from EPA Region 4, TVA,

7

and the Environmental Integrity Project ("EIP"). In response to those comments, TDEC issued an Addendum to Rationale in May 2012.

EIP Comment 12 asserted that "[t]he draft permit fails to address all known discharges," with those known discharges being discharges through seeps and groundwater. Permit, Addendum to Rational at A-14 (Descamps Ex. 1). TDEC responded:

> TDEC has addressed seeps from ash pond dikes in the previous GAF permit and this draft permit under the requirement for annual dike inspections and recent revisions for these inspections. TDEC experience with these seeps is that additional pollutant loading, if possible, would be *de minimus*, due to these factors:
>
> - The flow rate of seepage is so low as not to be measurable;
> - Seepage is more similar to a nonpoint source discharge, as it is diffused over a wide area; and
> - Quantification of any effects on the near-shore waters of Old Hickory Lake is impracticable.

Permit, Addendum to Rationale at A-14.

EIP Comment 13 asserted that "high concentrations of metals in groundwater are migrating to the Cumberland River and should be addressed in the NPDES permit." Permit, Addendum to Rational at A-14 . TDEC responded:

> TDEC coordinates the regulation of metals in groundwater between the Divisions of Solid Waste Management (DSWM) and Water Pollution Control (WPC).
>
> DSWM is currently addressing analytical data from [groundwater monitoring] well 19 and replacement well 19R, which indicate beryllium, cadmium and nickel concentrations above maximum contamination levels (MCLs). Analysis results of samples from wells 19, 19R and 20 indicate releases of other metals above natural background concentrations.

8

Presently, DSWM regulates Gallatin Fossil Plant's closed dry ash disposal area as a "Non-Registered-Site" (NRS 83-1324). Performance standards are commensurate with regulation of the disposal area as a Class II Industrial Landfill. On April 18, 2011, the DSWM approved TVA's plan for assessment of groundwater contamination for the facility. Part of this plan has included the placement of additional wells and conducting a risk assessment. DSWM will utilize information derived from the assessment and require TVA to conduct appropriate planning and implementation of corrective measures, as needed.

The Division of WPS assessed the potential effects of groundwater loadings on surface waters, in addition to the ash pond discharge, however no estimates of groundwater loadings have been made at GAF. In other TVA ash pond locations, the groundwater seepage rate has been found to be a likely insignificant factor in affecting surface water as compared to the GAF ash pond discharge to the Lake of 27 MGD.

Since it's not feasible to measure potential groundwater effects in the depths of the Lake due to the large volume of mixing, assessment of the aquatic community remains the only viable option. TVA has compiled data on Reservoir Fish Assemblage Index (RFAI) in Old Hickory Lake, upstream and downstream of GAF in 2001, -2, -3, -5, -7, and 2008, as described in the draft permit Rationale. These data demonstrate that groundwater flow has not affected the maintenance of a balanced, indigenous population in the vicinity of the plant.

Accordingly, DSWM continues to regulate groundwater conditions in the vicinity of the ash pond but no NPDES permit conditions are established.

Permit, Addendum to Rationale at A-15 (Descamps, Ex. 1).

## II. Summary Judgment Standard

Tennessee Rule of Civil Procedure 56, which was adopted in 1970, allows parties to obtain a partial or full judgment before trial if the moving party is able to "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The summary judgment mechanism was designed to fill a then-existing procedural gap "for disposition of a case in the trial courts without an actual trial on the merits if the case could not be disposed of

on demurrer or plea in abatement." Tenn. R. Civ. P. 56 advisory commission comment. The Commission, therefore, described the rule as "a substantial step forward to the end that litigation may be accelerated, insubstantial issues removed, and trial confined only to genuine issues." *Id.* Rule 56, consistent with corresponding rules adopted for the federal system and by other states, contemplates that litigants would have an adequate opportunity to develop the evidentiary record (through discovery and other means) before the case, or issues in a case, may properly be decided by summary judgment. *See* Tenn. R. Civ. P. 56.03, 56.04, 56.06, 56.07; *Craven v. Lawson,* 534 S.W.2d 653, 655 (Tenn. 1976).

It is now well-settled that a court may grant summary judgment if it determines that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997); *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993). In the summary judgment context, the court's consideration of the facts is record driven. *See McClung v. Delta Square Ltd. P'ship,* 937 S.W.2d 891, 894 (Tenn. 1996). The parties, therefore, should not attempt to establish or refute liability under Tenn. R. Civ. P. 56 by merely resting on general allegations in the pleadings. *See* Tenn. R. Civ. P. 56.06; *Byrd,* 847 S.W.2d at 215; *McCarley v. West Quality Food Serv.,* 948 S.W.2d 477 (Tenn. 1997).

In determining whether there are genuine issues of material fact, the court is required to construe the facts in the light most favorable to the nonmoving party. *See Blair v. West Town Mall,* 130 S.W.3d 761, 763 (Tenn. 2004); *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000). Simply put, "summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to

10

establish the existence of a genuine issue of material fact for trial." *Rye v. Women's Care Ctr. Of Memphis*, 477 S.W.3d 235, 265 (Tenn. 2015).[2] In ruling on a summary judgment motion, Rule 56 does not require the court to make findings of fact and conclusions of law, but, rather Rule 56 requires the court to "state the legal grounds upon which the court denies or grants the motion." Tenn. R. Civ. P. 56.04.

## III. Analysis

With certain exceptions, the TWQCA, the SWDA, and the CWA preclude discharges of pollutants into waters of Tennessee and waters of the United States. Within Tennessee, the primary exception to those statutory prohibitions is a permit issued by the TDEC that authorizes the discharge of pollutants. Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows the EPA to authorize a state to issue NPDES permits for discharges to the waters of the United States if the state permitting program meets CWA requirements. As to non-federal facilities, "[o]n December 28, 1977, the State of Tennessee was approved to administer the NPDES program within its borders." 46 Fed. Reg. 51, 644 (Oct. 21. 1981). In 1986, the EPA further delegated to Tennessee authority to issue NPDES permits to federal facilities located within the state. *See* 51 Fed. Reg. 32,834 (Sept. 16, 1986). TDEC issues NPDES permits under the TWQCA.

The TWQCA represents a comprehensive program for the protection and preservation of the waters of the state and for the regulation of activities affecting discharges into, and/or alterations of, the waters of the state. The TWQCA makes it unlawful for any person to alter the physical or chemical properties of any waters of the

---

[2] As far as the Court can determine, the *Rye* standard is consistent with the statutory standard (Tenn. Code Ann. § 20-16-101) adopted by the Tennessee General Assembly in 2011.

11

state except in accordance with the conditions of a valid permit from TDEC. *See* Tenn. Code Ann. § 69-3-108(b). "Waters" is defined as

> any and all water, public or private, on or beneath the surface of the ground, that are contained within, flow through, or border upon Tennessee or any portion thereof, except those bodies of water confined to and retained within the limits of private property, in a single ownership that do not combine or effect a junction with natural or underground waters.

Tenn. Code Ann. § 69-3-103(44). The groundwater at the NRS and the Cumberland River and its tributaries are classified as waters of the state.

Waters of the state are the property of the state and are held in public trust for the use of the people. *See* Tenn. Code Ann. § 69-3-102(a). Under the TWQCA, the State has a duty to take necessary steps to preserve and protect the public's right to enjoyment of unpolluted waters. In accordance with Tenn. Code Ann. § 69-3-107, the TDEC Commissioner is authorized to exercise general supervision and control over the quality of all state waters, as well as administer and enforce all laws and regulations relating to the pollution of waters.

The Commissioner is empowered to issue permits authorizing discharges that contain the most stringent effluent limitations, conditions, and water quality standards as necessary to comply with state and federal laws and regulations. *See* Tenn. Code Ann. § 69-3-108. The Commissioner is also empowered to undertake inspections and investigations as necessary to enforce the provisions of the TWQCA. *See* Tenn. Code Ann. § 69-3-107(5).

It is a violation of the TWQCA for any person to discharge any substance into the waters of the state (unless such action has been properly authorized) or to cause a substance to be placed in a location where such substance, either by itself or in

12

combination with other substances, causes pollution as defined under the TWQCA. *See* Tenn. Code Ann. § 69-3-114(a). It is also a violation of the TWQCA for any person to alter the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state except in accordance with the conditions of a valid permit. *See* Tenn. Code Ann. §§ 69-3-108(b)(1); 69-3-114(b). Furthermore, it is a violation of the TWQCA for any person to violate the terms or conditions of a permit issued under the TWQCA. §§ 69-3-108(b)(1); 69-3-114(b).

The SWDA represents a comprehensive program designed to regulate solid waste disposal in an effort to protect the public health, safety, and welfare, prevent the creation of nuisances, conserve the State's natural resources, and enhance the quality of the State's environment. A stated purpose of the SWDA is to "provide a coordinated statewide program of control of solid waste processing and disposal in cooperation with federal, state, and local agencies responsible for the prevention, control, or abatement of air, water, and land pollution." Tenn. Code Ann. § 68-211-102. The SWDA makes it unlawful to "[p]lace or deposit any solid waste into the waters of the state except in a manner approved by [TDEC]." Tenn. Code Ann. § 68-211-104. Solid waste is defined to include "spent material, byproducts . . . ash, sludge, and all discarded material including solid, liquid [or] semisolid . . . material resulting from industrial, commercial and agricultural operations." Tenn. Code Ann. § 68-211-103(8).

In accordance with Tenn. Code Ann. § 68-211-107, TDEC and TDEC's Commissioner are authorized to exercise general supervision over the operation and maintenance of solid waste processing and disposal facilities or sites. The Commissioner is also empowered to undertake inspections and investigations of such facilities,

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 223 of 332 PageID #: 229

operations, and sites necessary to enforce the provisions of the SWDA. It is a violation of the SWDA to construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the Commissioner. *See* Tenn. Code Ann. § 68-211-104(3).

Plaintiffs complain that seepage of CCR leachate from Gallatin's unlined coal ash treatment and storage facilities to surface and subsurface waters of Tennessee is in violation of the TWQCA, SWDA and the Permit. For purposes of TVA's motion for summary judgment, TVA admits that seepage of CCR leachate has occurred and is occurring from Gallatin's unlined CCR treatment and storage facilities to waters on and beneath the surface of the ground and that some amount of CCR leachate seepage reaches the Cumberland River. However, TVA argues that it is entitled to summary judgment under the permit shield doctrine.

Pursuant to federal law, a permit shield applies to enforcement suits against facilities with NPDES permits. *See* U.S.C. § 1342(k); 40 C.F.R. § 122.5. The shield provision applies to enforcement actions by the EPA or an approved state, as well as to enforcement through citizen suits. *See* 45 Fed. Reg. 33,290; 33,312 (May 19, 1980). The purpose of the permit shield is "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977).

The shield provision "places the burden on permit writers rather than permittees to search through the applicable regulations and correctly apply them to the permittee through its permit." 45 Fed. Reg. 33,312. The shield provision also furthers a parallel regulatory objective: "to specify all the regulatory requirements applicable to an

14

individual facility in the permit for that facility[.]" *Id.; see also* Tenn. Comp. R. & Regs. 0400-40-05-.07(1)(a) ("If more stringent effluent limitations are necessary to implement applicable water quality standards . . . or to comply with other state or federal laws or regulations, then they should be imposed in the permit.").

Thus, TVA argues, when the issuing authority for an NPDES permit (here TDEC) affirmatively considers pollution discharges in the permitting process and necessarily makes regulatory judgments about them in issuing a permit, the discharges are authorized discharges by virtue of the permit shield. TVA argues that TDEC affirmatively considered CCR leachate seeps from the Gallatin facilities and made regulatory judgments about them in reissuing the Permit. TVA argues that, under the permit shield, seepage at Gallatin could be a violation only if seepage had greatly increased between 2012 when the Permit was issued and 2015 when this lawsuit was filed. TVA asserts that, because there is no allegation of a major increase in seepage in the Verified Complaint, Gallatin's CCR leachate seeps are covered by the permit shield and cannot be considered unauthorized by TDEC.

TDEC argues that TVA's motion should be denied, as this matter is based on state, not federal, law, and the TWQCA does not contain a permit shield provision and no Tennessee state court has ever construed the TWQCA as providing a permit shield.

The CWA is premised on a cooperative federalism whereby states have the primary responsibility for enforcing the CWA within state borders. The CWA makes the states' enforcement scheme primary, and the state has substantial discretion in carrying out its surface water and groundwater programs and enforcing its requirements. The CWA has an express permit shield that provides: "Compliance with a permit issued

15

pursuant to this section shall be deemed compliance [with the federal CWA]." 33 U.S.C. § 1342(k). However, TDEC argues that while TVA asserts that the regulatory permit shield provision at 40 C.F.R. § 122.5 is applicable to state-administered NPDES programs pursuant to 40 C.F.R. § 123.25, TVA fails to include the text of the code provisions.

40 C.F.R. § 123.25 states in pertinent part: "All State Programs under this part must have legal authority to implement each of the following provisions and must be administered in conformance with each, except that States are not precluded from omitting or modifying any provision to impose more stringent requirements: . . . (2) § 122.5(a) and (b) – (Effect of a permit) . . ." 40 C.F.R. § 123.25(a)(2); *see also* 40 C.F.R § 123.1(i)(1)("Nothing in this part precludes a State from: (1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part[.]"). TDEC argues that these regulations allow the omission of the permit shield provision. Further, TDEC argues that the TWQCA's exclusion of an express permit shield provision makes the state program more stringent that the federal CWA, which is permissible under federal law and sanctioned by the EPA in its approval of Tennessee's NPDES permitting program. TDEC argues that, because there is no Tennessee permit shield law, TVA cannot assert the permit shield doctrine and therefore is not entitled to judgment as a matter of law.

The federal permit shield,[3] applicable to state programs pursuant to 40 C.F.R. § 122.5(a)-(b) provides:

---

[3] Pursuant to federal law, a permit shield applies to enforcement suits against facilities with NPDES permits. The statutory permit shield can be found at 33 U.S.C. § 1342(k), and the regulatory permit shield that mirrors the statutory permit shield can be found at 40 C.F.R. § 122.5. The statutory permit shield

16

(a) Applicable to State programs, see § 123.25.

(1) Except for any toxic effluent standards and prohibitions imposed under section 307 of the CWA and "standards for sewage sludge use or disposal" under 405(d) of the CWA, compliance with a permit during its term constitutes compliance, for purposes of enforcement, with sections 301, 302, 306, 307, 318, 403, and 405 (a)–(b) of CWA. However, a permit may be modified, revoked and reissued, or terminated during its term for cause as set forth in §§ 122.62 and 122.64.

(2) Compliance with a permit condition which implements a particular "standard for sewage sludge use or disposal" shall be an affirmative defense in any enforcement action brought for a violation of that "standard for sewage sludge use or disposal" pursuant to sections 405(e) and 309 of the CWA.

(b) Applicable to State programs, See § 123.25. The issuance of a permit does not convey any property rights of any sort, or any exclusive privilege.

*Id.* 40 C.F.R § 123.25 provides in pertinent part:

(a) All State Programs under this part must have legal authority to implement each of the following provisions and must be administered in conformance with each, except that States are not precluded from omitting or modifying any provisions to impose more stringent requirements:

* * *

(2) § 122.5(a) and (b)—(Effect of permit);

* * *

Note to paragraph (a): Except for paragraph (a)(46) of this section, states need not implement provisions identical to the above listed provisions. Implemented provisions must, however, establish requirements at least as stringent as the corresponding listed provisions. While States may impose more stringent requirements, they may not make one requirement more lenient as a tradeoff for making another requirement more stringent; for example, by requiring that public hearings be held prior to issuing any permit while reducing the amount of advance notice of such a hearing.

State programs may, if they have adequate legal authority, implement any of the provisions of parts 122 and 124. See, for

---

provides that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance [with the federal CWA]." 33 U.S.C. § 1342(k).

17

example, §§ 122.5(d) (continuation of permits) and 124.4 (consolidation of permit processing) of this chapter.

For example, a State may impose more stringent requirements in an NPDES program by omitting the upset provision of § 122.41 of this chapter or by requiring more prompt notice of an upset.

*Id.* Thus, it is clear that TDEC has the express authority under federal law to omit the permit shield provision of 40 C.F.R. § 122.5 in order to impose more stringent requirements in its NPDES program.

The TWQCA does not contain a permit shield. Furthermore, there is no state implementing rule or regulation that provides for a permit shield, and no Tennessee state court has interpreted the TWQCA, rule or regulation as providing a permit shield. This omission of the permit shield provision makes Tennessee's program more stringent than the federal CWA, which is permissible under federal law and sanctioned by the EPA in its approval of Tennessee's NPDES permitting program. Because this action was brought under state law and because the TWQCA does not contain a permit shield provision, the Court finds that TVA is not protected by the permit shield doctrine. Accordingly, TVA is not entitled to summary judgment on this ground.

To the extent TVA is asserting the federal permit shield provision is applicable to a state permit issued pursuant to state law, TDEC argues the federal CWA permit shield is not a limitless concept and does not provide an absolute bar against enforcement action. Specifically, TDEC argues that the federal permit shield is only available in two limited circumstances: 1) against claims of CWA violations based on discharges of substances not listed in an NPDES permit, provided the permittee made adequate disclosures during the permitting process and the pollutants were within the reasonable

18

contemplation of the permitting agency, or 2) against claims of CWA violations related to compliance with effluent limitations made more restrictive during the permit term.

> The Sixth Circuit has adopted a two-pronged analysis for determining whether the permit shield will apply to a particular allegation: "[f]irst, the permit holder must comply with the CWA's reporting and disclosure requirements"; and, "[s]econd, ... the discharges must be within the permitting authority's 'reasonable contemplation.'" *ICG Hazard*, 781 F.3d at 286 (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*, 268 F.3d 255, 267 (4th Cir. 2001)). The question of "reasonable contemplation" focuses in particular on whether the alleged discharges were "within the reasonable contemplation of the permitting authority *during the permit application process.*" *Id.* (quoting *Piney Run*, 268 F.3d at 267) (emphasis added).

*Tennessee Clean Water Network v. Tennessee Valley Auth.*, 206 F. Supp. 3d 1280, 1300 (M.D. Tenn. 2016).

In the Verified Complaint, the State brings a cause of action against TVA under the TWQCA and the SWDA for the NRS and under the TWQCA and the NPDES Permit for the Ash Pond Complex. As stated above, the Court finds that the TWQCA does not contain a permit shield. Furthermore, the Court finds that the federal permit shield does not apply to the causes of action alleged against TVA under state law.[4] Accordingly, the

---

[4] The Court notes that the related federal case, *Tennessee Clean Water Network v. Tennessee Valley Authority*, 206 F. Supp. 3d 1280 (M.D. Tenn. 2016), is premised on violations of the federal CWA. Regarding the issue of the application of the permit shield doctrine in the federal case, the District Court held:

> In *Sierra Club v. ICG Hazard, LLC*, the Sixth Circuit concluded that discharges of pollutants that are not expressly included in a permit may still be subject to the shield if the pollutants had been within the reasonable contemplation of the permitting agency when the permit was issued. *Id.* at 286–88. . . .

> While Plaintiffs do not dispute that this rule applies to discharges of unnamed pollutants, they urge the Court not to extend it to unnamed outfall locations, or at least not unnamed outfall locations that Plaintiffs argue may be characterized as independent point sources. Such a rule, they argue, is inconsistent with the CWA's provisions requiring an NPDES permit for "all point sources of discharge of pollutants." 33 U.S.C. § 1311(c). Nothing in the text of the permit shield provision, however, suggests that it should apply differently to violations based on the location of the discharge than it does to violations based on which pollutants are involved. The determinative issue is whether the party is in "[c]ompliance with" the relevant NPDES permit, 33 U.S.C. § 1342(k), which the Sixth

19

Circuit has read to mean that the discharges at issue were within the reasonable contemplation of the issuing agency. *ICG Hazard*, 781 F.3d at 286. As this Court reads both the case law and the purposes underlying the "reasonable contemplation" test, the Court should evaluate every feature of an alleged violation to determine if the relevant discharge or possibility thereof was adequately disclosed and reasonably contemplated. That inquiry may lead the Court to examine the pollutants at issue, but also the location of discharge, its magnitude, or any other relevant trait. The Court's analysis will inevitably be closely tied to a review of what the permittee itself disclosed, because "the scope of the permit as well as the discharge limitations contained therein are based largely on information provided by the permit applicant." *In Re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, at *10 (E.P.A. May 15, 1998). The Court now turns to the classes of allegation to which TVA seeks to apply the permit shield.

1. Seeps

TVA argues that all of Plaintiffs' claims based on seeps are categorically barred by the permit shield because seeps were within the reasonable contemplation of TDEC when it issued the NPDES Permit. TVA relies on the fact that, during the comment period for the NPDES Permit, the potential for seeps was brought to TDEC's attention, and TDEC concluded that the permit adequately accounted for that risk. Specifically, after TDEC published its "Permit Rationale" for public comment, it received comments about the possibility of seeps, which TDEC considered and acknowledged. (Doc. No. 1-2 at 48.) That TDEC contemplated some seeps under the permit, however, does not categorically shield TVA from liability for all seeps. TDEC's responses to comments describe the type of seepage that the agency anticipated from the ponds in a number of ways, for example: as having a "flow rate ... so low as not to be measurable"; as "more similar to a nonpoint source discharge, as it is diffused over a wide area"; and, perhaps most importantly, as resulting in only "*de minimus* [sic]" additional loading of pollutants. (Doc. No. 1-2 at 48.) The permit shield only protects discharges that the permit itself reasonably contemplates, and the NPDES Permit did not contemplate any and all manner of seepage without limitation. Moreover, the permit's toleration of even the contemplated seepage is in the context of TVA's presumed compliance with NPDES Permit provisions specifically designed to address the risk of seeps. Part III.B.(2) through (4) of the NPDES Permit, for example, require that TVA comply with self-inspection requirements intended to detect, among other things, seepage in the ponds' earthen dikes, and that TVA take timely remediation measures if it discovers any changes indicating a potential compromise in the structural integrity of the impoundment. (Doc. No. 1-2 at 26.) Among the failures Plaintiffs allege in their Complaint is that TVA "failed to properly maintain the impoundments to prevent seeps, or to properly inspect, identify, and remediate these seeps." (Doc. No. 1 at ¶ 65.) Finally, the mere fact that TDEC was aware of some seeps or the possibility thereof does not mean that TVA necessarily fully and accurately disclosed all relevant seeps at the time the NPDES Permit was reissued. Among the key allegations in this case is that TVA's actions have been insufficient to adequately identify and monitor the seeps. A permit applicant cannot disclose discharges that it does not know about.

The Court accordingly does not read the NPDES Permit as extending its permit shield protection categorically to any and all seeps. That is not to say that the permit shield may not serve as a defense to specific allegations. If TVA can eventually show that specific seeps were only of the type contemplated by the permit, and that the seeps' detection, monitoring, reporting, disclosure, and, if necessary, remediation, were handled in full compliance with the permit, the permit shield may apply. Such a conclusion, however, cannot be reached on the pleadings alone.

*Tennessee Clean Water Network*, 206 F. Supp. 3d at 1300-02.

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 230 of 332 PageID #: 236

Court finds that the TVA cannot rely upon the federal permit shield doctrine in this state action under state law.[5]

TVA argues that it is entitled to summary judgment under fundamental principles of permit interpretation, due process, and fair notice. "An NPDES permit is not a contract; rather it is a legally enforceable rule drafted by a regulatory agency. As such, it is akin to any agency regulation or rule, which a court would normally interpret." *California Pub. Interest Group v. Shell Oil Co.*, 840 F. Supp. 712, 716 (N.D. Cal. 1993).

> Generally speaking, the Court must interpret an NPDES Permit in the same manner as it would a contract, determining first whether a particular term has an unambiguous meaning, and, if the meaning is ambiguous, looking to the document as a whole, its underlying purpose, and, if necessary, appropriate extrinsic evidence to aid the Court's construction. *Piney Run*, 268 F.3d at 269–70.

*Tennessee Clean Water Network*, 206 F. Supp. 3d at 1302. Further, "[t]he parties' dispute over the meaning of the NPDES . . . permit presents a 'question of law' for the court to decide. *See Student PIRG of New Jersey v. American Cyanamid Co.*, 23 E.R.C. 2044, 2050, 1985 WL 186630 (D.N.J.1985)("interpretation of the terms of a [NPDES] permit is purely a question of law")[.]" *California Pub. Interest Group*, 840 F. Supp. at 716.

The Rationale and its Addendum, or "fact sheet," is "a document that is prepared when drafting an NPDES permit or permit action. It provides the technical, regulatory and administrative basis for an agency's permit decision." Descamps Aff., Ex. 1, p. 15. The Permit's Rationale can be generally analogized to a statute's legislative history. While a statute's legislative history is not part of the statute itself, it is a helpful tool for understanding the basis for the statutory provisions when the statute is unclear or ambiguous:

---

[5] This finding thereby renders the analysis under the reasonable contemplation test unnecessary.

21

> When the words of a statute are ambiguous or when it is just not clear what the legislature had in mind, courts may look beyond a statute's text for reliable guides to the statute's meaning. We consider the statute's historical background, the conditions giving rise to the statute, and the circumstances contemporaneous with the statute's enactment. We also resort to legislative history.

*BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997). The same is true of the Permit's Rationale and Addendum to Rationale: only when an NPDES Permit is ambiguous should extrinsic evidence be examined. *See Ohio Valley Envtl. Coalition v. Alex Energy, Inc.*, 12 F. Supp. 3d 844, 860 (S.D. W. Va. 2014)(After finding permit was ambiguous, court turned to the permit's rationale); *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255, 269-70 (4th Cir. 2001)(A proper interpretation first requires determination of whether it is ambiguous. If the language is plain and capable of legal construction, the language alone must determine the permit's meaning. If it is ambiguous, then a court must look to extrinsic evidence to determine the correct understanding of the permit.).

In the Verified Complaint, the allegations regarding the NRS center upon discharges into the groundwater. The allegations regarding the Ash Pond Complex center on a violation of Part II.C.1 of the NPDES Permit and upon "unpermitted discharges" to surface water and groundwater, which phrase can be read to encompass the terms of the Permit as a whole. Part II.C.1 of the NPDES Permit governs "Noncompliance" and the "Effect of Noncompliance" and provides: "All discharges shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance." *Id.* at p. 21.

22

TDEC alleges that the Permit does not authorize any discharge from seeps, from the bottom of the impoundments, or from the NRS. Further, TDEC alleges that the Permit does not authorize any discharges to groundwater and that the NRS is not covered at all by the NPDES Permit. On its face, the Permit provides that the "Discharger" is "TVA Gallatin Fossil Plant (GAF)," and that the Discharger is authorized to discharge:

> ash transport water, chemical and nonchemical metal cleaning wastes, water treatment plant wastes, combustion turbine oil/water separator effluent, demineralization off-spec water and filter backwash, demineralization waste neutralization and RO sump discharges, misc equip cooling water (CW), micro-filtered asbestos decon waste water, floor washing and other low volume wastes, boiler makeup water leakage, boiler blowdown, chemical lab drain water, boiler bottom overflow sump discharge, powerhouse extension pump discharge, U-Building pad wash oil/water separator, car wash, ash sluice water leakage, coal pile and coal barge runoff, and storm water runoff through Outfall 001 to Cumberland River at approximately river mile 240.5; steam condenser cooling water, turbine oil cooling water, non-contact air conditioning cooling water, hydrogen cooler cooling water, and storm water runoff through Outfall 002 Cumberland River at river mile 242.5; intake screen backwash plus intake building sump discharges through outfall 004 to Cumberland River at river mile 244.5; and air conditioner non-contact cooling water and boiler make-up water (Outfall 009 only) through Internal Monitoring Point 006 and Internal Monitoring Point 009 to Cumberland River at river mile 242.5

> * * *

> in accordance with effluent limitations, monitoring requirements and other conditions set forth herein.

Descamps Aff., Ex. 1., p. 1.

> In Part I.A.c., the Permit provides:

> Sludge or any other material removed by any treatment works must be disposed of in a manner[] which prevents its entrance into or pollution of any surface or subsurface waters. Additionally, the disposal of such sludge or other material must be in compliance with the Tennessee Solid

23

Waste Disposal Act, TCA 68-31-101 et seq. and the Tennessee Hazardous Waste Management Act, TCA 68-46-101 et seq.

*Id.* at p. 11.

TVA argues that when TDEC reissued the Permit in 2012, TDEC knew there was going to be ongoing seepage from the unlined Gallatin facilities and contemplated that there would continue to be a volume of wastewater seepage containing coal ash leachate from the unlined Gallatin facilities. TVA argues that TDEC explained in the Permit's Addendum to Rationale that it anticipated *de minimus* seeps to the surface and to subsurface water; that it anticipated insignificant additional pollutant loading from the seeps; that assessments of the aquatic community in the vicinity of the plant demonstrated a balanced, indigenous population; and that as a result "no NPDES permit conditions are established" with respect to the contemplated seeps. *Id.* at pp. 48-49.

TVA argues that if TDEC, in 2012, had considered seeps from the unlined facilities to be wholly prohibited by the TWQCA or SWDA, the Permit's Addendum to Rationale would have stated that all seeps of coal ash leachate from the unlined Gallatin facilities to surface or subsurface waters would be prohibited as not authorized by the reissued Permit. Further, TVA argues that TDEC did not notify TVA in 2012 that it was construing the reissued Permit such that the ongoing seeps would constitute an immediate breach of the Permit. TVA argues that if TDEC had so construed the reissued Permit in 2012, then basic considerations of due process, fair dealing, and fair notice would have required such notification.

The Court agrees with the analysis of the District Court in the related federal case[6] and determines that the question of whether TVA's maintenance of its NRS and Ash

---

[6] *Tennessee Clean Water Network v. Tennessee Valley Auth.*, 206 F. Supp. 3d 1280 (M.D. Tenn. 2016).

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 234 of 332 PageID #: 240

Pond Complex has been adequate is unavoidably bound up with fact and is, thus, inappropriate for resolution by the Court on the current summary judgment record alone. Whether seeps from the NRS and the Ash Pond Complex exceed *de minimis* levels raises factual questions both about the seeps themselves and about what would qualify as *de minimis* in the context of coal ash wastewater discharges. Whether TVA's response to the seeps has been sufficient to safeguard the structural integrity of the ponds as required by the permit presents another example of a question of fact. While the construction of the Permit's terms presents a question of law, a term like "properly," used in a specialized setting such as this one, sets forth a standard that must be understood and evaluated in a factual context that cannot be gathered solely from the four corners of the document.

TVA asserts that under Tennessee statutory "Bill of Rights for Permit Applicants," TVA had a statutory right to expect TDEC to be forthright in 2012 and inform TVA if TDEC, contrary to the long course of dealing between TDEC and TVA, had changed its position and considered the long-known ongoing seepage to no longer be permissible or authorized by the reissued Permit.

TDEC argues that its Complaint asserts violations of the TWQCA, SWDA and violations of the Permit – not just violations of the Permit. Furthermore, TDEC argues that the Bill of Rights for Permit Applications is expressly directed at the permitting process, not the enforcement of permits. TDEC argues that the Permit unambiguously identifies authorized discharge locations and states that noncompliance with its terms is a violation of the Permit. TDEC argues that, because the plain language of the Permit specifically identifies what is authorized, a reasonable person would properly conclude that anything not specifically authorized is prohibited. Furthermore, TDEC argues that

25

TVA never informed TDEC during its application process that it would discharge effluent from locations other than the outfalls identified in the NPDES permit.

As stated previously, the question of whether TVA's maintenance of its NRS and Ash Pond Complex has been adequate is unavoidably bound up with fact and is, thus, inappropriate for resolution by the Court on the current summary judgment record alone. Where a dispute exists as to facts that are deemed material by the Court, the Court must deny a motion for summary judgment. *See Evo Corp. v. Ross*, 528 S.W.2d 20, 25 (Tenn. 1975).

## IV. Conclusion

For the foregoing reasons, Court finds that the TWQCA does not contain a permit shield provision. Further, the Court finds that the federal permit shield does not apply to the causes of action alleged in this state enforcement action against TVA under state law.

The Court finds that genuine issues of material fact exist with regard to the parties' interpretation of the Permit's conditions and what is and is not authorized under the NPDES permit. Accordingly, summary judgment is inappropriate at this time on the current state of the record. Accordingly, Defendant's motion for summary judgment is hereby DENIED.

Pursuant to Tenn. R. Civ. P. 12.03, TVA moved this Court for judgment on the pleadings as to the Complaint in Intervention. TVA asserts this motion is contingent upon the Court's granting TVA's motion for summary judgment as to the Verified Complaint. The Conservation Groups are participating in this matter in their capacity as intervenors of right pursuant to Tenn. R. Civ. P. 24.01(3). Accordingly, the Court finds TVA's motion is not well taken and hereby DENIES TVA's motion for judgment on the

26

pleadings as to the Complaint in Intervention.

**IT IS SO ORDERED.**



CHANCELLOR RUSSELL T. PERKINS

cc:    Emily B. Vann, Esq.
Delta Ann Davis, Esq.
Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Frank S. Holleman, III, Esq.
David D. Ayliffe, Esq.
James S. Chase, Esq.
Frances Regina Koho, Esq.
Lane E. McCarty, Esq.

MAILED

27

# EXHIBIT 28

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| **STATE OF TENNESSEE ex rel. HERBERT**<br>**H. SLATERY III, in his official capacity as the**<br>**Attorney General and Reporter of Tennessee**<br>**and ROBERT J. MARTINEAU, JR.,**<br>**Commissioner of the Tennessee Department**<br>**of Environment and Conservation,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **and** | ) ) | **No. 15-23-IV** |
| **TENNESSEE CLEAN WATER NETWORK**<br>**and TENNESSEE SCENIC RIVERS**<br>**ASSOCIATION,** | ) ) ) ) | |
| **Plaintiff-Intervenors,** | ) | |
| **v.** | ) ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' MOTION TO SUPPLEMENT PLEADINGS OR AMEND VERIFIED COMPLAINT

Plaintiffs, the State of Tennessee, ex rel. the Attorney General and Reporter and the Commissioner of the Tennessee Department of Environment and Conservation (TDEC) (collectively the State), respectfully move this Court, in accordance with Tenn. R. Civ. P. 15, for leave to amend the Verified Complaint, filed in this matter on January 7, 2015, to include additional facts, claims, and causes of action that relate back to the filing of the original complaint and to set forth additional facts concerning transactions or occurrences that have happened since the date of the original pleading in this matter. As grounds for this motion, the State would show the following:

1.  At the time of the filing, the Verified Complaint was based on known facts and

violations up to that date.

2.     Since the filing of the Verified Complaint, the State has discovered additional information concerning potential violations of the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder.

3.     Additionally, Defendant has notified TDEC of and published information about the continued operation of the subject facility that post-dates the filing of the Verified Complaint.

4.     Justice requires that the State be allowed to amend its complaint to include additional claims arising from discovered information and new causes of action resulting from Defendant's notifications related to future operations in order that all issues between the parties be fully litigated in this action.

In support of this Motion, the State relies upon the attached proposed Amended Verified Complaint and Affidavit of Charles L. Head, Memorandum of Law in Support of Plaintiffs' Motion to Supplement Pleadings or Amend Verified Complaint, and Affidavit of Emily B. Vann, all filed contemporaneously herewith.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

2

EMILY B. VANN, BPR No. 026642
Assistant Attorney General
SOHNIA W. HONG, BPR No. 017415
Senior Counsel
J. PETER MURREY, BPR No. 033455
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

## NOTICE OF HEARING

Please take notice that this motion is set to be heard at 9:00 a.m. C.S.T. on Friday, July 28, 2017, in the Davidson County Chancery Court before the Honorable Chancellor Russell T. Perkins. Local Rule 26.04 provides, in pertinent part, that a response or any other matter presented in opposition to motions must be filed with the clerk's office by the close of business on the Monday before the Friday on which the motion is to be heard. The response must also be served upon all parties no later than 5:00 p.m. on the Monday before the Friday on which the motion is to be heard. FAILURE TO FILE AND SERVE A TIMELY WRITTEN RESPONSE TO THE MOTION SHALL RESULT IN THE MOTION BEING GRANTED WITHOUT FURTHER HEARING.

Case 3:17-cv-01139   Document 1-1   Filed 08/10/17   Page 241 of 332 PageID #: 247

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via electronic mail and first-class mail, postage prepaid, on this the 13th day of July, 2017, to:

Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

4

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | No. 15-23-IV |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO SUPPLEMENT PLEADINGS OR AMEND VERIFIED COMPLAINT

### I.   INTRODUCTION

Plaintiffs, the State of Tennessee, ex rel. the Attorney General and Reporter and the Commissioner of the Tennessee Department of Environment and Conservation (TDEC) (collectively the State) brought this original action under the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder, against defendant Tennessee Valley Authority (Defendant) for injunctive relief and the assessment of civil penalties for violations of

the SWDA, the TWQCA, and Defendant's issued NPDES Permit No. TN0005428 (the NPDES Permit). After filing the original complaint on January 7, 2015, TDEC, through investigation and discovery, obtained information concerning potential additional violations by Defendant of the SWDA, TWQCA, and the rules and regulations promulgated thereunder. Additionally, Defendant has notified TDEC of and published information about the continued operation of the subject facility that post-dates the filing of the State's original complaint and affects the allegations going forward. The State's Motion to Supplement Pleadings or Amend Complaint is predicated on facts that relate back to the original complaint and on additional facts that have transpired and were discovered since the filing of the original complaint.

## II.    STATEMENT OF THE FACTS

The State, in accordance with Tenn. R. Civ. P. 10.04, hereby include and incorporate by reference the factual allegations contained in the Verified Complaint in this matter.

This action concerns Defendant's operation of an active coal-fired power plant located on the north bank of the Cumberland River, approximately 4.5 miles south-southeast of Gallatin, Tennessee, known as the TVA Gallatin Fossil Plant (GAF). Prior to the filing of the original complaint, the State had limited information available to it concerning the hydrology and geology of the site. However, since the filing of the original complaint, the State has obtained a significant number of historical documents and overseen an ongoing environmental investigation at the GAF pursuant to the parties' Agreed Temporary Injunction, entered on January 21, 2016, all of which has revealed both new facts and evidence of potential additional violations of the SWDA, the TWQCA, and their implementing rules and regulations. Additionally, following the initiation of this lawsuit, Defendant notified TDEC and the public of its intentions regarding future operations at the GAF on several occasions. This information affects the State's

2

allegations going forward. The information received from Defendant concerning its future operations post-dates the filing of the original complaint.

<h3 align="center">III. ARGUMENT</h3>

**THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO SUPPLEMENT OR AMEND THEIR COMPLAINT AS SUCH ACTION IS PERMITTED UNDER BOTH THE TENNESSEE RULES OF CIVIL PROCEDURE AND TENNESSEE CASE LAW**

Rule 15 of the Tennessee Rules of Civil Procedure governs the amending and supplementing of pleadings in state court proceedings. Rule 15.01 provides, in part, that a "party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served . . . [o]therwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of court . . . ." Tenn. R. Civ. P. 15.01 (2009). Additionally, Rule 15.03 allows for the relation back of amendments to the original pleading and Rule 15.04 permits supplemental pleadings to set forth transactions or occurrences that have transpired since the filing of the pleading sought to be amended. Tenn. R. Civ. P. 15.03; 15.04 (2009).

As the Tennessee Supreme Court recognized in Doyle v. Frost, the goal behind Rule 15 is to ensure that cases are determined upon their merits and not upon legal technicalities or procedural niceties. Doyle v. Frost, 49 S.W.3d 853, 856 (Tenn. 2001). To further this goal the rule is to be construed liberally and leave to amend pleadings "shall be freely given when justice so requires." Tenn. R. Civ. P. 15.01; see also Welch v. Thuan, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994); Merriman v. Smith, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979). Courts have therefore determined that where there is no showing that the proposed amendments allege facts to the surprise of the defendant, cause any undue prejudice, and are not being proposed in bad faith, a motion to amend should be granted. Blocker v. Dearborn & Ewing, 851 S.W.2d 825, 826

3

(Tenn. Ct. App. 1992). Although a court has discretion as to whether or not to allow an amendment, Daniels v. Talent, 370 S.W.2d 515, 522, (Tenn. 1963), Rule 15 substantially lessens pre-trial discretion. In Branch v. Warren, the Tennessee Supreme Court discussed the effect of Rule 15.01, finding that the Rules of Civil Procedure "were designed simplify and ease the burden of procedure" and recognizing "the statute (s 20 – 1505, T.C.A.) which conferred a measure of discretion on trial judges was repealed and Rule 15 stands in its place and stead." Branch v. Warren, 527 S.W.2d 89, 91-92 (Tenn. 1975). The court ultimately held "that [Rule 15] needs no construction; it means precisely what it says, that 'leave shall be freely given.'" Id.

Tenn. R. Civ. P. 15.03 allows for the relation back of amendments to the original pleading and Tenn. R. Civ. P. 15.04 allows for supplemental pleadings to set forth transactions or occurrences that have transpired since the filing of the pleading sought to be amended. The Tennessee Supreme Court has established several non-exclusive factors for consideration in determining whether to grant leave to amend pleadings. These factors are:

(1)   futility of amendment;
(2)   undue delay in filing the motion to amend;
(3)   repeated failures to cure deficiencies with previous amendments;
(4)   bad faith on the part of the moving party;
(5)   lack of notice to the opposing party; and
(6)   undue prejudice to the opposing party.

George v. Building Materials Corp. of America, 44 S.W.3d 481, 487 (Tenn. 2001); March v. Levine, 115 S.W.3d 892, 908 (Tenn. Ct. App. 2003). Undue prejudice to the opposing party is the most critical factor in this determination. Hardcastle v. Harris, 170 S.W.3d 67, 81 (Tenn. Ct. App. 2004), appeal denied, (Tenn. 2005).

In the present case, the State seeks to amend its complaint to include additional facts and claims relating to Defendant's alleged violations of the SWDA and the TWQCA, which were

4

discovered after the original filing date, and the State's requested relief. These amendments involve inclusion of information related to two topics: the repair of seeps and the closure of the subject impoundments at the GAF. With regard to seeps, prior to the initiation of this lawsuit TDEC's general understanding was that when a seep was "repaired," the repair ceased the flow of wastewater through the seep. However, during its investigation associated with the pending lawsuit, TDEC discovered that the "repair" of seeps could include the continued movement of wastewater through the impoundment dike, resulting in a potential ongoing, unpermitted discharge. The requested amendments seek to include the discovery of this information in the State's complaint. Also, at the time of the original filing Bottom Ash Pond A and Fly Ash Pond E of the Ash Pond Complex were being utilized as part of the ongoing coal combustion residual (CCR) wastewater treatment process at the GAF. Since the date of filing, Defendant has advised on several occasions that Bottom Ash Pond A and Fly Ash Pond E will not be part of future CCR wastewater treatment operations at the GAF. In fact, Fly Ash Pond E is currently no longer part of the CCR wastewater treatment process at the GAF and Defendant has advised of its intent to exclude Bottom Ash Pond A from its CCR wastewater treatment process in the future. Because both Bottom Ash Pond A and Fly Ash Pond E will not be serving a CCR wastewater treatment function at the time of their closure, they will not be covered under the NPDES permit nor subject to regulation under the TWQCA. Additionally, although Defendant has submitted an application for renewal of its NPDES permit seeking coverage for continued discharge of treated non-CCR process wastewater through Stilling Ponds B, C, and D, TDEC has yet to determine whether a NPDES permit can be issued allowing Defendant to utilize these impoundments for non-CCR wastewater treatment. Therefore, the State seeks to amend its compliant to include

these facts and a prayer for relief that the closure of the impoundments at the GAF be governed by the SWDA and its implementing rules and regulations.

The State can satisfy the factors set out in George v. Building Materials Corp., which additionally weigh in favor of the Court granting the State's request for leave to amend to ensure the case is determined on the merits. First, amendment of the State's complaint would not be futile as the amendments represent valid and prosecutable allegations against Defendant. There has also been no undue delay in seeking amendment as investigation into Defendant's activities is ongoing and the State's filing follows receipt of documentation from Defendant necessary to support the amended claims and resolution of Defendant's dispositive motions. Furthermore, the State has filed no other amendments and has not acted in bad faith with regard to Defendant or in seeking leave to amend. Finally, Defendant will suffer no surprise or undue prejudice as the information that serves as the basis for the State's amendments was either (1) obtained through a review of the historical documents received from Defendant, (2) developed through the ongoing environmental investigation at the GAF pursuant to the parties' Agreed Temporary Injunction, or (3) produced by Defendant to TDEC and for publication to the public. Additionally, the State has discussed the information serving as the basis for its amendments with Defendant on multiple occasions prior to the filing of this request. (See Affidavit of Emily B. Vann, attached hereto and incorporated herein as Exhibit 1.) The State has met the criteria for amending or supplementing a pleading under both Rule 15 and Tennessee case law and therefore should be granted leave to amend its complaint.

## IV.   CONCLUSION

For all the foregoing reasons, the State respectfully requests that this Court enter an order permitting it to file its Amended Verified Complaint setting forth additional facts and claims

6

pertaining to Defendant's violation of the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

EMILY B. VANN, BPR No. 026642
Assistant Attorney General
SOHNIA W. HONG, BPR No. 017415
Senior Counsel
J. PETER. MURREY, BPR No. 033455
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

7

# CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via electronic mail and first-class mail, postage prepaid, on this the 13th day of July, 2017, to:

Elizabeth A. Alexander
Annie E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

8

# EXHIBIT 29

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT | ) | |
| H. SLATERY III, in his official capacity as the | ) | |
| Attorney General and Reporter of Tennessee | ) | |
| and ROBERT J. MARTINEAU, JR., | ) | |
| Commissioner of the Tennessee Department | ) | |
| of Environment and Conservation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | No. 15-23-IV |
| | ) | |
| TENNESSEE CLEAN WATER NETWORK | ) | |
| and TENNESSEE SCENIC RIVERS | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) | |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO SUPPLEMENT PLEADINGS OR AMEND VERIFIED COMPLAINT

### I.     INTRODUCTION

Plaintiffs, the State of Tennessee, ex rel. the Attorney General and Reporter and the Commissioner of the Tennessee Department of Environment and Conservation (TDEC) (collectively the State) brought this original action under the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder, against defendant Tennessee Valley Authority (Defendant) for injunctive relief and the assessment of civil penalties for violations of

the SWDA, the TWQCA, and Defendant's issued NPDES Permit No. TN0005428 (the NPDES Permit). After filing the original complaint on January 7, 2015, TDEC, through investigation and discovery, obtained information concerning potential additional violations by Defendant of the SWDA, TWQCA, and the rules and regulations promulgated thereunder. Additionally, Defendant has notified TDEC of and published information about the continued operation of the subject facility that post-dates the filing of the State's original complaint and affects the allegations going forward. The State's Motion to Supplement Pleadings or Amend Complaint is predicated on facts that relate back to the original complaint and on additional facts that have transpired and were discovered since the filing of the original complaint.

## II.    STATEMENT OF THE FACTS

The State, in accordance with Tenn. R. Civ. P. 10.04, hereby include and incorporate by reference the factual allegations contained in the Verified Complaint in this matter.

This action concerns Defendant's operation of an active coal-fired power plant located on the north bank of the Cumberland River, approximately 4.5 miles south-southeast of Gallatin, Tennessee, known as the TVA Gallatin Fossil Plant (GAF). Prior to the filing of the original complaint, the State had limited information available to it concerning the hydrology and geology of the site. However, since the filing of the original complaint, the State has obtained a significant number of historical documents and overseen an ongoing environmental investigation at the GAF pursuant to the parties' Agreed Temporary Injunction, entered on January 21, 2016, all of which has revealed both new facts and evidence of potential additional violations of the SWDA, the TWQCA, and their implementing rules and regulations. Additionally, following the initiation of this lawsuit, Defendant notified TDEC and the public of its intentions regarding future operations at the GAF on several occasions. This information affects the State's

2

allegations going forward. The information received from Defendant concerning its future operations post-dates the filing of the original complaint.

### III.    ARGUMENT

**THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO SUPPLEMENT OR AMEND THEIR COMPLAINT AS SUCH ACTION IS PERMITTED UNDER BOTH THE TENNESSEE RULES OF CIVIL PROCEDURE AND TENNESSEE CASE LAW**

Rule 15 of the Tennessee Rules of Civil Procedure governs the amending and supplementing of pleadings in state court proceedings. Rule 15.01 provides, in part, that a "party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served . . . [o]therwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of court . . . ." Tenn. R. Civ. P. 15.01 (2009). Additionally, Rule 15.03 allows for the relation back of amendments to the original pleading and Rule 15.04 permits supplemental pleadings to set forth transactions or occurrences that have transpired since the filing of the pleading sought to be amended. Tenn. R. Civ. P. 15.03; 15.04 (2009).

As the Tennessee Supreme Court recognized in Doyle v. Frost, the goal behind Rule 15 is to ensure that cases are determined upon their merits and not upon legal technicalities or procedural niceties. Doyle v. Frost, 49 S.W.3d 853, 856 (Tenn. 2001). To further this goal the rule is to be construed liberally and leave to amend pleadings "shall be freely given when justice so requires." Tenn. R. Civ. P. 15.01; see also Welch v. Thuan, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994); Merriman v. Smith, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979). Courts have therefore determined that where there is no showing that the proposed amendments allege facts to the surprise of the defendant, cause any undue prejudice, and are not being proposed in bad faith, a motion to amend should be granted. Blocker v. Dearborn & Ewing, 851 S.W.2d 825, 826

3

(Tenn. Ct. App. 1992). Although a court has discretion as to whether or not to allow an amendment, Daniels v. Talent, 370 S.W.2d 515, 522, (Tenn. 1963), Rule 15 substantially lessens pre-trial discretion. In Branch v. Warren, the Tennessee Supreme Court discussed the effect of Rule 15.01, finding that the Rules of Civil Procedure "were designed simplify and ease the burden of procedure" and recognizing "the statute (s 20 – 1505, T.C.A.) which conferred a measure of discretion on trial judges was repealed and Rule 15 stands in its place and stead." Branch v. Warren, 527 S.W.2d 89, 91-92 (Tenn. 1975). The court ultimately held "that [Rule 15] needs no construction; it means precisely what it says, that 'leave shall be freely given.'" Id.

Tenn. R. Civ. P. 15.03 allows for the relation back of amendments to the original pleading and Tenn. R. Civ. P. 15.04 allows for supplemental pleadings to set forth transactions or occurrences that have transpired since the filing of the pleading sought to be amended. The Tennessee Supreme Court has established several non-exclusive factors for consideration in determining whether to grant leave to amend pleadings. These factors are:

(1) futility of amendment;
(2) undue delay in filing the motion to amend;
(3) repeated failures to cure deficiencies with previous amendments;
(4) bad faith on the part of the moving party;
(5) lack of notice to the opposing party; and
(6) undue prejudice to the opposing party.

George v. Building Materials Corp. of America, 44 S.W.3d 481, 487 (Tenn. 2001); March v. Levine, 115 S.W.3d 892, 908 (Tenn. Ct. App. 2003). Undue prejudice to the opposing party is the most critical factor in this determination. Hardcastle v. Harris, 170 S.W.3d 67, 81 (Tenn. Ct. App. 2004), appeal denied, (Tenn. 2005).

In the present case, the State seeks to amend its complaint to include additional facts and claims relating to Defendant's alleged violations of the SWDA and the TWQCA, which were

4

discovered after the original filing date, and the State's requested relief. These amendments involve inclusion of information related to two topics: the repair of seeps and the closure of the subject impoundments at the GAF. With regard to seeps, prior to the initiation of this lawsuit TDEC's general understanding was that when a seep was "repaired," the repair ceased the flow of wastewater through the seep. However, during its investigation associated with the pending lawsuit, TDEC discovered that the "repair" of seeps could include the continued movement of wastewater through the impoundment dike, resulting in a potential ongoing, unpermitted discharge. The requested amendments seek to include the discovery of this information in the State's complaint. Also, at the time of the original filing Bottom Ash Pond A and Fly Ash Pond E of the Ash Pond Complex were being utilized as part of the ongoing coal combustion residual (CCR) wastewater treatment process at the GAF. Since the date of filing, Defendant has advised on several occasions that Bottom Ash Pond A and Fly Ash Pond E will not be part of future CCR wastewater treatment operations at the GAF. In fact, Fly Ash Pond E is currently no longer part of the CCR wastewater treatment process at the GAF and Defendant has advised of its intent to exclude Bottom Ash Pond A from its CCR wastewater treatment process in the future. Because both Bottom Ash Pond A and Fly Ash Pond E will not be serving a CCR wastewater treatment function at the time of their closure, they will not be covered under the NPDES permit nor subject to regulation under the TWQCA. Additionally, although Defendant has submitted an application for renewal of its NPDES permit seeking coverage for continued discharge of treated non-CCR process wastewater through Stilling Ponds B, C, and D, TDEC has yet to determine whether a NPDES permit can be issued allowing Defendant to utilize these impoundments for non-CCR wastewater treatment. Therefore, the State seeks to amend its compliant to include

5

these facts and a prayer for relief that the closure of the impoundments at the GAF be governed by the SWDA and its implementing rules and regulations.

The State can satisfy the factors set out in <u>George v. Building Materials Corp.</u>, which additionally weigh in favor of the Court granting the State's request for leave to amend to ensure the case is determined on the merits. First, amendment of the State's complaint would not be futile as the amendments represent valid and prosecutable allegations against Defendant. There has also been no undue delay in seeking amendment as investigation into Defendant's activities is ongoing and the State's filing follows receipt of documentation from Defendant necessary to support the amended claims and resolution of Defendant's dispositive motions. Furthermore, the State has filed no other amendments and has not acted in bad faith with regard to Defendant or in seeking leave to amend. Finally, Defendant will suffer no surprise or undue prejudice as the information that serves as the basis for the State's amendments was either (1) obtained through a review of the historical documents received from Defendant, (2) developed through the ongoing environmental investigation at the GAF pursuant to the parties' Agreed Temporary Injunction, or (3) produced by Defendant to TDEC and for publication to the public. Additionally, the State has discussed the information serving as the basis for its amendments with Defendant on multiple occasions prior to the filing of this request. (<u>See</u> Affidavit of Emily B. Vann, attached hereto and incorporated herein as <u>Exhibit 1</u>.) The State has met the criteria for amending or supplementing a pleading under both Rule 15 and Tennessee case law and therefore should be granted leave to amend its complaint.

## IV.   CONCLUSION

For all the foregoing reasons, the State respectfully requests that this Court enter an order permitting it to file its Amended Verified Complaint setting forth additional facts and claims

6

pertaining to Defendant's violation of the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter


EMILY B. VANN, BPR No. 026642
Assistant Attorney General
SOHNIA W. HONG, BPR No. 017415
Senior Counsel
J. PETER. MURREY, BPR No. 033455
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via electronic mail and first-class mail, postage prepaid, on this the 13th day of July, 2017, to:

> Elizabeth A. Alexander
> Annie E. Passino
> Frank S. Holleman III
> Southern Environmental Law Center
> 2 Victory Avenue South, Suite 500
> Nashville, Tennessee 37213
>
> *Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*
>
> David D. Ayliffe
> James S. Chase
> Frances Regina Koho
> Lane E. McCarty
> Office of the General Counsel
> Tennessee Valley Authority
> 400 West Summit Hill Drive
> Knoxville, Tennessee 37902
>
> *Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

8

# EXHIBIT 30

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

RECEIVED

JUL 18 2017

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| and | ) ) |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) |
| Plaintiff-Intervenors, | ) ) ) |
| v. | ) ) |
| TENNESSEE VALLEY AUTHORITY, | ) ) |
| Defendant. | ) ) |

No. 15-23-IV

## [PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW DELTA ANNE DAVIS AS COUNSEL FOR PLAINTIFF-INTERVENORS

Plaintiff-Intervenors, Tennessee Clean Water Network and the Tennessee Scenic Rivers Association, have submitted a Motion for Leave to Withdraw Delta Anne Davis as Counsel of Record.

Local Rule 5.02 requires that "No attorney may be allowed to withdraw except for good cause and by leave of court upon motion after notice to all parties." The Plaintiff-Intervenors gave notice to all parties of Ms. Davis's intent to withdraw by electronic mail on June 16, 2017, and no objections were raised. Ms. Davis has terminated her employment at the Southern Environmental Law Center.

The Court find that good cause has been shown for Ms. Davis's motion and that her withdrawal as counsel will not affect the progress of this action or prejudice any party. Leave to withdraw is granted, and the clerk shall modify the docket accordingly.

For the foregoing reasons, the Court hereby GRANTS Plaintiff-Intervenors' Motion for Leave to Withdraw Delta Anne Davis, Esq. as counsel.

**IT IS SO ORDERED**:

CHANCELLOR RUSSELL T. PERKINS

Date:

**Submitted By:**

Elizabeth A. Alexander, BPR 19273
Anne E. Passino, BPR 027456
Southern Environmental Law Center
The Bridge Building
2 Victory Avenue, Suite 500
Nashville, TN 37213
(615) 921-9470
balexander@selctn.org
apassino@selctn.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2017, I served a copy of this Proposed Order Regarding Withdrawal of Counsel and the attached Certificate of Service on the following parties or their counsel of record by electronic mail and U.S. Mail postage prepaid:

Emily B. Vann, BPR No. 026642
J. Peter Murrey, BPR No. 033455
Sohnia W. Hong, BPR No. 017415
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 532-2583
*Attorney for Plaintiffs*


David D. Ayliffe, BPR No. 024297
James S. Chase, BPR No. 020578
Frances Regina Koho, BPR No. 029261
Lane E. McCarty, BPR No. 028340
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
*Attorneys for Defendant Tennessee Valley Authority*

Elizabeth A. Alexander, BPR 19273

# EXHIBIT 31



MARIA M. SALAS
CLERK & MASTER
CHANCERY COURT

VICKI BAILEY, OFFICE MANAGER

CHRISTY DANIEL, SUPERVISOR
JULIE SPENCER, SUPERVISOR

1 PUBLIC SQUARE, SUITE 308
NASHVILLE, TENNESSEE 37201
(615) 862-5710
www.chanceryclerkandmaster.nashville.gov

# FACSIMILE

## Maria M. Salas, Clerk and Master

PHONE: 615-862-5710          FAX: 615-862-5722

TO: _Counsel of Record_

FROM: _Part II Chancery_          FAX: _____

DATE: _7/25/11_          PAGES: _5_, including cover

COMMENTS: _Order (State of TN v. TVA_
_Case # 15-0023-IV )_

RECEIVED

JUL 2 1 2017

DAV. CO. CHANCERY COURT

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

| | |
|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) ) |
| TENNESSEE VALLEY AUTHORITY, | ) ) |
| Defendant. | ) ) |

No. 15-23-IV

[CORRECTED PROPOSED] ORDER

RTP 7/25/2017

This matter came to be heard on July 14, 2017, upon Defendant Tennessee Valley

Authority's ("TVA") Motion for Leave to File Amended Answers pursuant to Tennessee Rule of

Civil Procedure 15.01 to add the affirmative defenses of laches, equitable estoppel, unclean hands,

res judicata, and collateral estoppel to TVA's original Answers to the Verified Complaint by

Plaintiffs the State of Tennessee ex rel. Attorney General and Reporter and Commissioner of the

Tennessee Department of Environment and Conservation ("State") and to the Complaint in

Intervention filed by Plaintiff-Intervenors Tennessee Clean Water Network and Tennessee Scenic

Rivers Association ("Plaintiff-Intervenors").

1

The State did not oppose TVA's motion, and the Plaintiff-Intervenors filed a limited opposition to the motion objecting only, on grounds of futility, to TVA's request to add affirmative defenses of res judicata and collateral estoppel.

After the Court's consideration of the briefs, the oral arguments of the parties, and the relevant law, it is ORDERED that:

1.      The Court FINDS TVA's proposed amendments to add affirmative defenses to be legally sufficient under Tennessee Rule of Civil Procedure 15.01's liberal standard for amendment of pleadings and that the proposed amendments to add the affirmative defenses of res judicata and collateral estoppel will not be disallowed on grounds of futility but may be addressed in an appropriate dispositive motion.

2.      The Court HOLDS IN ABEYANCE TVA's Motion for Leave to File Amended Answers until after disposition of the State's pending Motion to Supplement Pleadings or Amend Verified Complaint.

**IT IS SO ORDERED.**

**ENTER** this ___ day of _____, _____.

HONORABLE RUSSELL T. PERKINS
CHANCELLOR

MAILED

2

APPROVED FOR ENTRY:

_Emily B. Vann_ (By permission S.W. Hong)
Emily B. Vann (BPRN 026642)
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
615.532.2583
Emily.Vann@ag.tn.gov

*Attorneys for Plaintiffs*

_Elizabeth A. Alexander_ (By permission S.W. Hong)
Elizabeth A. Alexander (BPRN 019273)
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
615.921.9470
balexander@selctn.org

*Attorney for Plaintiff-Intervenors*

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing the foregoing Corrected Proposed Order has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 21ᵗʰ day of July, 2017, to:

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401

*Attorneys for Tennessee Valley Authority*


SOHNIA W. HONG
Senior Counsel
State of Tennessee

4

# EXHIBIT 32

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE, Co. Chancery Court
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

STATE OF TENNESSEE ex rel. HERBERT )
H. SLATERY III, in his official capacity as the )
Attorney General and Reporter of Tennessee )
and ROBERT J. MARTINEAU, JR., )
Commissioner of the Tennessee Department )
of Environment and Conservation, )
)
               Plaintiffs, )
)
and )
)
TENNESSEE CLEAN WATER NETWORK )    No. 15-231-IV
and TENNESSEE SCENIC RIVERS )
ASSOCIATION, )
)
       Plaintiff-Intervenors,)
)
v. )
)
TENNESSEE VALLEY AUTHORITY, )
)
         Defendant. )

---

**[PROPOSED] ORDER ON TVA'S MOTION FOR LEAVE TO FILE AMENDED ANSWERS AND PLAINTIFFS' MOTION TO SUPPLEMENT PLEADINGS OR AMEND VERIFIED COMPLAINT**

---

This matter is before the Court on Defendant Tennessee Valley Authority's Motion for

Leave to File Amended Answers and Plaintiffs' Motion to Supplement Pleadings or Amend

Verified Complaint. The parties, having agreed to submit the motions for final disposition on the

briefs, and the Court having considered the briefs and relevant law hereby resolves these motions

as set forth below:

      1. It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiffs' Motion to

Supplement Pleadings or Amend Verified Complaint, currently set for hearing on Friday, July

1

28, 2017, is **GRANTED**. The State's proposed Amended Verified Complaint and the Affidavit of Charles L. Head, filed on July 13, 2017, are hereby **ENTERED** with the Court, and the Clerk is **DIRECTED** to update the docket to reflect the date of entry of this Order as the date of entry of the Amended Verified Complaint.

2. Defendant has requested and Plaintiffs do not oppose an extension of the time allowed under the Tennessee Rules of Civil Procedure for filing of Defendant's response to Plaintiffs' Amended Verified Complaint. It is therefore furthered **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant shall serve its answer to Plaintiffs' Amended Verified Complaint upon the parties within thirty (30) days of the entry of this order. Accordingly, Defendant's motion for leave to file an amended answer as to the Verified Complaint is **DENIED** as **MOOT**.

3. The Court **FINDS** that Plaintiff-Intervenors have advised the parties that they do not intend to amend their Complaint in Intervention. Accordingly, it is furthered **ORDERED**, **ADJUDGED**, and **DECREED** that, consistent with the Court's July 25, 2017 Order, Defendant's Motion for Leave to File Amended Answers, filed on June 30, 2017, is hereby **GRANTED** as to the Complaint in Intervention. Defendant's previously submitted proposed Amended Answer to Plaintiff-Intervenors' Complaint in Intervention, filed on June 30, 2017, is hereby **ENTERED** with the Court, and the Clerk is **DIRECTED** to update the docket to reflect the date of entry of this Order as the date of entry of the Amended Answer to the Complaint in Intervention.

2

IT IS SO ORDERED.

Entered this the _____ day of _____, 2017.

_____
HONORABLE RUSSELL T. PERKINS
CHANCELLOR

Respectfully submitted,

_____
EMILY B. VANN, BPR No. 026642
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

Counsel for Plaintiffs

3

*Anne E Passino*

*by EAY*
*BPRN 026642*

ELIZABETH A. ALEXANDER, BPR No. 019273
Senior Attorney
ANNE E. PASSINO, BPR No. 027456
Staff Attorney
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213
(615) 921-9470

Counsel for Plaintiff-Intervenors

*David D. Ayliffe*

*by EAY*
*BPRN 026642*

DAVID D. AYLIFFE, BPR No. 004297
Senior Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902
(865) 632-8964

Counsel for Defendant

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded via first-class mail, postage prepaid, and electronic mail on this the 27th day of July, 2017, to:

Elizabeth A. Alexander
Anne E. Passino
Frank S. Holleman III
Southern Environmental Law Center
2 Victory Avenue South, Suite 500
Nashville, Tennessee 37213

*Attorneys for Plaintiff- Intervenors Tennessee Scenic Rivers Association and Tennessee Clean Water Network*

David D. Ayliffe
James S. Chase
Frances Regina Koho
Lane E. McCarty
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

EMILY B. VANN
Assistant Attorney General

5



MARIA M. SALAS
CLERK & MASTER
CHANCERY COURT

*Davidson County*

VICKI BAILEY, OFFICE MANAGER

CHRISTY DANIEL, SUPERVISOR
JULIE SPENCER, SUPERVISOR

1 PUBLIC SQUARE, SUITE 308
NASHVILLE, TENNESSEE 37201
(615) 862-5710
www.chanceryclerkandmaster.nashville.gov

# FACSIMILE

Maria M. Salas, Clerk and Master

PHONE: 615-862-5710          FAX: 615-862-5722

TO: Counsel of Record

FROM: Part II          FAX: _____

DATE: 8/2/17          PAGES: 6 , including cover

COMMENTS: Order (State v. TVA
Case #15-0023-II)

# EXHIBIT 33

**From:** Emily Vann
**To:** McCarty, Lane Elizabeth; Beth Alexander
**Cc:** Ayliffe, David Demar; Chase, James S; Koho, Frances Regina; Love, Kelly A; Barry Turner; "Joseph Sanders (Joseph.Sanders@tn.gov)"; "jenny. howard@tn. gov"; Sohnia Hong; Peter Murrey; Annie Passino; Frank Holleman; Descamps, Tracy Sue; Rhinehart, Carol B
**Subject:** RE: State of Tennessee et al. v. TVA, Case No. 15-23-IV (Davidson County Chancery Court) - TVA"s Amended Answer to Complaint in Intervention
**Date:** Wednesday, August 02, 2017 2:43:03 PM
**Attachments:** image009.png
image010.png
image011.png
image012.png
image013.png
image014.png
image015.png
image016.png
image017.png
TVA Amended Verified Complaint.pdf

**TVA External Message. Please use caution when opening.**

Lane:

Thank you for your email and electronic copy of TVA's Amended Answer to Complaint in Intervention. Pursuant to the entered Order, TVA's answer to the State's Amended Verified Complaint is due 30 days from today's date of August 2, 2017. Although previously provided, attached please find an as-filed copy of the Amended Verified Complaint and Affidavit of Charles L. Head.

As always, please feel free to contact me at my office should you need to discuss these or any other matters.

Emily B. Vann
Assistant Attorney General
Environmental Division
Office of the Attorney General & Reporter
P.O. Box 20207
Nashville, Tennessee 37202
Phone: (615) 532-2583
Fax: (615) 741-8151
Email: emily.vann@ag.tn.gov

Note: This email may contain legally PRIVILEGED and CONFIDENTIAL information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution, or copy of this E-Mail is legally and strictly prohibited. If you have received this E-Mail in error, please delete it and immediately notify the sender. Thank you for your cooperation.

**From:** McCarty, Lane Elizabeth [mailto:lemccarty@tva.gov]
**Sent:** Wednesday, August 02, 2017 1:34 PM
**To:** Emily Vann <Emily.Vann@ag.tn.gov>; Beth Alexander <balexander@selctn.org>
**Cc:** Ayliffe, David Demar <ddayliffe@tva.gov>; Chase, James S <jschase@tva.gov>; Koho, Frances Regina <frkoho@tva.gov>; Love, Kelly A <kalove@tva.gov>; Barry Turner <Barry.Turner@ag.tn.gov>; 'Joseph Sanders (Joseph.Sanders@tn.gov)' <Joseph.Sanders@tn.gov>; 'jenny. howard@tn. gov' <jenny.howard@tn.gov>; Sohnia Hong <Sohnia.Hong@ag.tn.gov>; Peter Murrey <Peter.Murrey@ag.tn.gov>; Annie Passino <apassino@selctn.org>; Frank Holleman <fholleman@selcnc.org>; Descamps, Tracy Sue <tsdescamps@tva.gov>; Rhinehart, Carol B <cbrhinehart@tva.gov>
**Subject:** State of Tennessee et al. v. TVA, Case No. 15-23-IV (Davidson County Chancery Court) - TVA's Amended Answer to Complaint in Intervention

Emily and Beth –

Following the Court's entry today of the Order on TVA's Motion for Leave to File Amended Answers and Plaintiffs' Motion to Supplement Pleadings or Amend Complaint, the Clerk asked TVA to file a signed copy of TVA's Amended Answer to Complaint in Intervention in lieu of the unsigned and undated copy previously submitted with TVA's Motion for Leave to File Amended Answers on June 30, 2017.  Pursuant to the Clerk's request, TVA made only the following modifications to the copy of TVA's Amended Answer to Complaint in Intervention submitted with TVA's Motion on June 30, 2017:

(1)  Added signatures and an email address for TVA's counsel;
(2)  Added today's date to the COS;
(3)  Added Sohnia  Hong and Peter Murrey to the COS; and
(4)  Removed Anne Davis's name and email from the COS and substituted Beth's email address for Anne's.

Accordingly, attached is an as-filed copy of TVA's Amended Answer to Complaint in Intervention (modified only to the extent stated above) filed today by operation of the Davidson County Chancery Court Electronic Case Filing System.  TVA will email a file-stamped copy once it becomes available and will also send a copy by U.S. Mail.

Thank you,

**Lane E. McCarty**
Attorney
Office of General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive, WT 6
Knoxville, Tennessee 37902
865-632-2396 (w)
lemccarty@tva.gov



**NOTICE:** This electronic message transmission contains information that may be TVA SENSITIVE, TVA RESTRICTED, or TVA CONFIDENTIAL. Any misuse or unauthorized disclosure can result in both civil and criminal penalties. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the content of this information is prohibited. If you have received this communication in error, please notify me immediately by email and delete the original message.

# EXHIBIT 34

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) ) | No. 15-23-IV |
| Plaintiff-Intervenors, | ) ) | |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## AMENDED VERIFIED COMPLAINT

1.      Pursuant to Tenn. R. Civ. P. 15, Plaintiffs hereby amend their original Verified Complaint, filed in this matter on January 7, 2015. This amended complaint represents an original enforcement action under the Tennessee Solid Waste Disposal Act, as amended, Tenn. Code Ann. §§ 68-211-101 to 68-211-124 (SWDA), the Tennessee Water Quality Control Act of 1977, as amended, Tenn. Code Ann. §§ 69-3-101 to 69-3-137 (TWQCA), and the rules and regulations promulgated thereunder, against defendant Tennessee Valley Authority (TVA) for injunctive relief and the assessment of civil penalties. The plaintiffs seek from this Court: (1) a permanent injunction establishing a schedule for the defendant's compliance with the SWDA,

1

the TWQCA, and the rules and regulations thereunder and (2) an order and judgment from this Court assessing civil penalties against the defendant for violations of the SWDA and the TWQCA in accordance with Tenn. Code Ann. § 68-211-117 and § 69-3-115, respectively.

2.     On November 10, 2014, the Southern Environmental Law Center (SELC), a non-profit public interest law firm, on behalf of its clients the Tennessee Clean Water Network (TCWN), a citizens' group based in Knoxville, Tennessee, and the Tennessee Scenic Rivers Association, a citizens' group based in Nashville, Tennessee, (collectively the Citizens' Groups) issued a 60-day Notice of Violation letter to TVA under the citizen suits provision of the Federal Water Pollution Control Act, also known as the Clean Water Act (CWA), 33 U.S.C. § 1365, alleging multiple violations of the statutory provisions. See 33 U.S.C. §§ 1251-1387. Under 33 U.S.C. § 1365(b), a citizen suit may not be commenced prior to 60 days after the Citizens' Groups have given notice to the U.S. Environmental Protection Agency (EPA), the State, and the alleged violator. The notice letter is intended to apprise the government of the alleged violations so that the government may take enforcement action, if appropriate. This original enforcement lawsuit serves as the State's commencement of an action in response to the Citizens' Groups' 60-day Notice of Violation letter.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action in accordance with the provisions of Tenn. Code Ann. §§ 68-211-115, -117 and §§ 69-3-115, -117, respectively.

4.     In accordance with Tenn. Code Ann. §§ 68-211-115, -117(b)(5) and §§ 69-3-115(a)(2)(D), -117, venue in this action is proper in the Chancery Court of Davidson County.

2

## PARTIES

5. This action is brought in the name of the State of Tennessee by plaintiff, Herbert H. Slatery III, in his official capacity as Attorney General and Reporter for the State of Tennessee. The Attorney General is the chief law enforcement officer of the State of Tennessee and of all its departments, commissions, and agencies. Tenn. Code Ann. §§ 8-6-109 and 8-6-301. The Attorney General also has authority over litigation involving the public interest. The Attorney General's official residence is in Nashville, Davidson County, Tennessee.

6. This action is also brought in the name of plaintiff, Robert J. Martineau, Jr., in his official capacity as Commissioner of the Tennessee Department of Environment and Conservation (TDEC). The Commissioner is charged with implementing the provisions of the SWDA under Tenn. Code Ann. §§ 68-211-101 et seq. The TDEC Commissioner is charged by Tenn. Code Ann. §§ 68-211-107, -115, -117 with the duty and responsibility to exercise general supervision and enforcement of the SWDA and to bring suit for any violations thereunder. The Commissioner is charged with implementing the provisions of the TWQCA under Tenn. Code Ann. §§ 69-3-101 et seq. The TDEC Commissioner is charged by Tenn. Code Ann. § 69-3-107 with the duty and responsibility to exercise general supervision and enforcement of the TWQCA and to bring suit for any violations thereunder. The Affidavit and Verification of Charles L. Head, Senior Advisor to TDEC's Deputy Commissioner for Environment, is attached hereto and incorporated by reference herein as Exhibit 1. The Commissioner's official residence is in Nashville, Davidson County, Tennessee.

7. Upon information and belief, defendant Tennessee Valley Authority (TVA) is a corporate agency and instrumentality of the United States created by the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C. §§ 831-831ee (the TVA Act), with its

3

headquarters in Knoxville, Tennessee. TVA operates a facility located at 1499 Steam Plant Road, Gallatin, Sumner County, Tennessee 37066, known as the TVA Gallatin Fossil Plant (GAF). The GAF is an active coal-fired power plant located on the north bank of the Cumberland River, approximately 4.5 miles south-southeast of Gallatin, Tennessee. During all times subject to the provisions of applicable Tennessee statutes and regulations, TVA was a "person" as defined by Tenn. Code Ann. § 68-211-103(6) and § 69-3-103(20). Service of process may be made on TVA through William D. Johnson, Chief Operating Officer, 400 West Summit Hill Drive, Knoxville, Tennessee 37902.

## TENNESSEE SOLID WASTE DISPOSAL ACT

8. The SWDA represents a comprehensive program designed to regulate solid waste disposal in an effort to protect the public health, safety, and welfare, prevent the creation of nuisances, conserve the State's natural resources, and enhance the quality of the State's environment. A stated purpose of the SWDA is to "provide a coordinated statewide program of control of solid waste processing and disposal in cooperation with federal, state, and local agencies responsible for the prevention, control, or abatement of air, water, and land pollution." Tenn. Code Ann. § 68-211-102.

9. In accordance with Tenn. Code Ann. § 68-211-107, TDEC and TDEC's Commissioner are authorized to exercise general supervision over the operation and maintenance of solid waste processing and disposal facilities or sites.

4

10.     The Commissioner is also empowered to undertake inspections and investigations of such facilities, operations, and sites necessary to enforce the provisions of the SWDA. Tenn. Code Ann. § 68-211-107(a).

11.     It is a violation of the SWDA to place or deposit any solid waste into the waters of the state except in a manner approved by TDEC or the Tennessee Board of Water Quality, Oil and Gas. Tenn. Code Ann. § 68-211-104(1).

12.     It is a violation of the SWDA to construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the Commissioner. Tenn. Code Ann. § 68-211-104(3).

13.     The Commissioner may seek injunctive relief in the courts through the Office of the Attorney General to enforce compliance with the SWDA. Tenn. Code Ann. § 68-211-115. Additionally, the Commissioner may institute proceedings in court for the assessment of civil penalties of up to seven thousand dollars ($7,000.00) per day for each day of violation against persons violating the SWDA or the regulations promulgated thereunder. Tenn. Code Ann. § 68-211-117.

## TENNESSEE WATER QUALITY CONTROL ACT

14.     The CWA, as amended, 33 U.S.C. §§ 1251-1387, requires all entities who discharge into the navigable waters of the United States to obtain a National Pollutant Discharge Elimination System (NPDES) permit from EPA in accordance with standards set by the Administrator of that agency. 33 U.S.C. § 1342(a). The Administrator may, however, authorize a state to issue NPDES permits in her stead if the state permitting program is at least equal to that

5

under the CWA. 33 U.S.C. § 1342(b). TDEC has been authorized by EPA to issue NPDES permits in the State of Tennessee. TDEC does so under the TWQCA. TDEC's authorized NPDES program permits discharges to surface water. NPDES permits do not authorize discharges of pollutants to groundwater.

15. The TWQCA represents a comprehensive program for the protection and preservation of the waters of the state and for the regulation of activities affecting discharges into, and/or alterations of, the waters of the state. The TWQCA defines these "waters" to encompass both surface water and groundwater "except those bodies of water confined to and retained within the limits of private property, in single ownership that do not combine or effect a junction with natural surface or underground waters." Tenn. Code Ann. § 69-3-103(44). The General Assembly has declared that the waters of Tennessee are the property of the state and are held in public trust for the use of the people. Tenn. Code Ann. § 69-3-102(a). The TWQCA further provides that the State, in its exercise of the public trust, has a duty to take necessary steps to preserve and protect the public's right to enjoyment of unpolluted waters. In accordance with Tenn. Code Ann. § 69-3-107, the TDEC Commissioner is authorized to exercise general supervision and control over the quality of all state waters as well as administer and enforce all laws and regulations relating to the pollution of waters.

16. The Commissioner is empowered to issue permits authorizing discharges that contain the most stringent effluent limitations, conditions, and water quality standards as necessary to comply with state and federal laws and regulations. Tenn. Code Ann. § 69-3-108. The Commissioner is also empowered to undertake inspections and investigations as necessary to enforce the provisions of the TWQCA. Tenn. Code Ann. § 69-3-107(5).

6

17.     It is a violation of the TWQCA for any person to discharge any substance into the waters of the state unless such action has been properly authorized, or to cause a substance to be placed in a location where such substance, either by itself or in combination with other substances, causes pollution as defined under the TWQCA. Tenn. Code Ann. § 69-3-114(a).

18.     It is a violation of the TWQCA for any person to alter the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state except in accordance with the conditions of a valid permit. Tenn. Code Ann. §§ 69-3-108(b)(1) and -114(b).

19.     It is a violation of the TWQCA for any person to violate the terms or conditions of a permit issued under the TWQCA. Tenn. Code Ann. §§ 69-3-108(b)(1) and -114(b).

20.     The Commissioner may seek injunctive relief in the courts through the Office of the Attorney General to enforce compliance with the TWQCA. Tenn. Code Ann. § 69-3-117. Additionally, the Commissioner may institute proceedings in court for the assessment of civil penalties of up to ten thousand dollars ($10,000.00) per day for each day of violation against persons violating the TWQCA or the regulations promulgated thereunder. Tenn. Code Ann. § 69-3-115.

## FACTS

### NON-REGISTERED SITE #83-1324

21.     The GAF came online in 1959, prior to the enactment of either the SWDA, enacted in 1961, or the TWQCA, enacted in 1977. From 1959 to 1970, coal combustion byproducts (also referred to as coal combustion residuals, or CCR) generated through operation

7

of the GAF were sluiced and treated in a series of unlined ash ponds located on the western edge of the site. These ponds reached capacity in 1970 and were closed to use. Because the ponds were closed before TDEC's implementation of the NPDES permitting program, the ponds have never been covered by an individual NPDES permit, including the GAF's current individual NPDES Permit No. TN0005428. This former ash management area is now known as Non-Registered Site #83-1324 (the NRS).

22.     The NRS has historically been and is currently managed under the provisions of the SWDA. In 1970, after the NRS ceased being used for the treatment of CCR and was closed, it became subject to regulation under the SWDA. The CCR that currently remains in the NRS is a "solid waste" as defined in the SWDA because it is "solid . . . [or] semisolid . . . material resulting from industrial . . . operations." Tenn. Code Ann. § 68-211-103(8)(A) (Supp. 2016). The closure of the NRS constituted "solid waste disposal" under the SWDA because the closure involved "the process of permanently . . . covering solid waste[.] § 68-211-103(9) (Supp. 2016). Because the NRS became a solid waste disposal facility prior to TDEC's implementation of the SWDA's registration/permitting program for such facilities, the NRS was not issued a solid waste disposal permit by TDEC, and thus, it is classified as non-registered. It is, however, still subject to regulation under the SWDA.

23.     In 1997, pursuant to the SWDA's implementing rules and regulations, TVA developed a closure plan for the NRS that included provisions to carry out groundwater monitoring around the site. Rules implementing the SWDA establish groundwater protection standards and require such groundwater monitoring. Tenn. Comp. R. & Regs. 0400-11-01-.04. As discussed in ¶ 22, once the NRS ceased treating CCR and became a solid waste disposal

8

facility, the SWDA became the primary means by which TDEC regulates any water quality issues at the facility. See Tenn. Code Ann. § 68-211-106(c) ("The division of solid and hazardous waste management using technical support and advice, to the extent available, from the bureau of the environment shall . . . determine that water quality standards have been adequately addressed to prevent pollution of the waters of the state."). TDEC approved the installation of three groundwater monitoring wells in 2000. The groundwater at the NRS is classified as a waters of the state. See Tenn. Code Ann. § 69-3-103(44).

24.     In September of 2008, groundwater samples collected from a monitoring well contained concentrations of constituents, including beryllium, cadmium, and nickel, detected at levels above TDEC's maximum containment levels (MCLs) for groundwater protection standards.

25.     These exceedances triggered a requirement for additional groundwater monitoring at the NRS to determine if coal combustion byproducts were currently or could in the future impact all groundwater at the GAF or pose a threat to public or private water supplies near the NRS. In February of 2009, TDEC gave TVA notice that the NRS was being placed in an assessment monitoring program pursuant to Tenn. Comp. R. & Regs. 0400-11-01-.04.

26.     As part of the assessment, TDEC required TVA to develop a Groundwater Quality Assessment Plan, which was approved by TDEC in April of 2011.

27.     In September and October of 2011, TVA installed additional groundwater monitoring wells and performed other sampling to gather data associated with the NRS, the GAF as a whole, and the Cumberland River.

9

28.   TVA submitted its Groundwater Monitoring Assessment Monitoring Project Summary and Risk Assessment Report (the Report) to TDEC on November 25, 2014.   The Report confirmed exceedances of various primary and secondary MCLs related to coal combustion byproducts in the area's groundwater.

## ASH POND COMPLEX AND NPDES PERMIT NO. TN0005428

29.   After the NRS reached capacity in 1970, TVA began treating its coal combustion byproducts, or CCR, using a series of unlined settling and stilling ponds. This pond complex is located north-northeast of the NRS along the Cumberland River and is comprised of Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D (the Ash Pond Complex).

30.   Bottom Ash Pond A covers approximately 248 acres with earthen dikes of 20 to 25 feet.  Bottom Ash Pond A discharges through buried pipes into Stilling Pond B, which discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

31.   Fly Ash Pond E covers approximately 167 acres with earthen dikes of 25 to 30 feet.  Fly Ash Pond E discharges into Stilling Pond C, then to Stilling Pond D, then to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001.

32.   The CCR in Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D meets the SWDA's definition of "solid waste," however the SWDA excludes from regulation "industrial discharges that are point sources are subject to [NPDES] permits[.]"  Tenn. Code Ann. § 68-211-103(8)(B)(i) (Supp. 2016).  Therefore, while the Ash Pond Complex ponds are

10

functioning as wastewater treatment impoundments that are subject to a NPDES permit, the CCR in the ponds is not regulated under the SWDA.

33. The Cumberland River and its tributaries are waters of the state. The Cumberland River is classified for domestic water supply, industrial water supply, fish and aquatic life, recreational use, livestock watering and wildlife, and irrigation. Tenn. Comp. R. and Regs. 0400-40-04-.12. Tenn. Comp. R. & Regs. 0400-40-03-.02(5) provides that since all waters of the state are classified for more than one use, the most stringent criteria [for the respective classified use] will be applicable.

34. On June 26, 2012, TDEC's Division of Water Resources (the Division) issued NPDES Permit No. TN0005428 (the NPDES Permit) to TVA authorizing it to discharge effluent from the GAF under prescribed limitations to the Cumberland River through several outfalls. The NPDES Permit authorizes TVA to discharge treated effluent including, but not limited to, discharge ash transport water, chemical and nonchemical metal cleaning wastes, water treatment plant wastes, combustion turbine oil/water separator effluent demineralizer off-spec water and filter backwash, miscellaneous equipment cooling water, ash sluice water leakage, coal pile and coal barge runoff, and storm water runoff through Outfall 001 to the Cumberland River, located at mile 240.5. Outfall 001 is the only authorized discharge point for treated wastewater from the Ash Pond Complex to the Cumberland River.

35. The NPDES permit only addresses discharges from the Ash Pond Complex through Outfall 001. The NPDES Permit does not authorize discharges to groundwater.

11

36.     The NPDES Permit does not currently, nor has it ever, authorized discharges at the NRS. As discussed in ¶¶ 21-28, since closing in 1970 the NRS has been a solid waste disposal facility, not a wastewater treatment facility, and regulated under the SWDA and its implementing rules and regulations.

37.     On October 17, 2016, TVA submitted its application for renewal of NPDES Permit No. TN0005428 to the Division.  Based on the submitted application, additional documentation submitted to TDEC by TVA, and TVA's publications concerning its intended future operations at the GAF, on March 28, 2017, TDEC sent correspondence to TVA advising that Bottom Ash Pond A and Fly Ash Pond E would not be included in any renewed NPDES permit as they are scheduled for closure and therefore will not be part of any ongoing CCR wastewater treatment process.

38.     Once Bottom Ash Pond A and Fly Ash Pond E cease functioning as wastewater treatment impoundments subject to a NPDES permit, they are no longer excluded from regulation under the SWDA.  As discussed in ¶¶ 8-13, 29-32, the CCR in Bottom Ash Pond A and Fly Ash Pond E is solid waste as defined in the SWDA and the closure of these ponds will constitute solid waste disposal regulated under the SWDA and its implementing rules and regulations.

39.     The SWDA generally requires coal ash to be disposed of in a permitted facility with "a liner."  Tenn. Code Ann. § 68-211-106(j).  However, for "the disposal of coal ash in connection" with "wastewater treatment units[,]" TDEC may authorize another method for disposal.  Id.  Any method of coal ash disposal authorized by TDEC must provide the Commissioner with satisfactory proof "that the geologic formation of the proposed site . . . [is]

12

capable of containing the disposed wastes, so that ground water protection standards are not exceeded." Tenn. Code Ann. § 68-211-105(g)(2). When it is either technologically or economically infeasible to meet ground water protection standards, TDEC may authorize a method of disposal based on a risk assessment. Tenn. Comp. R. and Regs. 0400-11-01-.04(7).

40.     TDEC's March 28, 2017, correspondence to TVA also addressed Stilling Ponds B, C, and D. Although TVA's submitted application for renewal of NPDES Permit No. TN0005428 seeks coverage for continued discharge of treated non-CCR process wastewater through Stilling Ponds B, C, and D into the Cumberland River, TDEC learned that TVA has dredged CCR from the Stilling Ponds and therefore informed TVA in its correspondence that it is unclear how much CCR remains in these ponds and that TDEC is currently uncertain as to whether a NPDES permit can be issued allowing these ponds to be used for non-CCR wastewater treatment. If TDEC determines that Stilling Ponds B, C, and D have to be closed, closure will be governed by the SWDA and its implementing rules and regulations as discussed in ¶¶ 71-73.

41.     The current NPDES Permit imposes daily maximum and monthly average limits on effluent characteristics, including, but not limited to: metals and coal ash byproduct constituents, flow, pH, oil and grease, and total suspended solids (TSS). The NPDES Permit also requires TVA to submit weekly and/or monthly discharge monitoring reports (DMRs) to provide monitoring results for the effluent characteristics to the Division.

42.     Any discharges from the GAF other than those specifically identified in the NPDES Permit and in the manner identified in the NPDES Permit would result in a violation of the TWQCA and, in some cases, the NPDES Permit itself.

13

43. TVA has maintained a very limited number of groundwater monitoring wells around the Ash Pond Complex in the past.

44. TVA conducted limited groundwater monitoring from 1987 to 1997, however, the sampled wells were primarily located north of the Ash Pond Complex, were limited in number, and were ultimately closed in 2006. Beginning in 2011, TVA voluntarily participated in an industry-wide groundwater monitoring program at the Ash Pond Complex, however the sampling only included 4 wells, resulted in limited monitoring, and was terminated in 2014. TVA's first sampling report from this groundwater monitoring, dated in January/February 2011, provided that "indicators at the site, including incipient ash leachate indicators boron, sulfate, and total dissolved solids, are elevated above background – though not nearly to the degree observed at other fossil plants during initial USWAG well sampling." TVA's later sampling reports were silent on exceedances above background for boron, sulfate, and total dissolved solids in groundwater.

45. As part of an on-going environmental investigation at the GAF, TVA was required to install groundwater monitoring wells throughout the GAF facility, including in and around the Ash Pond Complex. On December 16, 2016, TVA contacted TDEC and advised that it had conducted groundwater sampling events at and around the Ash Pond Complex, that some analytical results from those samplings were available, and that the data showed exceedances of various MCLs. Additional groundwater sampling events continue to show exceedances of various MCLs at and around the Ash Pond Complex.

46. TVA, as a condition of the NPDES Permit, also conducts inspections of the Ash Pond Complex's impounding dikes and dams for structural defects. Areas in the dikes where

14

impounded wastewater is or may be escaping from the Ash Pond Complex are generally referred to as "seeps." The terms "seep," "seeps," and/or "seepage," as used in the NPDES Permit, are tied to the dike inspections/dam safety and do not contemplate leakage through the bottoms of the ash ponds.

47.     The NPDES Permit requires TVA to conduct a daily visual inspection of the impoundment dams, dikes, and toe areas; maintain records of the inspections; take immediate corrective action once a potential compromise is discovered; and report within 24 hours the discovery of a change that indicates a potential compromise to the structural integrity of the impoundment.

48.     At the time of the original filing of the Verified Complaint, it was TDEC's understanding that appropriate corrective action for seeps included "repair" for the purpose of structural stability, which included eliminating the flow of wastewater through the impoundment dikes. However, TDEC has since discovered that a "repaired seep," as that terms is used in reference to the GAF, may continue to allow the movement of wastewater from inside the impoundment to outside of the dike, resulting in a potential ongoing, unpermitted discharge.

49.     TVA has reported to TDEC at least 10 seeps it is monitoring related to the Ash Pond Complex, each constituting a potential unpermitted discharge from the impoundment ponds.

15

## GEOLOGY AT THE GAF

50.     The peninsula on which the GAF is located has a significant history of karst activity, including the development of sinkholes. In the past 10 years alone, TVA has discovered and "repaired" at least 15 sinkholes in the vicinity of and within the Ash Pond Complex.

51.     Historic information suggested that the geologic formation under and around the Ash Pond Complex was similarly, if not potentially more, porous than the geologic formation under and around the NRS. As detailed in ¶¶ 24-28, the NRS has had and continues to have reported exceedances of various MCLs for the area's groundwater.

52.     Current scientific data generated through an on-going environmental investigation at the GAF has developed substantial additional information concerning the hydrology and geology under, around, and within the Ash Pond Complex that confirms the presence of significant karst geology and exceedances of various MCLs in the area's groundwater. As discussed in ¶¶ 8-13, 29-32, and 38-39, when closed, Bottom Ash Pond A and Fly Ash Pond E will be solid waste disposal facilities and their closure must be in accordance with the SWDA and its implementing rules and regulations.

## CAUSES OF ACTION

### NRS VIOLATIONS

53.     In accordance with the provisions of Tenn. Code Ann. § 68-211-104(1), it is unlawful to "place or deposit any solid waste into the waters of the state except in a manner approved by [TDEC]."

16

54.     "Solid waste" is defined in the SWDA as *"spent material, byproducts, . . . ash, sludge, and all discarded material including solid, liquid, [or] semisolid . . . material resulting from industrial, commercial, and agricultural operations."* Tenn. Code Ann § 68-211-103(8) (emphasis added).

55.     Based on TVA's submitted groundwater monitoring reports, and upon current information and belief, solid waste has been repeatedly discharged from the NRS into the groundwater in and around the GAF, as detailed in ¶¶ 22-28 above, in violation of the SWDA and its implementing rules and regulations.

56.     Additionally, pursuant to Tenn. Code Ann. § 68-211-104(3), it is unlawful to "construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the [C]ommissioner."

57.     "Solid waste disposal" is defined in the SWDA as *"the process of permanently or indefinitely placing, confining, compacting, or covering solid waste."* Tenn. Code Ann § 68-211-103(9) (emphasis added).

58.     The NRS meets the definition of a solid waste disposal site and based on TVA's submitted groundwater monitoring reports and upon current information and belief, solid waste has been repeatedly discharged from the NRS into the groundwater in and around the GAF, as detailed in ¶¶ 22-28 above, in violation of the provisions of the SWDA and its implementing rules and regulations.

17

59.     In accordance with Tenn. Code Ann. § 68-211-115, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the SWDA and the rules and regulations thereunder.

60.     In accordance with Tenn. Code Ann. § 68-211-117(a)(1), this Court may impose a civil penalty of up to $7,000.00 per day for each day any person violates the SWDA by failing to comply with the provisions of the SWDA and its implementing rules and regulations. Additionally, pursuant to Tenn. Code Ann. § 68-211-117(2), each day such a violation continues is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $7,000.00 per day for each day of such violation.

61.     Pursuant to Tenn. Code Ann. §69-3-114(a):

> it is unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in § 69-3-103, . . . unless such action has been properly authorized.

62.     Pursuant to Tenn. Code Ann. § 69-3-114(b), it is unlawful for any person to act in a manner or degree that is violative of the TWQCA, or any rule, regulation, or standard of water quality promulgated thereunder.

63.     Based on TVA's submitted groundwater monitoring reports and upon current information and belief, as detailed in ¶¶ 22-28 above, TVA has violated the provisions of the TWQCA and its implementing rules and regulations.

18

64.     In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the TWQCA and the regulations thereunder.

65.     In accordance with Tenn. Code Ann. §§ 69-3-115(a)(1)(A) and (B) and § 69-3-115(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition. Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation occurs is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## ASH POND COMPLEX VIOLATIONS

66.     As detailed in paragraphs ¶¶ 29-52, through reported unpermitted discharges throughout the GAF's Ash Pond Complex and based on current information and belief, TVA has violated § 69-3-114(a) and § 69-3-114(b).

67.     Additionally, as a result of the unpermitted discharges, TVA has violated Part II.A.4.a., titled Proper Operation and Maintenance, of the NPDES Permit issued pursuant to Tenn. Code Ann. § 69-3-108, which requires that: "[t]he permittee shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit."

19

68.     Based upon current information and belief, TVA has also violated Part II.C.1. of the NPDES Permit, which requires that all discharges be consistent with the terms and conditions of the permit.

69.     In accordance with Tenn. Code Ann. § 69-3-117, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the TWQCA, the regulations thereunder, and the conditions of all NPDES permits issued to TVA pursuant to Tenn. Code Ann. § 69-3-108.

70.     In accordance with Tenn. Code Ann. §§ 69-3-115(a)(1)(A) and (B) and § 69-3-115(a)(2)(D), this Court may impose a civil penalty of up to $10,000.00 per day for each day any person violates an effluent or water quality standard promulgated under the TWQCA or a permit condition. Additionally, pursuant to Tenn. Code Ann. § 69-3-115(b), each day such a violation occurs is considered a separate violation. TVA is therefore subject to a civil penalty assessment of up to $10,000.00 per day for each day of such violation.

## CLOSURE OF BOTTOM ASH POND A AND FLY ASH POND E

71.     As detailed in ¶¶ 37-38 above, TVA has advised that Bottom Ash Pond A and Fly Ash Pond E of the Ash Pond Complex are to be closed and therefore will not be part of any ongoing wastewater treatment process at the GAF and, as a result, will not be covered by a NPDES permit. The CCR remaining in Bottom Ash Pond A and Fly Ash Pond E is "solid waste," and the closure of these ponds is "solid waste disposal," which is defined in the SWDA as "*the process of permanently or indefinitely placing, confining, compacting, or covering solid waste*." Tenn. Code Ann § 68-211-103(9) (emphasis added).

20

72.     Based on groundwater monitoring reports identifying exceedances of various MCLs in the area's groundwater and upon current information and belief, solid waste has been and continues to be repeatedly discharged from Bottom Ash Pond A and Fly Ash Pond E into the groundwater in and around the GAF, as detailed in ¶¶ 43-45 above. The SWDA governs the closure of Bottom Ash Pond A and Fly Ash Pond E and under the SWDA and its implementing regulations, TDEC seeks closure of these ponds in a manner such "that ground water protection standards are not exceeded[.]"  Tenn. Code Ann. § 68-211-105(g)(2).

73.     In accordance with Tenn. Code Ann. § 68-211-115, this Court is authorized to issue a permanent injunction against TVA requiring it to comply with the provisions of the SWDA and the rules and regulations thereunder.  Specifically, TDEC seeks a permanent injunction requiring TVA to close Bottom Ash Pond A and Fly Ash Pond E in accordance with the requirements of the SWDA and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request the following relief:

A.     That this complaint be filed without cost bond, as provided by Tenn. Code Ann. § 20-13-101, and that process issue and be served upon the defendant requiring it to appear and answer this Complaint;

B.     That upon a trial or final hearing in this matter, the Court issue a permanent injunction against the defendant, in accordance with Tenn. Code Ann. § 68-211-115, § 69-3-117, and, as applicable, Tenn. R. Civ. P. 65, requiring TVA and its successors, assigns, officers, agents, servants, attorneys, and any other person or entity in active concert or participation with

21

TVA, to comply with, and enjoining it from further violations of, the provisions of the SWDA, the TWQCA, and the rules promulgated thereunder, as well as the current and any future NPDES permit issued to TVA in the State of Tennessee, and requiring TVA to close the historic and existing impoundments at the GAF in accordance with the requirements of the SWDA, and its implementing rules and regulations. This request for extraordinary relief is plaintiffs' first application for such process;

C.      That upon a trial or final hearing in this matter, the Court enter judgment for the plaintiffs against the defendant and assess civil penalties in an amount not to exceed $7,000.00 per day for each violation, in accordance with Tenn. Code Ann. § 68-211-117, against the defendant for violations of the SWDA and the regulations promulgated thereunder;

D.      That upon a trial or final hearing in this matter, the Court enter judgment for the plaintiffs against the defendant and assess civil penalties in an amount not to exceed $10,000.00 per day for each violation, in accordance with Tenn. Code Ann. § 69-3-115, against the defendant for violations of the TWQCA and the regulations promulgated thereunder;

E.      That this Court assess post-judgment interest against the defendant in accordance with Tenn. Code Ann. §§ 47-14-121 and 47-14-122 until the judgment against the defendant is paid in full, for which execution may issue if necessary;

F.      That all costs in this cause be taxed to the defendant; and

G.      That the Court award the plaintiffs such other general and equitable relief as the Court deems appropriate.

22

Respectfully submitted,

HERBERT H. SLATERY III, BPR No. 009077
Attorney General and Reporter
State of Tennessee


EMILY B. VANN, BPR No. 026642
Assistant Attorney General
SOHNIA W. HONG, BPR No. 017415
Senior Counsel
J. PETER MURREY, BPR No. 033455
Assistant Attorney General
Environmental Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2583

23

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | No. 15-23-IV |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## VERIFICATION OF AMENDED COMPLAINT

STATE OF TENNESSEE    )
                      )
COUNTY OF DAVIDSON    )

I, Charles L. Head, being duly sworn, do hereby depose and, upon personal knowledge, state as follows:

1.    I am employed as the Assistant Commissioner for the Bureau of Environment of the Tennessee Department of Environment and Conservation (TDEC). I have been employed with TDEC since 1977 and currently serve in the TDEC Central Office located in Nashville, Tennessee.

1

EXHIBIT
1

2.     My job responsibilities include, but are not limited to, serving as an environmental technical and regulatory expert for TDEC's Bureau of Environment, providing support for environmental investigations and clean-up, developing environmentally protective permitting and licensing processes, and serving as TDEC's lead for investigation of and determinations regarding corrective action for coal combustion residual material locations in Tennessee.

3.     I am familiar with the facts giving rise to this lawsuit. I have read the allegations contained in the foregoing amended complaint and believe the allegations concerning violations of the Tennessee Solid Waste Disposal Act (SWDA), the Tennessee Water Quality Control Act of 1977 (TWQCA), and NPDES Permit No. TN0005428 to be true to the best of my knowledge, information, and current belief.

4.     Based on my experience, the information obtained by TDEC in the course of its investigation of the TVA Gallatin Fossil Plant located in Sumner County, Tennessee, and the alleged current and ongoing violations of the SWDA, the TWQCA, and NPDES Permit No. TN0005428, the public interest requires that this action be commenced.

FURTHER THE AFFIANT SAITH NOT.

_____
CHARLES L. HEAD

Sworn to and subscribed before me

this 3th day of July, 2017

_____
NOTARY PUBLIC
My Commission Expires: _____



2

# EXHIBIT 35

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY

| | | |
|---|---|---|
| STATE OF TENNESSEE ex rel. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee and ROBERT J. MARTINEAU, JR., Commissioner of the Tennessee Department of Environment and Conservation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | No. 15-23-IV |
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) | |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## DEFENDANT TENNESSEE VALLEY AUTHORITY'S AMENDED ANSWER TO COMPLAINT IN INTERVENTION

### I.    NATURE OF THE ACTION

1.    Answering the allegations of paragraph 1, TVA admits that the State brought a civil enforcement action under the cited state statutes, but states that TVA is immune from civil penalties under the TWCQA and that the TWQCA spans Tenn. Code Ann. §§ 69-3-101 to 69-3-148. Except as expressly admitted, TVA denies the allegations of paragraph 1.

2.    Denied.

3.    Denied.

4.    Admitted.

1

5.     Answering the allegations of paragraph 5, TVA admits that the State's Complaint in this action states that the State's enforcement action is "in response to the Citizens' Groups' 60-day Notice of Violation letter." TVA is without information to admit or deny the allegations of paragraph 5 regarding communications between the State and the Plaintiff-Intervenors. Except as expressly admitted, TVA denies the allegations of paragraph 5.

## II.    PARTIES

6.     Upon information and belief, TVA admits the allegations of the first sentence of paragraph 6. TVA denies the allegations of the second sentence of paragraph 6. Except as expressly admitted, TVA denies the allegations of paragraph 6.

7.     Upon information and belief, TVA admits the allegations of paragraph 7.

8.     Upon information and belief, TVA admits the allegations of paragraph 8.

9.     Upon information and belief, TVA admits the allegations of paragraph 9.

10.    Upon information and belief, TVA admits the allegations of paragraph 10.

11.    Upon information and belief, TVA admits the allegations of paragraph 11.

12.    Upon information and belief, TVA admits the allegations of the first sentence of paragraph 12. TVA denies the allegations of the second and third sentences of paragraph 12. Except as expressly admitted, TVA denies the allegations of paragraph 12.

13.    Upon information and belief, TVA admits the allegations of paragraph 13.

14.    Denied.

15.    Admitted.

16.    Admitted.

17.    TVA admits the allegations of the first sentence of paragraph 17, but states that the appropriate citation for the TVA Act, as amended, is 16 U.S.C. §§ 831-831ee. TVA admits the allegations of the second sentence of paragraph 17. TVA denies the allegations of the third

2

sentence of paragraph 17. Answering the allegations of the fourth sentence of paragraph 17,

TVA admits that the TVA Act at 16 U.S.C. § 831c(b) provides that TVA "[m]ay sue and be sued

in its corporate name." TVA admits the allegations of the fifth sentence of paragraph 17 but

states that William D. Johnson is TVA's Chief Executive Officer. Except as expressly admitted,

TVA denies the allegations of paragraph 17.

## III.    JURISDICTION AND VENUE

18.    Answering the allegations of paragraph 18, TVA admits that jurisdiction over the

State's action against TVA is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-

117, but denies that jurisdiction over the Tennessee Valley Authority is proper under Tenn. Code

Ann. § 69-3-115. Except as expressly admitted, TVA denies the allegations of paragraph 18.

19.    Answering the allegations of paragraph 19, TVA admits that venue in the State's

action against TVA is proper under Tenn. Code Ann. §§ 68-211-115, -117 and § 69-3-117, but

denies that venue over the Tennessee Valley Authority is proper under Tenn. Code Ann.

§ 69-3-115. Except as expressly admitted, TVA denies the allegations of paragraph 19.

20.    Answering the allegations of paragraph 20, TVA admits that, pursuant to

33 U.S.C. § 1323(a), TVA is subject to the jurisdiction of this Court for claims of injunctive

relief by the State stemming from allegations of violations of state law respecting the control and

abatement of water pollution. Except as expressly admitted, TVA denies the allegations of

paragraph 20.

## IV.    GENERAL ALLEGATIONS

21.    Admitted.

22.    Admitted.

23.    TVA admits the allegations of the first and second sentences of paragraph 23.

Answering the allegations of the third sentence of paragraph 23, TVA states that 235,000 tons of

3

coal ash are not consistently produced each year and that this figure represents the maximum

annual value of historical coal ash production since 2006. Answering the allegations of the

fourth sentence of paragraph 23, TVA states that coal ash is sluiced to a settling pond on the

plant property. Except as expressly admitted, TVA denies the allegations of paragraph 23.

24.    Answering the allegations of paragraph 24, TVA admits that the ash ponds are

bounded adjacent to the Cumberland River by earthen dikes and states that Gallatin's ponds may

have a naturally occurring clay liner. Except as expressly admitted, TVA denies the allegations

of paragraph 24.

25.    Upon information and belief, TVA admits the allegations of paragraph 25.

26.    Upon information and belief, TVA admits the allegations of paragraph 26.

27.    Admitted.

28.    TVA is without information to admit or deny the allegations of paragraph 28.

29.    Denied.

30.    Denied.

31.    Answering the allegations of paragraph 31, TVA admits that the groundwater at

the Gallatin Plant is a water of the State of Tennessee. Except as expressly admitted, TVA

denies the allegations of paragraph 31.

32.    Denied.

33.    Admitted.

34.    Answering the allegations of paragraph 34, TVA admits that the coal ash ponds at

Gallatin were rated in 2009 by TVA staff as having "significant" hazard potential, which does

not reflect their actual stability but rather the probable impacts that would result should they fail;

specifically, a "significant" hazard indicates that "failure or misoperation results in no probable

loss of human life but can cause economic loss, environmental damage, disruption of lifeline

4

facilities, or can impact other concerns." TVA denies that EPA made this determination in 2009. Except as expressly admitted, TVA denies the allegations of paragraph 34.

35. TVA denies the allegations of the first sentence of paragraph 35, and states that EPA found "the Gallatin Fly Ash Pond E is rated **SATISFACTORY** for continued safe and reliable operation" and that "the Bottom Ash Pond A and the system of Stilling Ponds B, C, and D are rated **FAIR**." Answering the allegations of the second sentence of paragraph 35, TVA states the EPA concluded that because TVA "has taken the necessary action to replace an existing deficient spillway at Bottom Ash Pond A and to make improvements in the stilling ponds (Pond B, C, and D), for improving the design flood routing through the CCR Complex to prevent overtopping of the dikes, the inadequacy is considered temporary. Upon completion of the new spillway and stilling pond improvements, the CCR Complex will be considered adequate with respect to hydrologic/hydraulic safety." Except as expressly admitted, TVA denies the allegations of paragraph 35.

36. Answering the allegations of paragraph 36, TVA states that in a June 13, 2013, letter, EPA stated, "Since these recommendations relate to actions which could affect the structural stability of the CCR management unit(s) and, therefore, protection of human health and the environment, EPA believes their implementation should receive the highest priority." Except as expressly admitted, TVA denies the allegations of paragraph 36.

37. Denied.

38. Denied.

39. Denied.

5

## A.   The Gallatin Plant Coal Ash Ponds

40.   Answering the allegations of paragraph 40, TVA states that it adds water to the coal ash from the Gallatin Plant and sluices it to a settling pond.  Except as expressly admitted, TVA denies the allegations of paragraph 40.

41.   TVA admits the allegations of the first and second sentences of paragraph 41 but states that ash is sluiced only to one settling pond.  TVA denies the accuracy of Exhibit 1 attached to Intervenors' Complaint.   Except as expressly admitted, TVA denies the allegations of paragraph 41.

42.   Denied.

43.   Denied.

44.   Denied.

45.   Denied.

46.   Answering the allegations of paragraph 46, TVA admits that the Gallatin plant is located in an area with karst geology, which has had sinkhole activity, and denies the accuracy of Exhibit 2 attached to Intervenors' Complaint.  Except as expressly admitted, TVA denies the allegations of paragraph 46.

47.   Answering the allegations of paragraph 47, TVA admits that it undertook a study and produced a report based on that study dated April 1977, entitled "Magnitude of Ash Disposal Pond Leakage Problem: Gallatin Steam Plant," that such report was attached to a memorandum with the same subject dated June 13, 1977, and that the language quoted in paragraph 47 is a partial quotation from the report. Except as expressly admitted, TVA denies the allegations of paragraph 47.

6

48. Answering the allegations of paragraph 48, TVA states that the referenced report states, "The leakage rate is equal to the inflow rate of the ash sluice water into the pond . . . ." Except as expressly admitted, TVA denies the allegations of paragraph 48.

49. Denied.

### B. The Abandoned Ash Pond: Non-Registered Site #83-1324

50. Answering the allegations of paragraph 50, TVA admits that, until around 1970, TVA placed ash in a facility comprised of a series of ponds beside the Cumberland River which is now closed, and states that these ponds may have a naturally occurring clay liner. Except as expressly admitted, TVA denies the allegations of paragraph 50.

51. TVA admits that it ceased disposal at Non-Registered Site # 83-1324 around 1970 when the area reached capacity and that the area is closed, and states that the area no longer contains or impounds water and is vegetated, and further states that TVA and TDEC refer to the area as "Non-Registered Site # 83-1324," which is an identifier assigned by TDEC. Except as expressly admitted, TVA denies the allegations of paragraph 51.

52. Answering the allegations of paragraph 52, TVA admits that the surface area of the Non-Registered Site is estimated to be 73 acres inside the dikes, the height of the Non-Registered Site is estimated to be 25 feet from toe to top of dike, and the Non-Registered Site's estimated coal ash storage is unknown because the area is closed. Except as expressly admitted, TVA denies the allegations of paragraph 52.

53. Answering the allegations of paragraph 53, TVA admits that it ceased disposal at Non-Registered Site # 83-1324 in approximately 1970 when the area reached capacity, that the area is closed and no longer contains or impounds water, and that TVA developed a closure plan for the Non-Registered Site in 1997 at the request of TDEC. Except as expressly admitted, TVA denies the allegations of paragraph 53.

7

54.     Answering the allegations of paragraph 54, TVA admits that it ceased disposal at Non-Registered Site # 83-1324 in approximately 1970 when the area reached capacity, that the area is closed and no longer contains or impounds water, and that TVA installed monitoring wells and began collecting groundwater data in 2000, but TVA denies that state law authorized or required TDEC to direct TVA to develop a closure plan. Except as expressly admitted, TVA denies the allegations of paragraph 54.

55.     Answering the allegations of paragraph 55, TVA admits that TVA's groundwater monitoring in 2002 indicated the presence of beryllium and cadmium at or exceeding MCLs, and states that although cobalt was present in amounts exceeding MCLs, TDEC concurred with TVA's assessment that those exceedances were due to naturally occurring background levels of cobalt. Except as expressly admitted, TVA denies the allegations of paragraph 55.

56.     Denied.

57.     Denied.

58.     Answering the allegations of paragraph 58, TVA admits that it installed new groundwater monitoring wells in 2011. Except as expressly admitted, TVA denies the allegations of paragraph 58.

59.     Answering the allegations of paragraph 59, TVA admits that a Preliminary Ecological Screening Evaluation of Groundwater Discharges at the Abandoned Ash Disposal Area (Non-Registered Site # 83-1324) at Gallatin yielded measured and modeled concentrations of beryllium, cadmium, nickel, and zinc that "may pose a risk to aquatic biota in the groundwater discharge zone of the Cumberland River [but that] the conservative assumptions required for [the study's] screening evaluation are likely to overestimate potential risks." Except as expressly admitted, TVA denies the allegations of paragraph 59.

60.     Denied.

8

61. Denied.

62. Denied.

63. Denied.

64. Answering the allegations of paragraph 64, TVA states that it has begun a root cause analysis in response to the groundwater monitoring results. Except as expressly admitted, TVA denies the allegations of paragraph 64.

65. Denied.

## C. The Active Ash Pond Complex: Bottom Ash Pond A, Fly Ash Pond E, and Stilling Ponds B, C, and D

66. Answering the allegations of paragraph 66, TVA admits that it ceased disposing ash at the Non-Registered Site in approximately 1970, that the Non-Registered Site is closed, and that TVA now sluices ash to a settling pond. Except as expressly admitted, TVA denies the allegations of paragraph 66.

67. Admitted.

68. Answering the allegations of paragraph 68, TVA states that the United States Geological Survey map attached as Exhibit 3 to Intervenors' Complaint speaks for itself. Except as expressly admitted, TVA denies the allegations of paragraph 68.

69. Admitted.

70. Answering the allegations of the first sentence of paragraph 70, TVA admits that its NPDES Permit No. TN0005428 includes limits on TVA's discharge of Oil & Grease, Total Suspended Solids, and pH from Outfall 001 located at Cumberland River mile 240.5. TVA admits the allegations of the second sentence of paragraph 70. Except as expressly admitted, TVA denies the allegations of paragraph 70.

9

71.     Answering the allegations of paragraph 71, TVA admits that the NPDES permit for the Gallatin plant does not impose numeric limits on the discharge of the constituents listed in paragraph 71 but does contain narrative limits requiring TVA to implement best management practices to address controls on those constituents in ash pond discharges and requires TVA to monitor those constituents and report its monitoring results to TDEC. Except as expressly admitted, TVA denies the allegations of paragraph 71.

72.     Answering the allegations of paragraph 72, TVA states that in the past five years, the reported toxic weighted pounds equivalent of aluminum has ranged from 3,044 to 8,951 TWPE; the reported toxic weighted pounds equivalent of arsenic has ranged from 932 to 7,057 TWPE; and the reported toxic weighted pounds equivalent of selenium has ranged from 847 to 4,713 TWPE. TVA further states that on the "Discharge Monitoring Report Pollutant Loading Tool" website where EPA provides the toxic weighting factors, EPA states that a Toxic-Weighted Pound Equivalent is a number calculated from Discharge Monitoring Report data and pollutant specific toxic weighting factors and is used to compare the relative toxicities of different pollutant discharges but that "**[i]t is important to note that this value is not a measure of risk or potential for human health impacts**." (Emphasis in original.) Except as expressly admitted, TVA denies the allegations of paragraph 72.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Answering the allegations of paragraph 76, TVA admits that the Gallatin NPDES permit requires daily visual inspections of dams, dikes, and toe areas, and requires TVA to report to TDEC and begin remediation procedures within 24 hours of discovering changes that indicate

10

a potential compromise to the structural integrity of the impoundment. Except as expressly admitted, TVA denies the allegations of paragraph 76.

77.    Denied.

78.    Denied.

79.    TVA admits the allegations in the first sentence of paragraph 79. Answering the allegations of the second sentence of paragraph 79, TVA states that the amount of ash produced each year varies, but admits that approximately 185,000 tons of fly ash and 45,000 tons of bottom ash annually are sluiced to Bottom Ash Pond A. Answering the allegations of the third sentence of paragraph 79, TVA states that the earthen dikes at Bottom Ash Pond A are estimated to be between 20-25 feet high and estimated to contain just under 5 million cubic yards of coal ash. Except as expressly admitted, TVA denies the allegations of paragraph 79.

80.    Answering the allegations of paragraph 80, TVA states that water from Bottom Ash Pond A flows through buried pipes to Stilling Pond B, then to Stilling Pond C, and then to Stilling Pond D, before discharging to the Cumberland River through NPDES Permit No. TN0005428 Outfall 001. Except as expressly admitted, TVA denies the allegations of paragraph 80.

81.    TVA admits the allegations of the first and fourth sentences of paragraph 81. Answering the allegations of the second and third sentences of paragraph 81, TVA states that the dikes at Fly Ash Pond E are partially constructed over fly ash, estimated to be between 25-30 feet high, and estimated to contain just under 5 million cubic yards of coal ash. Except as expressly admitted, TVA denies the allegations of paragraph 81.

82.    Denied.

83.    Denied.

84.    Admitted.

11

85.     Answering the allegations of paragraph 85, TVA admits that its monitoring wells in the vicinity of the Ash Pond Complex have shown the presence of some amount of metals and other pollutants, but states that the only pertinent regulatory standards are Maximum Contaminant Levels (MCLs) and/or groundwater protection standards (GWPS) and there have been no exceedances of MCLs or GWPS at those monitoring wells.  Except as expressly admitted, TVA denies the allegations of paragraph 85.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     TVA is without information to admit or deny the purported sampling results, and states that it is not aware of an EPA-approved protocol for sampling seeps.  Except as expressly admitted, TVA denies the allegations of paragraph 90.

91.     Denied.

### D.     Sampling Results

92.     Admitted.

93.     Answering the allegations of the first sentence of paragraph 93, TVA admits that the groundwater monitoring wells in the vicinity of the Gallatin plant are identified by number, with each well having the prefix "GAF," but TVA denies the accuracy of Exhibit 2 attached to Intervenors' Complaint.  TVA admits the allegations of the second sentence of paragraph 93 but states that the listed monitoring wells are not the only wells that exist in the vicinity of the Gallatin plant.  Except as expressly admitted, TVA denies the allegations of paragraph 93.

94.     Denied.

12

95. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 95.

96. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 96.

97. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 97.

98. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 98.

99. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 99.

100. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 100.

101. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 101.

102. TVA is without information to admit or deny the purported sampling results. Except as expressly admitted, TVA denies the allegations of paragraph 102.

103. Answering the allegations of paragraph 103, TVA states that these are summaries of statements that appear in the current Agency for Toxic Substances and Disease Registry (ATSDR) toxicological profile of aluminum, but that the profile also states, among other things, that "[p]eople generally consume little aluminum from drinking water," that "[o]ral exposure to aluminum is usually not harmful," and that "[o]bvious signs of damage were not seen in animals after high oral doses of aluminum." The ATSDR report further states that, if a person is exposed to aluminum, many factors will determine whether that person will be harmed, including the

13

dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 103.

104. Answering the allegations of the first, third, and fourth sentences of paragraph 104, TVA states that these are summaries of statements that appear in the current ATSDR toxicological profile of arsenic. The ATSDR report further states that, if a person is exposed to arsenic, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits the allegations of the second sentence of paragraph 104. Except as expressly admitted, TVA denies the allegations of paragraph 104.

105. Answering the allegations of paragraph 105, TVA states that the current ATSDR toxicological profile of barium and barium compounds states that some studies have shown these effects, but that the profile also states, among other things, that "[t]he amount of barium found in food and water usually is not high enough to be a health concern." The ATSDR report further states that, if a person is exposed to barium and barium compounds, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 105.

106. Answering the allegations of paragraph 106, TVA states that the current ATSDR toxicological profile of boron states that "[s]tudies of dogs, rats, and mice indicate that the male reproductive organs, especially the testes, are affected if large amounts of boron are ingested for short or long period of time [but that the] doses that produced these effects in animals are more than 1,800 times higher than the average intake of boron in food by adults in the U.S. population," that "concentrations [of boron] up to 0.4 mg/L have been found in most drinking water samples," and that "[b]oron is part of the natural environment and [one will] have some

14

exposure from foods and drinking water." The ATSDR report further states that, if a person is exposed to boron, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 106.

107.    Answering the allegations of paragraph 107, TVA states that the current ATSDR toxicological profile of cadmium summarizes several studies with equivocal results from long-term exposure to cadmium or exposure to acute levels of cadmium and states "[f]or the U.S. population, cadmium exposure through the drinking water supply is of minor concern." The ATSDR report further states that, if a person is exposed to cadmium, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 107.

108.    Answering the allegations of paragraph 108, TVA admits that iron levels above the secondary MCL can produce a rusty color, reddish or orange staining, a metallic taste, or sedimentation, but denies that water containing iron becomes "unusable" as a result of certain cosmetic or aesthetic effects. Except as expressly admitted, TVA denies the allegations of paragraph 108.

109.    Answering the allegations of paragraph 109, TVA states that exposure to high lead levels can affect the nervous system and that, although EPA has determined that lead is a probable human carcinogen, the current ATSDR toxicological profile of lead states that there is "no conclusive proof that lead causes cancer (is carcinogenic) in humans" and that "very little lead is found in lakes, rivers, or groundwater used to supply the public with drinking water" and that more "than 99% of all publicly supplied drinking water contains less than 0.005 parts of lead per million parts of water (ppm)." The ATSDR report further states that, if a person is exposed

15

to lead, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 109.

110. Answering the allegations of the first and third sentences of paragraph 110, TVA states that the current ATSDR toxicological profile of manganese states that inhalation of very high levels of manganese by workers in mines and factories has been shown to affect the nervous system and that nervous system disturbances have been observed in animals after being given very high oral doses of manganese. The ATSDR report further states that, if a person is exposed to manganese, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Answering the allegations of the second sentence of paragraph 110, TVA admits that such manganese concentrations can discolor water, give water a metallic taste, and cause black staining, but denies that water containing manganese becomes "unusable." Except as expressly admitted, TVA denies the allegations of paragraph 110.

111. Answering the allegations of the first sentence of paragraph 111, TVA states that the current ATSDR toxicological profile of nickel states that "exposure to nickel may cause dermatitis in some sensitized people" and that "cancer of the lung and nasal sinus has occurred in people who have breathed dust containing certain nickel compounds while working in nickel refineries or nickel-processing plants [but that the] levels of nickel in these workplaces were much higher than usual (background) levels in the environment." The ATSDR report further states that, if a person is exposed to nickel, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits the allegations of the second sentence of paragraph 111, but states that EPA has reported that "[t]here is no evidence that nickel has the potential to cause

16

cancer from lifetime exposures in drinking water." Except as expressly admitted, TVA denies the allegations of paragraph 111.

112. Answering the allegations of the first sentence of paragraph 112, TVA states that EPA conducted studies "to examine the association between consumption of tap water continuing high levels of sulfates and reports of osmotic diarrhea in susceptible populations (infants and transients, i.e., those acutely exposed) [but was] unable to conduct a study of infants [and] did not find a significant dose-response association between acute exposure to sodium sulfate in water (up to 1200 mg/L) and reports of diarrhea [but] did find a weak (not statistically significant) increase in reports of diarrhea at the highest does level when it was compared to the combined lower doses." Answering the allegations of the second sentence of paragraph 112, TVA admits that EPA has established a secondary MCL of 250 mg/L for sulfates in drinking water "based on aesthetic effects (i.e., taste and odor)" and has recommended a health-based advisory for acute effects of 500 mg/L. Except as expressly admitted, TVA denies the allegations of paragraph 112.

113. Answering the allegations in the first sentence of paragraph 113, TVA admits that 40 C.F.R. § 401.15 lists selenium as a toxic pollutant, and states that the current ATSDR toxicological profile of selenium states that "[a]s shown by affected populations in China, chronic dietary exposure to . . . excess levels of selenium [10-20 times more than normal] has caused [selenosis, but that] studies of people living in areas of naturally occurring high selenium concentrations in the United States have not revealed adverse health effects in those populations." The ATSDR report further states that, if a person is exposed to selenium, many factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. TVA admits that the allegations in the second and third sentences of paragraph 113 appear in a 2009 report entitled,

17

"Coal Combustion Waste Is a <u>Deadly</u> Poison to Fish," but is without information to admit or deny the substance of those allegations. Except as expressly admitted, TVA denies the allegations of paragraph 113.

114. Answering the allegations in the first sentence of paragraph 114, TVA admits that 40 C.F.R. § 401.15 lists thallium as a toxic pollutant and states that the current ATSDR toxicological profile of thallium states that adverse health effects can result if large amounts of thallium are eaten or drunk for short periods of time but that "[n]o information was found on health effects in humans after exposure to smaller amounts of thallium for longer periods." Answering the allegations in the second sentence of paragraph 114, TVA admits that the 1992 ATSDR profile reports such findings, but states that the profile also reports "[n]o studies were located regarding reproductive effects in humans after inhalation, oral, or dermal exposure to thallium." The ATSDR report further states that, if a person is exposed to thallium, several factors will determine whether that person will be harmed, including the dose (how much), the duration (how long), and how the person comes in contact with it. Except as expressly admitted, TVA denies the allegations of paragraph 114.

115. TVA admits that the allegations of paragraph 115 appear in a 2010 report entitled "Coal Ash: The toxic threat to our health and environment," but is without information to admit or deny the substance of those allegations. Except as expressly admitted, TVA denies the allegations of paragraph 115.

116. Denied.

18

## V.    APPLICABLE LAW AND REGULATIONS

117.    Answering the allegations of paragraph 117, TVA states that 33 U.S.C. § 1311(a) states: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." Except as expressly admitted, TVA denies the allegations of paragraph 117.

118.    TVA admits the allegations of paragraph 118 and states that 33 U.S.C. § 1342(k) provides that compliance with a permit issued pursuant to 33 U.S.C. § 1342 shall be deemed compliance with 33 U.S.C. § 1311 for purposes of 33 U.S.C. §§ 1319 and 1365.

119.    Answering the allegations of paragraph 119, TVA admits that, pursuant to 33 U.S.C. § 1342(b), EPA approved the State of Tennessee's request to administer its own permit program under state law for discharges into navigable waters within its jurisdiction and that TDEC administers Tennessee's approved NPDES permitting and compliance program. Except as expressly admitted, TVA denies the allegations of paragraph 119.

120.    Answering the allegations of paragraph 120, TVA admits that TDEC issues NPDES permits in accordance with Tenn. Code Ann. § 69-3-108, other provisions of the Tennessee Water Quality Control Act, TDEC's implementing regulations, and the CWA. Except as expressly admitted, TVA denies the allegations of paragraph 120.

121.    TVA admits the allegations of paragraph 121, but states the agreement is clear that it becomes effective upon last signature, which was dated October 12, 2007.

122.    Answering the allegations of paragraph 122, TVA states that EPA's pending Coal Ash Rule speaks for itself, and TVA denies any allegations that are inconsistent with that pending Rule or the ultimate version of the Rule that will be published in the Federal Register. Except as expressly admitted, TVA denies the allegations of paragraph 122.

19

123. Answering the allegations of paragraph 123, TVA states that the Preamble to the Coal Ash Rule provides that "the CCR unit must be closed in a manner that will control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters." Except as expressly admitted, TVA denies the allegations of paragraph 123.

124. Admitted.

125. TVA admits the allegations of paragraph 125 and states that, in addition to the use classifications listed, the Cumberland River is also classified for navigation.

126. Answering the allegations of paragraph 126, TVA incorporates herein by reference its responses to the allegations in paragraphs 6 through 18 in TVA's Answer to the State of Tennessee's Complaint in this matter as if such responses were set forth fully in this paragraph.

127. Denied.

128. Answering the allegations of paragraph 128, TVA admits that Plaintiff-Intervenors sent a Notice of Intent dated November 10, 2014, but denies the allegations contained in that Notice of Intent. Except as expressly admitted, TVA denies the allegations of paragraph 128.

## VI.    CAUSES OF ACTION

### A.    Abandoned Ash Pond Violations

129. Admitted.

130. Admitted that this is a partial description of solid waste from the Tennessee Solid Waste Disposal Act.

131. Denied.

132. Admitted.

20

133.    TVA admits the allegations of paragraph 133, but states that the proper citation for the quoted language is Tenn. Code Ann. § 68-211-103(9).

134.    Denied.

135.    Denied.

136.    Answering the allegations of paragraph 136, TVA admits that the Court may impose civil penalties generally, but states that penalties of up to $7,000 per day are permitted only when a violation involves the disposal of waste into a sinkhole.  Except as expressly admitted, TVA denies the allegations of paragraph 136.

137.    TVA admits the allegations of the first sentence of paragraph 137.  TVA denies the allegations of the second sentence of paragraph 137.

138.    TVA admits the allegations of paragraph 138, but states that the cited statute states that discharges "due to an unavoidable accident" are not unlawful under the provisions of the TWQCA.

139.    Answering the allegations of paragraph 139, TVA states that Tenn. Code Ann. § 69-3-114(b) states:  "In addition, it is unlawful for any person to act in a manner or degree that is violative of any provision of this part or of any rule, regulation, or standard of water quality promulgated by the board or of any permits or orders issued pursuant to this part . . . ."  Except as expressly admitted, TVA denies the allegations of paragraph 139.

140.    Denied.

141.    Denied.

142.    TVA admits the allegations of the first and second sentences of paragraph 142, but denies the allegations of the third sentence of paragraph 142.  Except as expressly admitted, TVA denies the allegations of paragraph 142.

21

## B.    Ash Pond Complex Violations

143.   Denied.

144.   Denied.

145.   Denied.

146.   Denied.

147.   TVA admits the allegations of the first and second sentences of paragraph 147, but denies the allegations of the third sentence of paragraph 147.  Except as expressly admitted, TVA denies the allegations of paragraph 147.

## ANSWER TO PRAYER FOR RELIEF

TVA denies that Plaintiff-Intervenors are entitled to the relief requested, or to any relief.

## AFFIRMATIVE DEFENSES

### First Defense

TVA is immune from civil penalties under the Tennessee Water Quality Control Act of 1977, *as amended*, Tenn. Code Ann. §§ 69-3-101 to 69-3-148.

### Second Defense

To the extent there were any violations of the Tennessee Water Quality Control Act, they have been remediated.

### Third Defense

TVA is shielded from liability by virtue of its compliance with the National Pollutant Discharge Elimination System Permit issued to it by TDEC.

### Fourth Defense

There is no jurisdiction over the Non-Registered Site under the Solid Waste Disposal Act.

22

### Fifth Defense

TVA has sovereign immunity and may not be sued except to the extent that its immunity has been waived by Congress.

### Sixth Defense

Plaintiff-Intervenors have no standing to pursue the claims stated in this Complaint in Intervention independent from the State's enforcement action.

### Seventh Defense

There is no private right of action under the Tennessee Water Quality Control Act or the Tennessee Solid Waste Disposal Act.

### Eighth Defense

Plaintiff-Intervenors' claims are barred in whole or in part by the doctrine of laches.

### Ninth Defense

Plaintiff-Intervenors' claims are barred in whole or in part by the doctrine of equitable estoppel.

### Tenth Defense

Plaintiff-Intervenors' claims are barred in whole or in part by the doctrine of unclean hands.

### Eleventh Defense

Plaintiff-Intervenors' claims are barred in whole or in part by the doctrine of collateral estoppel.

23

**Twelfth Defense**

Plaintiff-Intervenors' claims are barred in whole or in part by the doctrine of res judicata.

Respectfully submitted,

*s/Lane E. McCarty*
David D. Ayliffe (BPR 024297)
James S. Chase (BPR 02497)
Frances Regina Koho (BPR 029261)
Lane E. McCarty (BPR 028340)
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
lemccarty@tva.gov

Attorneys for Tennessee Valley Authority

44974055

24

## CERTIFICATE OF SERVICE

I hereby certify that, on August 2, 2017, the foregoing document was electronically filed by operation of the Davidson County Chancery Court Electronic Case Filing System and was served on counsel for Plaintiffs and Plaintiff-Intervenors by sending copies by U.S. Mail and electronic mail as indicated below.

Emily B. Vann, Esq.
Sohnia W. Hong, Esq.
J. Peter Murrey, Esq.
Assistant Attorney General
Office of the Attorney General, Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
615.532.2583
Emily.Vann@ag.tn.gov

*Attorney for Plaintiffs*

Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
615.921.9470
balexander@selctn.org

Frank S. Holleman III, Esq.
Southern Environmental Law Center
601 West Rosemary Street
Suite 220
Chapel Hill, North Carolina 27516-2356
919.967.1450
fholleman@selcnc.org

*Attorneys for Plaintiff-Intervenors*

s/Lane E. McCarty
Attorney for Tennessee Valley Authority

25